JAN A. GREBEN (Bar No. 103464)
CHRISTINE M. MONROE (Bar No. 304573)
GREBEN & ASSOCIATES
125 E. De La Guerra Street, Suite 203
Santa Barbara, CA  93101
Tel:   (805) 963-9090
Fax:  (805) 963-9098
Email: jan@grebenlaw.com
Email: christine@grebenlaw.com

Attorneys for Plaintiff, MISSION LINEN SUPPLY

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA - FRESNO DIVISION

| | |
|---|---|
| MISSION LINEN SUPPLY, a California Corporation,<br><br>                    Plaintiff,<br><br>     v.<br><br>CITY OF VISALIA,<br><br>                    Defendant. | Case No.: 1:15-cv-00672-AWI-EPG<br><br>**PLAINTIFF MISSION LINEN SUPPLY'S BRIEF IN RESPONSE TO THE CITY'S BRIEF AND PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Trial Dates:   December 12-15, 2017<br>*Honorable Judge Anthony W. Ishii* |

## TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................ 1

II.   FINDINGS AND CONCLUSIONS  DISREGARDED AND NOT REBUTTED BY THE CITY .............................................................................................................. 1

III.  RESPONSE TO THE CITY'S BRIEF REGARDING PROPOSED FINDINGS ............ 5

    A.   The ability of the parties to demonstrate that their contribution can be distinguished; the amount of hazardous waste involved; and the degree of toxicity. ......................................................................................................... 5

        1.   The Court should strike the City's proposed findings as they are not supported by any facts in the record. .................................................... 5

        2.   Divisibility and ability to distinguish contribution to the Contamination Plume. ............................................................................ 5

            a.   The City's argument regarding the storm sewer pathways should be disregarded. ....................................................................... 7

            b.   The City's contribution to the Contamination Plume is not merely derivative of Mission Linen or Star. .................................. 9

            c.   The City mischaracterizes Mission Linen's contribution to the Contamination Plume. ........................................................ 9

        3.   The amount of hazardous waste discharged is not a necessary consideration to determine allocation of responsibility for the Contamination Plume. ............ 10

        4.   There is no evidence in the record that separator water containing PCE is a "toxic chemical" or as to what standard. ......................................... 12

    B.   Mission Linen's relationship to Star Laundry. ...................................... 13

        1.   The Court should strike the City's proposed finding as it is not supported by any facts in the record. ................................................ 13

        2.   The facts in the record contradict the City's proposed finding. ..................... 13

C.    The parties' relative fault: including the degree of care exercised by the parties; the degree of involvement; and knowledge and/or acquiescence of the parties. .14

1.    The Court should strike the City's proposed findings as they are not supported by any facts in the record. ................................................................ 14

2.    The facts in the trial record do not support the City's finding that the City's contribution was not knowingly made. ........................................................ 14

a.    The City's argument regarding knowledge of discharges of separator water to the sewers is controverted by the record. ............................ 15

b.    The City's foreseeability argument is controverted by the record and the City had knowledge of risk of releases and contamination, and responsibility to exercise due care and take reasonable precautions to prevent the occurrence of such risk. ................................................... 17

c.    The undisputed record proves that the City accepted discharges containing PCE to its sewers. .............................................................. 20

D.    The degree of cooperation by the parties with government agencies to prevent harm to the public health or environment. ............................................................. 21

1.    The Court should strike the City's proposed finding, legal authority and hypothetical arguments, as they are not supported by the record. ................. 21

a.    Proposed findings should be stricken. .................................................. 21

b.    The City cites to an unsupported legal standard that should be disregarded. ....................................................................................... 22

c.    The City's argument and citations to facts are improper because they are not in the record. ......................................................................... 22

2.    Mission Linen's presentation of unrebutted evidence is not tantamount to mudslinging. ..................................................................................... 23

3.    The City has not addressed Mission Linen's cooperation because Mission Linen's responsive conduct is in stark contrast to the City's conduct. ........... 25

E.      Economic benefits received by the parties from contaminating activities or

        remediation. ....................................................................................................25

        1.      The Court should strike the City's proposed finding as it is not supported by

                any facts in the record. ....................................................................25

        2.      The City has not shown through any evidence that PCE was prohibited by its

                Ordinances. ....................................................................................25

        3.      The City's contentions that Mission Linen enjoyed an economic benefit are

                unsupported by any evidence. ...........................................................28

        4.      The City received an economic benefit from the contaminating activities and

                by not investigating or addressing releases from its sewers. ............29

F.      Contracts between the parties and financial resources and economic status. ......31

IV.     RESPONSE TO THE CITY'S BRIEF REGARDING PROPOSED CONCLUSIONS. 31

        A.      Liability. ...........................................................................................31

        B.      Allocation. ........................................................................................32

                1.      *Waste Management of Alameda County v. East Bay Regional Park District.* 32

        C.      Star's Orphan Shares. .......................................................................36

                1.      Mission Linen and Star. ...................................................................36

                2.      The City and Star. ............................................................................37

V.      RESPONSE TO THE CITY'S PROPOSED FINDINGS AND CONCLUSIONS .........37

        A.      Mission Linen's Response to the City's Proposed Findings of Fact in Its

                Supplemental Proposed Findings of Fact and Conclusion of Law. [Document 150

                at 22.] .................................................................................................37

        B.      Mission Linen's Response to the City's Proposed Conclusions of Law in Its

                Supplemental Proposed Findings of Fact and Conclusions of Law. [Document

                150 at 26.] ...........................................................................................44

VI.     CONCLUSION ...................................................................................................46

# TABLE OF AUTHORITIES

**CASES**

*Adobe Lumber, Inc. v. Hellman,* 658 F.Supp.2d 1188 (E.D. Cal. 2009) ................................ 18, 21, 38

*AngioScore, Inc. v. TriReme Med., LLC,* 70 F. Supp. 3d 951  (N.D. Cal. 2014) ............................... 13

*Asarco LLC v. Shore Terminals LLC,* 2011 U.S. Dist. LEXIS 72859 (N.D. Cal. July 7, 2011) ........ 36

*Atchison, T. & S.F. Ry. v. Brown & Bryant,* 159 F.3d 358 (9th Cir. 1997) ....................................... 13

*Lincoln Properties v. Higgins,* 823 F. Supp. 1528 (E.D. Cal. 1992) ........................................... 21, 24

*Pakootas v. Teck Cominco Metals, Ltd.,* 868 F.Supp.2d 1106 (E.D. Wash. 2012) ........................... 11

*United States v. Atchison, Topeka & Santa Fe Ry.,* 2003 U.S. Dist. LEXIS 23130 (E.D. Cal. July 14, 2003) ............................................................................................................................................ 6

*United States v. Broderick Inv. Co.,* 862 F. Supp. 272, 277 (D. Colo. 1994) ..................................... 5

*United States v. Monsanto Co.,* 858 F.2d 160 (4th Cir. 1988) ........................................................... 18

*United States v. Rodriguez-Vega,* 797 F.3d 781 (9th Cir. 2015) ................................................. 17, 18

*United States v. Sterling Centrecorp, Inc.,* 960 F.Supp.2d 1025 (E.D. Cal. 2013) ........................... 13

*United States v. Wash. State DOT,* 2010 U.S. LEXIS 121759 (W.D. Wash. November 17, 2010) ..... 8

*Washington v. United States,* 922 F. Supp. 421 (W.D. Wash. 1996) ................................................... 5

*Waste Mgmt. of Alameda County, Inc. v. East Bay Regional Park Dist.,* 135 F. Supp. 2d 1071 (N.D. Cal. 2001) ......................................................................... 11, 18, 19, 20, 23, 24, 32, 33, 34, 35

# I.

## INTRODUCTION

In its briefing, the City of Visalia ("City") attempts to make a record where one does not exist. Repeatedly, and without reference to factual support from the trial record because there is no such support, the City surmises and speculates as to things that simply have no basis. These problems are detailed at length in the accompanying motion to strike.  When it is considered the City's defense at trial consisted of approximately two hours of collective testimony from two witnesses – percipient witness Adam Ennis and expert Nicole Sweetland – neither of which the City mentions once in its briefing, it is fair to say that the City's defense here is simply to attack Mission Linen Supply's ("Mission Linen") case on facts and law that it could have put into the record, but chose not to.

The majority of Mission Linen's evidence went unrebutted at trial.  The City offered no witness – expert or otherwise – at trial to address the conclusions of its prime target, Mission Linen's expert Peter Krasnoff, whose opinions go substantially unchallenged.  Similarly, the City chose not rebut Mission Linen's other expert, Keith O'Brien.  Finally, in the face of extensive and damaging video testimony from City employees offered by Mission Linen, the City chose to not bring these witnesses forward to attempt to refute the clear testimony they provided on behalf of Mission Linen's case or to address their testimony in its briefing.

At bottom, Mission Linen's factual case and its experts' opinions are broadly unrebutted, but for the City's argument – not facts – in its brief.  For these reasons and those discussed below, Mission Linen has made its case for an allocation – **a premise essentially admitted to by the City – and such allocation should weigh heavily in favor of the City's limited effort to contest Mission Linen's case.**

# II.

## FINDINGS AND CONCLUSIONS

## DISREGARDED AND NOT REBUTTED BY THE CITY

The City has abandoned its third party defense and concedes liability.  Mission Linen established its CERCLA case against the City, essentially through stipulated facts.  The only remaining issue for the Court to resolve is allocation.

1  Although the City uses its brief to attempt to mitigate its failure to present evidence during
2  trial, its hypothetical notions and arguments, which are not based in fact, are nothing more than smoke
3  and mirrors.  The City's brief, like its case during trial, ignores extensive evidence presented by
4  Mission Linen that weighs against the City in determining its responsibility for its contribution to the
5  Contamination Plume.

6  The City does not offer evidence or alternate opinions with respect to Mr. O'Brien's testimony
7  on the reasonable divisibility of the Contamination Plume.  [Document 152 at 6, ¶ 30, et. seq.] His
8  testimony established the extent and responsibility for the Contamination Plume, most of which is
9  coincident with releases from the City's sewers.  His testimony was corroborated by Mr. Krasnoff's
10  testimony and extensive evidence – both unrebutted – establishing that there have been defects in the
11  City's sewers that allowed wastewater containing PCE to escape into the subsurface, and that these
12  defects occurred shortly after construction due to the City's substandard design and construction.  [See
13  e.g. Document 152 at 5, ¶ 22, et. seq.]

14  Mr. Krasnoff testified that the problems were compounded by the City's failure to exercise due
15  care with respect to the operation of its sewers, including its failure to implement recommendations
16  from its consultants and its inappropriate sewer maintenance.  [See e.g. Document 152 at 5, ¶ 22, et.
17  seq.] The City similarly fails to address the testimony of City employees who corroborated Mr.
18  Krasnoff's expert analysis and testified that the City did not have or implement a proper maintenance
19  program, including preventative maintenance and routine cleaning of its sewers. [Document 152 at 7-
20  9, ¶¶ 39-62.]

21  The City cannot refute that it has had knowledge, or at least should have known, that PCE was
22  present in its sewers since at least 1989. [See e.g. Document 152 at 23, ¶ 194.] Similarly, the City does
23  not address Mr. Knight's testimony – at trial or in its brief – that the City has never prohibited the
24  discharge of wastewater containing PCE to its sewers.  [See e.g. Document 152 at 6-7, ¶¶ 35-38.] Mr.
25  Knight's testimony is also not rebutted by the City's Ordinances. [Document 152 at 23, ¶ 196.]  The
26  Ordinances do not prohibit the discharge of wastewater containing PCE and Mr. Knight, who has been
27  in charge of enforcement of the Ordinances, testified that the City would not enforce the discharge of
28  wastewater containing PCE because there was no numeric local limit for PCE, and that wastewater

1  containing PCE has not impacted the City's sewers or treatment process so as to have a need to prohibit

2  it. [Document 152 at 6-7, ¶¶ 35-38; 24-25, ¶¶ 202-216.]

3          The City has not rebutted that it had knowledge of the potential risks of releases and

4  contamination associated with the operation of its sewers since the 1970s. [See e.g. Document 152 at

5  22, ¶ 185; 23, ¶ 192.]  In 1991, the City had notice of the specific risks associated with releases from

6  its sewers as a result of separator water discharges by dry cleaners. [Document 152 at 23, ¶ 195.] The

7  only effort by the City to attempt to address this testimony comes after the fact, on an unsupported

8  standard that it did not have actual notice of the discharge.  The problem with the City's argument is

9  twofold.

10         First, the City does not rebut the evidence that it failed to exercise due care and take precautions

11  against foreseeable releases.  Even if it did not have actual knowledge, the City had notice of the risks

12  that required it to take reasonable precautions to protect its sewers from causing contamination.

13  [Document 152 at 21, ¶ 179, et. seq.; 26, ¶ 219, et. seq.] The record shows that the City has not

14  implemented a proper preventative maintenance program that would address these issues.  [Document

15  152 at 27, ¶ 233, et. seq.]

16         Notably missing from the City's brief is the undisputed record that in Mission Linen's

17  operations it exercised due care and took precautions to minimize the risk of releases, including: (1)

18  Mission Linen used a sniffer in its dry cleaning operations, which was state of the art at the time, to

19  reduce the amounts of PCE being exhausted to the atmosphere [Document 152 at 45, ¶ 405]; (2)

20  Mission Linen used state of the art dry cleaning equipment to separate and remove PCE from its

21  wastewater before it was discharged to the City's sewers [Document 152 at 45, ¶ 404]; and (3) it

22  logically follows that Mission Linen's practice of discharging separator water to the sewer with the

23  reasonable expectation that it was being handled and carried to the City's wastewater treatment plant

24  was intended to minimize the risk of consequences from releases into the subsurface. [See e.g.

25  Document 152 at 62, ¶¶ 89-90.] This is corroborated by the lack of evidence showing that Mission

26  Linen knew or should have known that the City's sewers were releasing wastewater from its sewers

27  into the subsurface. [Document 152 at 61, ¶ 82.]

28  ///

Second, the record shows that in 2009 when the City had actual knowledge of defects in its sewers, it still chose not to take action, so there is a reasonable inference that had the City discovered these defects when it should have through regular inspections and maintenance, it still would not have made repairs or addressed these problems. [Document 152 at 19, ¶¶ 161-164; 27, ¶¶ 229-232.] Although the City's brief argues otherwise, such argument is unsupported by the record and the City ignores the evidence from its own files. [Exhibit JT/115.]  Even if an argument could be made that the City did not have actual knowledge of this video, it should have had knowledge imputed by the fact that it was in their own files that were produced to the DTSC. [See e.g. Document 152 at 12, ¶ 90.] As a result, the inference to be drawn is that the City had actual knowledge or was on sufficient actual notice and turned a blind eye.

When the City was put on actual notice of the contamination along its sewers, the City took minimal effort in responding to the DTSC and did not investigate its sewers or otherwise address the DTSC's concerns. The testimony by City employees Messrs. Loeb and Olmos is unrebutted regarding the City's notice and its lack of response to the contamination and problems with the City's sewers identified by the DTSC. [Document 152 at 9-10, ¶¶ 63-71.]  These witnesses were the individuals who interfaced with the DTSC, and Mr. Ennis' lack of awareness of these interactions does not refute their testimony. [See e.g. Document 152 at 11, ¶ 83.]

In determining allocation, Mission Linen has shown through comprehensive evidence that "a much smaller problem would exist here if the City's sewers did not leak." [Trial Transcript at 12:9-12.]  Mission Linen, only, has presented evidence as to the extent and basis for responsibility regarding contribution to the Contamination Plume. [Document 152 at 38, ¶ 341, et. seq.] This evidence remains unrebutted despite the City's unsupported attempt to taint Mission Linen in its brief and its meritless motion to strike. Mission Linen presented well-supported evidence that the Court should employ in allocating responsibility for the Contamination Plume.

///

///

///

///

## III.

## RESPONSE TO THE CITY'S BRIEF REGARDING PROPOSED FINDINGS

**A. The ability of the parties to demonstrate that their contribution can be distinguished; the amount of hazardous waste involved; and the degree of toxicity.**

    **1.  The Court should strike the City's proposed findings as they are not supported by any facts in the record.**

    The proposed findings that the City raises in its brief regarding its contribution are not in evidence on the trial record.  Mission Linen moves to strike the City's three proposed findings in its brief at 7:10-16.  The City has not and cannot cite to any facts in the record to support its finding, as supported by Mission Linen's accompanying motion. Mission Linen's motion also seeks to strike various unsupported statements made by the City in support of these proposed findings.

    **2.  Divisibility and ability to distinguish contribution to the Contamination Plume.**

    Mission Linen has presented essentially unrebutted testimony of Mr. O'Brien regarding the sources and contribution to the Contamination Plume. [Document 152 at 38, ¶ 341, et. seq.] It logically follows that the Court should employ his comprehensive and rational basis for demonstrating and distinguishing contribution to the Contamination Plume.

    There are various methods to distinguish or apportion[1] harm, "depending upon the facts at the particular site that are capable of proof."  *Washington v. United States*, 922 F. Supp. 421, 426 (W.D. Wash. 1996).   In this case, the extent of responsibility for the contamination in the specifically identified areas can be traced to the use of the relevant sewers to distinguish contribution without calculating the volume of discharges or releases. [Document 152 at 38, ¶ 341, et. seq.] In distinguishing contribution, the court may consider that the contamination is "divisible geographically." *United States v. Broderick Inv. Co.*, 862 F. Supp. 272, 277 (D. Colo. 1994).

    As part of this analysis, Mr. O'Brien distinguished the relative contributions to the Contamination Plume through the different sewers in the vicinity of and servicing the Mission Linen

---

[1] The City uses the terms apportionment (rational and practical division) and allocation (equitable) interchangeably in its brief, but these terms have special legal meanings for purposes of deciding a party's contribution under CERCLA.

Site. [Document 152 at 37, ¶ 334; 38, ¶¶ 338-340.] The division and differentiation of contribution is reasonable because apart from the onsite contamination (which is not attributed to the City), there was a cause and effect relationship between the Contamination Plume and the defects in the City's sewers. [Document 152 at 42, ¶ 376; ¶¶ 383-384.] The City's sewers serve as the mechanism for, and caused releases of, wastewater containing PCE into the subsurface.  [Document 152 at 15, ¶ 121, et. seq.] The City did not offer any expert testimony regarding the condition of the City's sewers, except that it concedes that there "was sufficient data to indicate that the sewers leaked." [Document 152 at 13, ¶ 104.]  As identified on Plaintiff's Exhibit 165, the geographic locations where contamination is present are consistent with and capable of being traced to specific City sewers, and the separate dry cleaning operations.  The City's argument that Mission Linen cannot show that the Contamination Plume is divisible must fail because it ignores this testimony.

Moreover, the burden to prove divisibility rests with the City, not with Mission Linen. *United States v. Atchison, Topeka & Santa Fe Ry.,* 2003 U.S. Dist. LEXIS 23130, at *235 (E.D. Cal. July 14, 2003). The City's misdirection regarding what evidence Mission Linen has omitted is a red herring because the City was required to present evidence in this area to distinguish its contribution, and if the Court determines that the Contamination Plume is indivisible, it merely warrants the Court's allocation of liability using equitable considerations. *Id.*

In its brief, the City disregards its expert Dr. Sweetland's testimony, and so should the Court. Even if the Court considers Dr. Sweetland's testimony, it is not credible because it contradicts the evidence and site conditions.   Mr. O'Brien testified extensively regarding elevated detections coincident with releases from the City's sewers. [See e.g. Document 152 at 6, ¶ 33.] He also testified about the flow direction of groundwater.  [See e.g. Document 152 at 6, ¶ 30.] Based on his analysis, and the lack of explanation by Dr. Sweetland to support her testimony, there is no evidence that onsite releases could have migrated to the distinct off-site areas, and that the only reasonable explanation as to the source of those releases is the City's sewers. [Document 152 at 13, ¶ 99; see also 50, ¶ 14.]

Therefore, the Court should accept Mr. O'Brien's testimony that the distribution of the contamination along Mineral King east of Tipton, as well as the contamination running north along Tipton, can only be reasonably explained by releases from the City's storm sewers.  [Document 152

at 41, ¶ 371, et. seq.; see also 38, ¶ 344; 40, ¶ 359.] The City has offered no credible alternative explanation for the sources or migration of the distinct portions of the Contamination Plume, but rather unfounded speculations that were not investigated.  In contrast, Mission Linen's evidence is credible and appropriately distinguishes the sources and contributions to the Contamination Plume under the circumstances.

> a. **The City's argument regarding the storm sewer pathways should be disregarded.**

The City's argument regarding the storm sewer contamination data and pathway should fail because it accepted the analysis presented by Mission Linen to support the storm sewer pathway when it accepted the same analysis presented with respect to the sanitary sewer pathway.  Mr. Krasnoff testified that he considered the type of dry cleaning equipment, the equipment manual, the standard practices of the dry cleaning industry during the relevant time, the defects in the City's sewers, and the data corroborating elevated concentrations of PCE in soil vapor and ground water coincident with the City's sewers.  [See e.g. Document 152 at 3-4, ¶ 14.] Based on this extensive evidence, Mr. Krasnoff reached two conclusions in this area: (1) separator water containing PCE was discharged to the City's sanitary sewers [Document 152 at 14, ¶¶ 114-115]; and (2) PCE vapors exhausted to the atmosphere sorbed onto particles and washed into the storm drains [Document 152 at 15, ¶ 120].  The City readily accepts the first conclusion based on this evidence. However, the City objects to and criticizes the second conclusion despite being based on the same types of information and data it accepts for the sanitary sewer.

As demonstrated by the evidence in the record, Mission Linen has established the reasonable pathway by which PCE entered into the City's sanitary and storm sewers as a result of the dry cleaning operations.  [Document 152 at 4, ¶¶ 15-16; 14, ¶ 114, et. seq.; 49, ¶ 10; 50, ¶ 14.] Mr. Krasnoff's reliance, in part, on industry standards and other evidence is sufficient under the circumstances because the dry cleaning operator is now deceased, and the only information that is available is through limited records.  [Document 152 at 3, ¶ 14.] Mr. Krasnoff's expert testimony is sufficient to meet the burden that it is more likely than not that the dry cleaning equipment identified in historical records generated separator water that was discharged to the City's sanitary sewers, and on the same evidence, that PCE

was exhausted into the atmosphere and washed into the City's storm sewers. [Document 152 at 14, ¶ 113, et. seq.]

The City has not met its burden to "disprove causation" with respect to the reasonable pathways testified to at length by Mr. Krasnoff. *United States v. Wash. State DOT,* 2010 U.S. LEXIS 121759 at *13 (W.D. Wash. November 17, 2010). The City failed to present any credible evidence, which is apparent because the City disregards Dr. Sweetland's testimony on the issue in its brief. The only testimony by Dr. Sweetland is that Mr. Krasnoff's opinion limited to the storm sewer pathways is "speculative". [Document 152 at 12, ¶ 95; 13, ¶ 101.] In reaching her opinion, Dr. Sweetland also confirmed that she did not review all of the evidence that Mr. Krasnoff reviewed in forming his opinion. [Trial Transcript at 547:5-548:5.] As noted above, this attempt to rebut only the storm sewers contradicts the City's acceptance of the same analysis with respect to the sanitary sewers.

Separately, the City misstates the record that there is no evidence showing PCE has ever been in the storm drains and cites to the section of testimony from Mr. Krasnoff in which he stated that there have been no samples of surface storm water for PCE. [City's Brief – Document 150 at 25, ¶ 14, citing to Trial Transcript at 256:17-265:4.] The City's proposed inference is flawed because present day sampling of storm water would have no relevance as to whether PCE was present in storm water decades ago during the dry cleaning operations, which ceased in 1983.

Instead, the data corroborates contamination in the subsurface coincident with defects in the City's storm sewers. [Document 152 at 6, ¶ 33; 16, ¶ 128; 19, ¶ 165; Plaintiff's Exhibit 178.] As discussed above, Mr. O'Brien's testimony regarding the flow direction of groundwater and the distribution of the contamination along Tipton, and Mineral King east of Tipton, can only be reasonably explained by releases from the City's storm sewers. [Document 152 at 6, ¶ 30 and ¶ 33; see also 38, ¶ 344; 39, ¶ 348.] Therefore, the City has not met its burden to disprove causation with respect to the reasonable pathways testimony offered by Mission Linen's experts and its argument should be disregarded.

///

///

///

b.   **The City's contribution to the Contamination Plume is not merely derivative of Mission Linen or Star.**

Mission Linen has set forth a complete record as to the City's contribution; the City's suggestion that it has not must fail.  In addition to the testimony discussed above, there is significant unrebutted testimony by Mr. Krasnoff that the City's design, construction and operation of its sewers were the cause of defects and releases of wastewater containing PCE from the City's sewers that caused the Contamination Plume. [See e.g. Document 152 at 5, ¶ 17, et. seq.]  The City does not address this testimony in its brief.

Similarly, the City ignores the record of Mr. Krasnoff's testimony that based on the monitoring data with respect to the presence of PCE in the City's sewers (i.e. "residential/commercial trunk line monitoring data") a conclusion cannot be reached or supported that the contamination would not have happened if Star and Mission Linen had not discharged separator water to the City's sewers. [Document 152 at 42, ¶ 375; Exhibit JT/130-1.]  In fact, the City detected PCE present in samples taken from its sewers in other areas of the City with concentrations up to 37 micrograms per liter, which is put in context to the Maximum Contaminant Level ("MCL") of 5 micrograms per liter for drinking water.  [Trial Transcript at 197:5-17; Exhibit JT/130-1.]  Despite this knowledge, the City determined that there was no need for it to include a limit for PCE in its local limits.  The City's conclusory argument that releases from its sewers were derivative and dependent on Mission Linen or Star's discharges is unsupported and should be disregarded.

c.   **The City mischaracterizes Mission Linen's contribution to the Contamination Plume.**

There is no evidence to establish that Mission Linen or Star willfully discharged pure, undissolved PCE to the sewers – the trial record is undisputed that the dry cleaners discharged separator water with dissolved PCE to the City's sewers.  There is no testimony on the record as to a level of toxicity of dilute PCE in separator water, or that these dry cleaners knew that the separator water they discharged during their relevant dry cleaning operations contained PCE.  The City attempts to impute Mr. Krasnoff's expert knowledge in the present day to the knowledge of historical dry cleaner several decades ago.  Mr. Krasnoff testified that the dry cleaners discharged separator water,

1   and that as of 2017 it is "generally accepted" that "historically that separator water that came out of

2   those particular types of dry cleaning machines would have PCE." [Trial Transcript at 256:12-16.]

3       However, the City has not cited to any fact in evidence that Mission Linen had the same

4   knowledge as Mr. Krasnoff has as a testifying expert in the present day.  It logically follows that there

5   is no evidence that Mission Linen or Star knowingly or willfully discharged PCE to the City's sewers.

6   As discussed below, the City's finding is also a red herring because the City did not prohibit the

7   discharge of separator water that contained PCE to its sewers. [Document 152 at 23, ¶ 199, et. seq.]

8       Separately, there is no evidence in the record that Mission Linen or Star's discharge of

9   separator water was improper.  The City agrees that during Star's dry cleaning operations (1971-1978)

10  and Mission Linen's dry cleaning operations (1978-1983) at the Mission Linen Site, "the only option

11  or manner of disposing of separator water was to the City's sewers."  [City's Proposed Findings of

12  Fact and Conclusions of Law – Document 150 at 24, ¶ 9.]  Mr. Krasnoff also testified that such

13  practices were consistent with the standards within the dry cleaning industry during the relevant

14  timeframe. [Document 152 at 43, ¶ 389; 45, ¶ 409.]

15      The discharge of separator water containing PCE to the City's sewers is also distinguished

16  from the release of wastewater containing PCE from the City's sewers into the subsurface.  [See e.g.

17  Document 152 at 4, ¶¶ 17-18.] However, the City appears to disregard this fact as it did not oppose it

18  during trial.  Through extensive testimony, Mr. O'Brien demonstrated the cause and effect relationship

19  between the City's sewers and the Contamination Plume [Document 152 at 6, ¶ 33; 16, ¶ 128; 19, ¶

20  165], and the respective contributions to portions of the Contamination Plume. [Document 152 at 38,

21  ¶ 341, et. seq.]

22      **3.   The amount of hazardous waste discharged is not a necessary consideration to**

23          **determine allocation of responsibility for the Contamination Plume.**

24      The amount of separator water discharged is not a necessary consideration because the Court

25  may reasonably allocate responsibility based on the analysis conducted by Mission Linen's experts

26  that was offered at trial.  The City points out that the volume of discharges to the City's sewers was

27  omitted from Mission Linen's case, but its argument lacks any substance, specifically, as to whether

28  and why the City contends this factor is germane to allocation in this case, because it is not.

- 10 -

It is well-established that allocation is "'a type of decision particularly suited to case-by-case determination,' a court may consider 'several factors, a few factors, or only one determining factor.'" *Waste Mgmt. of Alameda County, Inc. v. East Bay Regional Park Dist.*, 135 F. Supp. 2d 1071, 1089-1090 (N.D. Cal. 2001), internal citations omitted.  The volume of hazardous waste or a party's contribution to a certain percentage of that volume should not "necessarily be a basis to conclude it caused the same percentage of 'harm'" to the contamination plume because the "harm is not the mere disposal or release of hazardous substances, but the consequences thereof." *Pakootas v. Teck Cominco Metals, Ltd.,* 868 F.Supp.2d 1106, 1126 (E.D. Wash. 2012).

Mission Linen's experts testified in two distinct areas to demonstrate the sources and contribution to the Contamination Plume.  Mr. Krasnoff testified regarding the pathway by which separator water containing PCE was discharged to distinct City sewers at relevant time periods, and the pathway by which PCE in storm water was washed into the storm drains. [Document 152 at 14-15, ¶¶ 116-120.]  As part of this testimony, Mr. Krasnoff discussed the volume of separator water generated by the dry cleaning equipment that was discharged to the sewers.  [Trial Transcript at 56:16-57:5.] Thereafter, Mr. O'Brien's testimony regarding the extent and contribution to the Contamination Plume demonstrates that in all of the off-site areas, the contamination is a direct result of releases from the City's sewers, which is discussed fully above. [Document 152 at 38, ¶ 341, et. seq.]

While the amount of separator water discharged by Mission Linen and Star might be relevant in distinguishing their relative contributions, Mr. O'Brien testified as to why the lack of availability of such evidence is unimportant to allocating liability – Mission Linen and Star discharged separator water containing PCE to different sewers.  [Document 152 at 37, ¶ 332, et. seq.] It follows that division of responsibility for the Contamination Plume can be made without an assessment of the amount of hazardous waste contributed by the respective parties because the respective contributions can be traced by area, time-specific discharges to sewers, and releases from those sewers.

At bottom, the City's reference appears to be nothing more than an effort to create doubt where none exists.  The City has failed to explain why it is asking the Court to consider this factor or how it would change the scope and sources to the existing Contamination Plume.  Based on its broad discretion, the Court need not consider this factor as it is not relevant to the specific facts of this case.

**4.   There is no evidence in the record that separator water containing PCE is a "toxic chemical" or as to what standard.**

Proof of the "degree of toxicity" of PCE in wastewater requires more than a conclusory statement without citation to any trial evidence that PCE is a toxic chemical. The City's brief, as well as its trial testimony, lacks any expert evidence to establish relevant standards, characteristics and degree of toxicity of PCE, and more pertinent, of separator water containing PCE.

The City has presented no evidence and offered no expert testimony regarding the standard of toxicity and whether PCE would be characterized within such standard.  There is no evidence that separator water containing PCE is a toxic chemical, or the toxicity of separator water.  Separator water discharges, *not* undissolved PCE discharges, are at issue.  There is no evidence that Mission Linen or Star discharged undissolved PCE, a useful solvent, to the sewers.  As noted during trial, there are acceptable standards for PCE in drinking water, so separator water that contained PCE is not *per se* toxic. [Document 152 at 41, ¶ 372.]  At bottom, to the extent that PCE is a "toxic chemical" such finding is subject to expert testimony, which the City has not provided.

What is known, is that continuing releases from the City's sewers have resulted in the Contamination Plume. [Document 152 at 20 ¶¶ 166-168; see generally 15, ¶ 121, et. seq.]  As set forth in Mission Linen's proposed findings of fact and conclusions of law, the elevated PCE detections in the Contamination Plume demonstrate that the contamination requires cleanup because it is above the MCL, and the DTSC has determined that it is detrimentally impacting the City's drinking water supply. [Document 152 at 41, ¶¶ 372-374; 60, ¶ 72.] This is the only relevant and supported consideration to the extent the Court considers toxicity, but even still, it does not appear to help allocate liability between the parties, rather only that the Contamination Plume requires cleanup.

The City fails to explain why the degree of toxicity is a necessary consideration for the purposes of allocation under the circumstances.  The Court is not bound to rely on this factor, as it is likely not as relevant in this case as in other cases where there are multiple constituents with differing toxicity commingled in a single contamination plume.  This is not the case here; the only constituent at issue is PCE.  Therefore, the degree of toxicity of PCE or separator water is not supported by the trial record and thus, should not be an allocation consideration.  The consideration of toxicity is likely

minimal at best given that it is a single constituent site, and the Court's attention is better focused to the existence of the Contamination Plume and requirement by the DTSC that it be abated.

**B.  Mission Linen's relationship to Star Laundry.**

**1.  The Court should strike the City's proposed finding as it is not supported by any facts in the record.**

The City asks the Court to assume facts not in evidence.  Mission Linen moves to strike the City's various references that Mission Linen is the successor-in-interest to Star, especially to the extent this is a legal conclusion. [City's Brief – Document 150 at 7:2-8.]  The City has not and cannot cite to any facts in the record to support its finding, as supported by Mission Linen's accompanying motion.

**2.  The facts in the record contradict the City's proposed finding.**

The City attempts to align Mission Linen and Star as a single entity under successor liability, but the City has not cited to any legal authority, nor has it introduced any evidence to establish such a finding.  The Court should not follow the City's haste and unsupported conclusion.

While the circuits disagree as to how best determine successor liability under CERCLA in the absence of legislative intent, the Ninth Circuit has established a recognized standard, that a purchaser is "not liable as successor corporations unless: (1) The purchasing corporation expressly or impliedly agrees to assume the liability; (2) The transaction amounts to a 'de-facto' consolidation or merger; (3) The purchasing corporation is merely a continuation of the selling corporation; or (4) The transaction was fraudulently entered into in order to escape liability."  *Atchison, T. & S.F. Ry. v. Brown & Bryant,* 159 F.3d 358, 361 (9th Cir. 1997) – although the Third Circuit has criticized this approach,  it has been continually adopted in this Circuit's district courts, see e.g. *United States v. Sterling Centrecorp, Inc.*, 960 F.Supp.2d 1025, 1034 (E.D. Cal. 2013); *AngioScore, Inc. v. TriReme Med., LLC,* 70 F. Supp. 3d 951, 958  (N.D. Cal. 2014) – the standard for successor liability "is limited to specific circumstances."

The City has failed to demonstrate any evidence that would prove Mission Linen is a legal successor to Star.  The only evidence is that Mission Linen acquired the Mission Linen Site from Star. [Exhibit JT/1 at ¶ 1(h).] There is no discussion as to the acquisition of the business.

///

1    The only facts on the record are that Mission Linen acquired the property in 1978, discontinued

2    the dry cleaning operations shortly thereafter in 1983, and has operated its own commercial laundry,

3    only, at the Mission Linen Site for the past 35 years. [Exhibit JT/1 at ¶1 (c), (j).]   The City also

4    concedes that Mission Linen is a commercial laundry business and owns several commercial laundries

5    – not dry cleaners. [City's Brief – Document 150 at 26, ¶ 19; Trial Transcript at 301:2-5.]   Mission

6    Linen discontinued the dry cleaning operations shortly after it acquired the property. [Exhibit JT/1 at

7    ¶ 1(j)-(k).]

8        Notably missing is any evidence as to the nature of any transactions between Mission Linen

9    and Star.   Therefore, the Court should disregard the City's unsupported theories because there is no

10   evidence in the trial record, as a result of the City's choice not to present any evidence; and Mission

11   Linen should not be bound by such a finding that it was deprived of addressing during trial, which it

12   would have done if the City had introduced it.

13   **C.  The parties' relative fault: including the degree of care exercised by the parties; the degree**

14   **of involvement; and knowledge and/or acquiescence of the parties.**

15       **1.  The Court should strike the City's proposed findings as they are not supported by**

16       **any facts in the record.**

17       The proposed findings that the City raises in its brief regarding culpability are not in evidence

18   on the trial record.   Mission Linen moves to strike the City's three proposed findings in its brief at

19   10:2-13.  The City has not and cannot cite to any facts in the record to support its finding, as supported

20   by Mission Linen's accompanying motion.   Mission Linen's motion also seeks to strike various

21   unsupported statements made by the City in support of these proposed findings, including to the extent

22   that the City attempts to use terms that call for a legal conclusion as to transporter liability under

23   CERCLA, as no such theory of liability has been alleged and should be disregarded.

24       **2.  The facts in the trial record do not support the City's finding that the City's**

25       **contribution was not knowingly made.**

26       The City's contentions regarding the comparative fault of the parties overlaps its contribution

27   arguments.   The City's arguments remain unsupported, and for the reasons set forth above, should be

28   disregarded.

In addition, the City fails to cite to any portion of the trial record to substantiate that its conduct was not knowingly made.  On the other hand, Mission Linen presented an abundance of evidence about when the City had knowledge of the risks associated with the existence of PCE in its sewers, defects and leaks from its sewers, and the risks of contamination.  Mission Linen's proposed findings of fact identify many of these facts, supported by the record.  [See e.g. Document 152 at 21, ¶ 183, et. seq.; 26, ¶ 219, et. seq.]

### a. The City's argument regarding knowledge of discharges of separator water to the sewers is controverted by the record.

The City makes a series of factually unsupported arguments that are refuted by the trial record. The City's argument that there was no evidence of Mission Linen or Star telling the City they were discharging separator water that contained PCE into the sewers is not convincing.  It is a fallacy because there is no evidence that Mission Linen and Star did not tell the City they were discharging separator water to its sewers.  Stated another way, there are no witnesses from Star, Mission or the City that could testify about this information one way or the other during the timeframe.  As noted, the City's witness lacked knowledge about the City before 2012, so the lack of knowledge of a pre-2012 statement does not give rise to an inference that none was made. [Document 152 at 11, ¶ 77.] The operator of the dry cleaning equipment is deceased. [Document 152 at 3, ¶ 14.]  As a result, the inference the City attempts to draw fails because it is not supported by the evidence.  Rather, the only available building records shows that the City had knowledge that a dry cleaner was operating at the Mission Linen Site when the connection was made to the City's sewers in 1971. [Document 152 at 21, ¶ 181 citing to Exhibit JT/125.]

Even absent a direct communication between Star or Mission Linen and the City, there is no evidence on the record that Mission Linen or Star hid their practices or discharged "on the Q.T.", and such an inference would be illogical given the testimony that this practice was within the industry standards and the only option available to dry cleaners at the time, including those in the Central Valley of California. [Document 152 at 43, ¶¶ 385-389; see also City's Proposed Findings of Fact and Conclusions of Law – Document 150 at 24, ¶ 9.]

///

Moreover, during the relevant periods the City had general knowledge of the risks associated with its sewers and the need to take precautions to prevent releases from its sewers that could pollute groundwater.  [Document 152 at 22-23, ¶¶ 184-192.] For example, the City had knowledge since the 1970s regarding the threat of releases from the sanitary sewers and risk of contamination that was a foreseeable result of such releases. [Document 152 at 21-22, ¶¶ 183-186.]  In the early 1980s, the City knew that its sewers should not leak because it allowed pollutants to be discharged to its sewers that should not be allowed to escape from the sewers to pollute the groundwater, particularly without treatment.  [Document 152 at 22, ¶¶ 187-188.]   It follows that even absent exact notification, the City had sufficient knowledge with respect to the need to take precautions to prevent releases from its sewers.

Separately, the City's actual knowledge as of 1989 that wastewater containing PCE was being discharged to its sewers demonstrates that the City's argued lack of knowledge is not persuasive.  [See e.g. Exhibit JT/99 – analytical data records from the City showing the presence of PCE in wastewater being discharged to the City's sewers.]  The City did not do anything to change its practices, and did not take any precautions to prevent releases despite known discharges and the risks associated with releases. [Exhibit JT/100.]

The City's knowledge has continued, and even more recently in 2009, the City knew of detections of PCE in samples of wastewater collected from within the City's sewers in various locations in the City. [Exhibit JT/130-1.] For example, the City had notice of concentrations of PCE at 37 micrograms per liter.  [Exhibit JT/130-1; Trial Transcript at 197:20-21.]   In comparison, the MCL with respect to PCE is 5 micrograms per liter in drinking water. [Document 152 at 47, ¶ 424.] As a result, the City knew that wastewater with elevated concentrations of PCE at over seven times the limit should not be allowed to escape from the City's sewers because it could contaminate groundwater and the City's drinking water supply. [See e.g. Document 152 at 22, ¶ 188.]

The 2009 data were collected as part of the City's revisions to its local limits. [Trial Transcript at 197:20-21.] These samples demonstrate the City had knowledge that wastewater containing PCE was being discharged into the City's sewers and was present in the City's trunk lines around the City, not associated with Mission Linen. [Trial Transcript at 197:6-17.] Despite the knowledge that

wastewater containing PCE was being discharged to its sewers in various areas of the City, it chose not to establish a local limit for wastewater containing PCE. [Document 152 at 24-25, ¶¶ 210-213; see also Exhibit JT/93.]

The City has continually failed to exercise due care since at least 1989 based on its knowledge over time, and as a result the City has contributed to the Contamination Plume because its sewers are continuing to leak and release chemicals into the subsurface that threaten groundwater quality and the City's drinking water supply. [See generally, Document 152 at 20, ¶ 166; 26, ¶ 219, et. seq.]   The City's failure to take any action once it was put on actual notice has exacerbated the Contamination Plume because there are ongoing releases as a result of the City's failure to repair its sewers.

An inference can also be drawn from the record that regardless of whether or not the City had actual knowledge of the discharge of wastewater containing PCE during the relevant dry cleaning operations, the City still would not have exercised due care, because when it had actual knowledge it did not exercise due care.  Stated another way, the City cannot argue that it would have exercised due care if it had been on notice because once it was on notice, it still chose not to prevent continuing releases from its sewers. This inference is also consistent with the evaluation in *Adobe*, in which the Court held that not only did the city in that case have an obligation to exercise due care once it had knowledge, it also had a duty to exercise care with respect to the operation of its sewers that could have led to the discovery of such conditions under appropriate regular maintenance.

**b. The City's foreseeability argument is controverted by the record and the City had knowledge of risk of releases and contamination, and responsibility to exercise due care and take reasonable precautions to prevent the occurrence of such risk.**

The City cites to an illustration quoted from *U.S. v. Rodriguez-Vega*, a case that dealt with a criminal plea and the duty of the state to inform the defendant of the consequences of her plea.  This case should be distinguished from the circumstances before the Court because the City has not established a fiduciary duty owed to the City by Mission Linen in the manner that was required in criminal pleas under those relevant statutes.  The City's argument similarly fails because it attempts

1  to justify its duty to exercise due care in the operation of its sewers by claiming that no duty existed

2  unless the City had actual notice of the consequence, and nothing less.

3       Not only did the City have actual notice of the consequences since the 1970's, the Court

4  rejected a similar argument by a city in *Adobe*.   [Document 152 at 22, ¶¶ 185-186.] Although the City

5  argues this case addresses liability, there is no reason it should not be considered by the Court in

6  deciding allocation. In *East Bay Park* – the case the City relies heavily on in its brief – the court

7  considered elements of the innocent party defense to CERCLA in deciding the purchaser's allocation

8  in that case.  See e.g. *Waste Mgmt. v. East Bay Park*, *supra*, 135 F. Supp. 2d at 1092-1093.  With the

9  Court's discretion of allocation factors, the considerations identified in *Adobe* are probative in this

10  case similar to those considerations in *East Bay Park* given the overlapping and broad nature of

11  allocation, and thus, *Adobe* is instructive.

12       In *Adobe*, the Court analyzed a city's state of knowledge under similar circumstances rejecting

13  its circular argument that it had no duty to maintain its sewers because the releases of PCE were

14  unforeseeable.  The Court held that the releases of PCE may have been unforeseeable due to the city's

15  lack of maintenance.  Similarly, the City's arguments as to its lack of knowledge only demonstrate its

16  "willful or negligent blindness."  *Adobe Lumber, Inc. v. Hellman,* 658 F.Supp.2d 1188, 1206-1207

17  (E.D. Cal. 2009) citing *United States v. Monsanto Co.,* 858 F.2d 160, 169 (4th Cir. 1988).

18       Unlike the criminal defendant in *Rodriguez-Vega*, the City's decision whether to maintain its

19  sewers is not dependent on actual knowledge of existing discharges or problems.  The City has had a

20  regular and ordinary duty to maintain its sewers irrespective of actual knowledge.  In its findings, the

21  City attempts to avoid culpability contending that "any negligence of City in the maintenance of its

22  sewers was not done in light of a known hazardous substance." [City's Brief – Document 150 at 10:2.]

23  However, the City had knowledge of various hazardous substances with respect to the operation of its

24  sewers as part of its pretreatment program and local limits over time. [Document 152 at 22, ¶¶ 187-

25  191.] At least in part, the type of due care necessary with respect to wastewater containing PCE is the

26  same as the due care that the City should take with respect to wastewater containing any hazardous

27  substances in its sewers: the City was required to take the same precautions to ensure that its sewers

28  do not leak to prevent releases from its sewers that could contaminate groundwater.  The Court may,

1  and should, consider the lack of due care exercised by the City with respect to its sewer maintenance

2  program irrespective of knowledge specific to PCE, because the City owed a duty of care with respect

3  to various hazardous substances, and the risks were known to the City as early as the 1970s.

4  [Document 152 at 21, ¶ 183, et. seq.]

5      In *East Bay Park*, the court considered the "knowledge of risks and acceptance of

6  responsibility" as an allocation factor. *Waste Mgmt. v. East Bay Park*, *supra,* 135 F. Supp. 2d at 1092–

7  considering similar factors to the innocent purchaser defense.  Mission Linen presented evidence

8  regarding the state of the knowledge and industry standards for sewer operators during various times

9  to demonstrate what the City knew or should have known relative to other similarly situated sewer

10  operators in the Central Valley of California. [See e.g. Document 152 at 43, ¶ 392, et. seq.] There is

11  evidence that the City had sufficient notice of the risk of contamination and its need to prevent releases

12  from its sewers. [See generally, Document 152 at 26, ¶ 219, et. seq.]

13      As part of this analysis, the Court should consider the City's knowledge of potential risks of

14  contamination and the City's failure to take reasonable precautions to prevent those risks from

15  occurring through regular maintenance. Mission Linen presented substantial evidence of the City's

16  lack of due care despite these standards and notice of risks.  [Document 152 at 26, ¶ 219, et. seq.]

17      The landfill in *East Bay Park* is analogous to the City's sewers in this case because they are

18  waste facilities, in which the operators know of and have responsibility to take precautions to prevent

19  releases of waste from those facilities.  In *East Bay Park*, the court held that "Municipal landfills

20  typically contain some leachate [the hazardous by-product at issue in that case]. The danger arises

21  when leachate is allowed to accumulate or escape from the landfill..." *Waste Mgmt. v. East Bay Park*,

22  *supra,* 135 F. Supp. 2d at 1094.

23      The City has known since at least the 1970s that its sewers carried materials including

24  hazardous substances to its wastewater treatment facilities and that one of the purposes of its

25  subsurface piping systems was to prevent groundwater contamination.  [Document 152 at 22, ¶¶ 185-

26  186; Exhibit JT/62 at COV8870.] By the 1980s the City knew that its sewers should not leak because

27  it allowed pollutants to be discharged to its sewers that should not be allowed to escape from the

28

1   sewers to pollute the groundwater, particularly without treatment. [Document 152 at 22, ¶¶ 188-189;

2   Exhibit JT/100 at COV 7177.]

3       The City had actual notice, as early as 1989, that PCE was contained in wastewater within its

4   sewers in the vicinity of the Mission Linen Site.  [Document 152 at 23, ¶ 194.]   In 1991, the City had

5   notice from the Regional Water Quality Control Board that releases of PCE from its sewers could

6   cause groundwater contamination that the City could be held responsible for. [Document 152 at 23, ¶

7   195.]   At least as early as 1992 – when the City already had notice that PCE was present in its sewers,

8   the risks of releases, and potential for contamination – the City's consultant indicated that because the

9   City "does not have a preventative maintenance program to clean sanitary sewer pipes on a regular

10  basis", the City's sewers "remain without cleaning until they cause problems. [Exhibit JT/103 at 2-3.]

11  It is clear the City did not take any action to address these deficiencies because in 1994, its consultant

12  again indicated that the City needed to take precautions such as routine cleaning to prevent foreseeable

13  problems. [Exhibit JT/104 at 2-2, Sec. 2.3.2.]

14      Accordingly, similar to the unmaintained landfill in *East Bay Park*, the City's failure to

15  maintain its sewers allowed the accumulation and escape of wastewater containing PCE that caused

16  the contamination along its sewers in the vicinity of the Mission Linen Site.  The City's failure to

17  exercise due care was with full knowledge of the risks and consequence of its inaction.   Even by the

18  City's standard, at a minimum, the City had a duty to exercise due care with respect to the discharges

19  to its sewers to prevent releases into the subsurface by the early 1990s. The record is clear, the City

20  has not exercised due care despite this specific knowledge. [Document 152 at 26, ¶ 219, et. seq.]

21          **c.   The undisputed record proves that the City accepted discharges containing**

22              **PCE to its sewers.**

23      Grant Knight, a City employee and decision-maker in charge of enforcement of the City's

24  Ordinances and local limits, offered unrebutted testimony that the City permits the discharge of

25  wastewater containing PCE.  He testified that there would be no reason to issue a notice of violation

26  for known discharges containing PCE because it was not prohibited or limited by numeric limits.

27  [Document 152 at 25, ¶¶ 215-216.]  He testified that the discharges containing PCE have not impacted

28  the City's system or treatment processes.  [Document 152 at 24, ¶¶ 202-205.] The City's knowledge

1   and affirmative choice not to limit discharges of wastewater containing PCE to its sewers invalidates

2   the City's argument that Mission Linen cannot point to a choice by a single decision-maker for the

3   City regarding the discharge of PCE into its sewers.

4        Mr. Knight's testimony, the trial exhibits regarding the City's pre-treatment program and local

5   limits, and the City's actual knowledge of the presence of PCE in its sewers since 1989 invalidate the

6   City's unsupported argument that it had no knowledge of control over discharges to its sewers.

7   Irrespective, the City's transporter argument is irrelevant because it is not alleged, and there is

8   sufficient legal precedent that a City is not immune from a CERCLA allocation under the alleged

9   theories of owner/operator. *Adobe Lumber Inc. v. Hellman,* 658 F. Supp. 2d 1188 (E.D. Cal. 2009);

10  *Lincoln Properties v. Higgins,* 823 F. Supp. 1528 (E.D. Cal. 1992).

11       Separately, as part of its argument, the City again assumes that separator water was toxic,

12  without any such expert opinion.  As discussed above, whether the amount of PCE in separator water

13  was toxic or its level of toxicity is also not in the record, so the City cannot argue that Mission Linen's

14  discharges to the sewers were problematic, and there is no evidence that they were prohibited. The

15  City has not demonstrated any facts that Mission Linen made a choice to discharge PCE into the

16  sewers, or that it knew its separator water contained PCE.  See *supra* discussion on knowledge.  There

17  are no facts that Mission Linen's discharge of separator water violated any laws or that its practice

18  was not consistent with industry standards during the timeframe.  The City's interpretations, which

19  are not based on the record and have no nexus to its findings, should be disregarded.

20  **D.  The degree of cooperation by the parties with government agencies to prevent harm to the**

21  **public health or environment.**

22       **1.  The Court should strike the City's proposed finding, legal authority and hypothetical**

23       **arguments, as they are not supported by the record.**

24            **a.  Proposed findings should be stricken.**

25       The proposed findings that the City raises in its brief regarding its involvement are not in

26  evidence on the trial record.  Mission Linen moves to strike the City's proposed finding: "There is no

27  evidence that City was uncooperative or obstructionist in its dealings with governmental agencies."

28  [City's Brief – Document 150 at 15:2-3.]  The City's statement is controverted, and the City concedes

that some evidence exists because it attempts to rebut such evidence.  While the Court may consider the weight of such evidence, the City's finding that "no evidence" was presented contradicts the record and should be stricken as set forth in Mission Linen's accompanying motion.

Moreover, many of the arguments and evidentiary conclusions raised by the City in an attempt to bolster this finding are also unsupported by the trial record and should be stricken for the reasons set forth in Mission Linen's accompanying motion.

### b.   The City cites to an unsupported legal standard that should be disregarded.

The City claims, without citing to any legal authority, the "Federal Rules govern a party's cooperation" to prove the degree of cooperation under CERCLA. [City's Brief – Document 150 at 14:4-5.]  The City does not cite to what federal rules it references, but it is apparently the Federal Rules of Civil Procedure because it concludes that "Mission Linen never raised this issue in discovery." [City's Brief – Document 150 at 14:28.]  The discovery motions that have been brought in this case are not appropriate for the factual determinations at trial – at most they serve to assist the Court in making an admissibility determination, which is not relevant here.  Thus, the City's citation to the rules that govern civil procedure, and not substantive law, should be disregarded as a basis for the burden of proving CERCLA allocation.

### c.   The City's argument and citations to facts are improper because they are not in the record.

The City did not offer any testimony in rebuttal to the vast majority of Mission Linen's testimony.  Now it seeks to add information that was not raised at trial and is not supported by fact, and poses hypothetical questions without any foundation to attempt to create a question of credibility.

The City raises several questions about the DTSC's potential views on the City's cooperation, but these are merely hypothetical.  Mr. Krasnoff testified that the DTSC took issue with the City's organization of its production. [Document 152 at 36, ¶ 321; Trial Transcript at 187:23-24.]  The City could have cross-examined Mr. Krasnoff or called a witness from the DTSC.

These DTSC witnesses were disclosed by the City as trial witnesses, but were never called to testify by the City as suggested in its post-evidence briefing.  Any inference as to why the City did not call on these witnesses to testify should be construed against the City – that these DTSC witness would

- 22 -

not dispute Mr. Krasnoff's analysis.  The Court should disregard the City's attempt to discredit Mr. Krasnoff's testimony by posing speculative questions about witnesses it chose not to call at trial.

The City takes a similar approach to address Mission Linen's presentation of the City's letter to the DTSC declining to participate in a meeting with the DTSC and Mission Linen.  The City's letter speaks for itself. [Plaintiff's Exhibit 86.]  The City could have produced Mr. Olmos to testify as to the intent of his letter or clarify the City's now-argued position, but it chose not to.  The City's claimed position is simply not reflected in the letter, nor was testimony given, and thus, is not on the record.

The City also claims that Mr. Ennis' testimony as to the City's conduct with respect to the DTSC is uncontroverted.  Mr. Ennis testified that he was unaware of all, but one, of the interactions with DTSC.  [Document 152 at 11, ¶ 83; Trial Transcript at 514:22-515:7.]  As there is evidence and City witness testimony of other requests from the DTSC to the City, Mr. Ennis' testimony that he is "unaware" is not probative to reach a finding in this area.

Separately, there is no basis for the City's argument and unnecessary attacks against Mission Linen's attorney or her motive to engage the City with the DTSC in an effort to facilitate cleanup efforts of the City's leaking sewers.  The City would have the Court believe that it was trapped into these negative facts against it, but the only evidence in the record is the City's response and inaction.

**2. Mission Linen's presentation of unrebutted evidence is not tantamount to mudslinging.**

There is no dispute that one of the Gore Factors in CERCLA allocation that the Court may consider is the parties' relative degree of cooperation with government agencies to prevent harm to public health or the environment.  Both parties cite to this factor in their briefing, and it follows that Mission Linen's straightforward presentation of the evidence was necessary to establish this factor, as well as the anticipated third party defense, which the City has now waived.

The City could have introduced witnesses or cross-examined Mission Linen's witnesses in these areas, but it chose not to do so, except with limited testimony by Mr. Ennis.  The City's hollow argument, merely citing to a quote from *East Bay Park*, fails as it has not demonstrated any portion of the trial record in which Mission Linen's trial conduct was "vulgar" or "vitriolic."

///

*East Bay Park*, unlike this case, appears to have been highly contested and the record reflected that both of those parties exerted efforts to respond to the regulatory agency and/or address the contamination.  Although the court acknowledged its disappointment with the manner in which the evidence was presented, it still considered and made a determination as to the level of cooperation with respect to addressing the contamination.

At trial, the City only attempted to address the production of files that it provided to the DTSC. Mr. Ennis was unaware of the other interactions or requests from the DTSC.  [Document 152 at 11, ¶ 83; Trial Transcript at 500:2-9.]  The evidence demonstrates that while the City may have provided information to the DTSC at one point in time, it was unorganized.  [Trial Transcript at 187:21-188:6.] The City argument that this unorganized data consisting of sewer information about a dozen different sites in the City supports Mr. Krasnoff's opinion that the production was neither responsive nor well-presented and that the DTSC requested that the City provide the information in a more usable format. [Document 152 at 36, ¶ 321.]

The Court's focus on the quality of this response need not be essential to its analysis because even if the City did provide some information, it did nothing to follow through to investigate or participate in the DTSC's investigation of the contamination along the City's sewers, despite notice of actual and probable ongoing problems with its sewers.  Strikingly similar to the City's conduct here, the *East Bay Park* court held that while the landfill operator, WMAC, had provided "information over the years, they did not responsibly follow through with needed mitigation measures despite persistent signs of leachate problems at the site." *Waste Mgmt. v. East Bay Park*, *supra,* 135 F. Supp. 2d at 1097. In *Lincoln*, the court looked at the county's response efforts to investigate and address the leaking systems upon discovery.  *Lincoln Properties v. Higgins*, 823 F. Supp. 1528, 1543-1544 (E.D. Cal. 1992).  Under similar circumstances, the City has not taken any response effort to investigate or address its leaking sewers. [Document 152 at 36, ¶ 318, et. seq.; 46, ¶ 412, et. seq.]

The City's failure to exercise due care is a relevant consideration, particularly that the City has been on actual notice of the DTSC's investigations since 2004, and that its sewers needed repairs since at least 2009.  The City's interpretation of Mr. Olmos' testimony is in part misplaced because it is not intended to show that its conduct did in fact increase the cost of cleanup or this litigation, but rather

1  that the City was on notice that exacerbation of the contamination was a foreseeable consequence of

2  the failure to exercise due care upon discovery.

3       The remaining part of the City's argument that the cost of cleanup is not in the record is

4  improper because the City objected to the cost of cleanup during trial and it was sustained by the Court

5  on the basis that it was not relevant.  [Trial Transcript at 491:1-16.] The City cannot argue that the cost

6  of cleanup is relevant when it objected to its relevancy during trial, or that the lack of evidence in the

7  record should be used against Mission Linen in this regard.

8      **3.  The City has not addressed Mission Linen's cooperation because Mission Linen's**

9         **responsive conduct is in stark contrast to the City's conduct.**

10       There is no evidence in the record to refute Mission Linen's immediate and voluntary

11  cooperation and response actions to the DTSC starting in 2010 and continuing to the present.

12  [Document 152 at 46, ¶ 418.] These actions are representative of both its cooperation and its exercise

13  of due care.  The City claims it will not discuss Mission Linen's level of cooperation under the guise

14  of civility, but it can cite to no facts that Mission Linen has not cooperated with the DTSC.  Its assertion

15  also falls short of civility as it proceeds to disparage Mission Linen's counsel and expert witness.

16  Therefore, the Court should limit its consideration to the evidence in the trial record.

17  **E.  Economic benefits received by the parties from contaminating activities or remediation.**

18      **1.  The Court should strike the City's proposed finding as it is not supported by any facts**

19         **in the record.**

20       The proposed findings that the City raises in its brief regarding its culpability are not in

21  evidence on the trial record.   Mission Linen moves to strike the City's three proposed findings cited

22  in its brief at 16:19-26.  The City has not and cannot cite to any facts in the record to support its finding,

23  as supported by Mission Linen's accompanying motion.  Mission Linen's motion also seeks to strike

24  various unsupported statements made by the City in support of these proposed findings.

25      **2.  The City has not shown through any evidence that PCE was prohibited by its**

26         **Ordinances.**

27       The City cannot show that Mission Linen received a benefit as a result of its discharge of

28  separator water because Mission Linen paid for its use of the City's sewers, an activity that was

allowed by the City.  The City makes an unsupported, passing reference that its ordinances prohibited the discharge of substances like PCE into its sewers, merely citing to Exhibits JT/83-88.  The City does not, and cannot, cite to any portion of these ordinances that expressly prohibits PCE.  The City has not made any argument – factual, technical or legal – to show how or why the Court should find that PCE is prohibited by its ordinances.   Accordingly, the Court should disregard the City's unsupported argument.

Even assuming that the City's Ordinances did prohibit undissolved, pure PCE, which they do not, the City has not and cannot cite to any evidence or argument that the City's Ordinances prohibited the discharge of separator water containing PCE because the City has not put any evidence into the record regarding the character and nature of the PCE that would be in the separator water, nor what impact, if any, that the separator water would have on the City's sewers to cause it to be prohibited.

The City has offered only the ordinances themselves and the limited testimony of Mr. Ennis (knowledge since 2012, not when these ordinances were prepared, enacted or implemented).  Mr. Ennis testified that the city council enacts ordinances and that the City operates based on those ordinances, but there is no testimony about the preparation or development of ordinances. [Document 152 at 11, ¶¶ 78-79.]

There is no testimony offer, and no evidence, showing that PCE was expressly prohibited.  Mr. Ennis only testified that the ordinances are in place for the City's sewer systems and specifically prohibit certain types of materials, including those that could cause potential problems to the system. [Trial Transcript at 500:10-18.]  The City does not offer expert testimony to explain the characteristics of PCE or wastewater containing PCE to establish that it falls into any prohibited category.  Rather, Mr. Krasnoff testified that it does not. [Document 152 at 42, ¶¶ 381-383; see also 24, ¶¶ 208-210.] On that basis, there is no evidence that the ordinances prohibit PCE.

Any argument by the City in this regard is also a red herring because the City, under its own interpretation, did not implement or enforce the ordinances to prohibit the discharge of wastewater containing PCE. [Document 152 at 44, ¶ 395.] Mission Linen has presented evidence by City employee Grant Knight that the discharge of PCE has not caused any interferences referenced in the ordinance that would cause it to be prohibited by the ordinance.  Specifically, he testified that he is

1   unaware of any problem experienced by the City with its collection system due to PCE, and that the

2   discharge of PCE has not caused an upset or adverse impact to the City's sewers system, has not

3   inhibited or interfered with the City's wastewater treatment process.  [Document 152 at 24, ¶ 202, et.

4   seq.]

5          Additionally, to the extent that these types of interference could be caused by PCE in certain

6   concentrations, they should be handled by local limits.  The purpose of a local limit is to identify what

7   concentrations or types of chemicals can be safely handled within the wastewater collection system

8   and also not cause a problem with the operation of the wastewater collection treatment plant.  The

9   local limits are developed specific to each community based upon the nature of the wastewater

10  treatment plant and based on its processes and ability to effectively remove certain types of chemicals

11  during the treatment process. [Trial Transcript at 202:15-203:6.]

12         There is no record regarding any local limits for PCE effective in 1965, but an inference can

13  be drawn that PCE was not regulated by limit because as of 1982, 1992, and even in the City's current

14  2011 local limits, PCE is not regulated by concentration. [Document 152 at 44, ¶ 395.]

15         To the extent that any argument can be fashioned to call PCE a substance possible of causing

16  a nuisance, the plain and ordinary meaning of these terms cannot be given because, notwithstanding

17  other limitations, it is essentially the function of the wastewater system – to collect substances that

18  would otherwise cause a nuisance if released into the environment untreated.  For example, the MCL

19  for PCE at or below 5 micrograms per liter is suitable in drinking water, and thus, would not be a

20  nuisance. [Document 152 at 41, ¶ 372.]  As a result, the City has not and cannot show that PCE at any

21  concentration is a nuisance *per se*.

22         Any attempt to argue a nuisance only establishes a basis for setting a local limit, which the

23  City did not do.  The City's own local limits studies demonstrate that the City determined PCE did not

24  require a limitation.  The City was aware that PCE was being discharged to its wastewater collection

25  system and through technical evaluation determined that there was no need to develop a local limit for

26  PCE because at the concentrations that it was detected, it was not a problem for the criteria that are

27  used to set local limits. [Document 152 at 24, ¶ 210; Trial Transcript at 197:6-21, 208:8-209:5;

28  Exhibits JT/93 and JT/130-1.]  Therefore, the City has not presented any evidence to demonstrate that

1   PCE or wastewater containing PCE has any of the characteristics of or fits into any of the prescribed
2   categories set forth in Ordinances that would prohibit the discharge of PCE to its sewer system.

3        Separately, the City's attempt to characterize separator water as a "toxic substance" is flawed
4   because not only has it not proven this, but the City accepted toxic waste to its sewers. As part of the
5   City's 1982 pretreatment program, the City discusses the discharge and treatment of toxic substances
6   and wastes that the City allowed and knew where being discharged to its sewers and intended to be
7   handled at its treatment plant.  [Document 152 at 22, ¶¶ 187-188.]  It follows that even under the City's
8   interpretation, Mission Linen did not receive a disproportionate economic benefit from its discharge
9   despite the City's attempt to portray it as violative.  Rather, taking the City's mischaracterization, it
10  only shows that the City should have been taking precautions to prevent its sewers from releasing *any*
11  of the toxic chemicals it accepted to its sewers.

12       **3.  The City's contentions that Mission Linen enjoyed an economic benefit are**
13           **unsupported by any evidence.**

14       The City's argument overlaps with the discussion between Mission Linen and Star above, and
15  for the same reasons, its argument here should fail.  The City's findings with respect to its contention
16  that Mission Linen gained any good will from its acquisition of the dry cleaner from Star and its
17  operations between 1978 and 1983 are unsupported and should be stricken because the City has not
18  and cannot cite to any evidence in the record.  The only evidence demonstrates that Mission Linen
19  operated dry cleaning at the Mission Linen Site for five of the forty years during which it has and is
20  operating a commercial laundry. [Exhibit JT/1.] It does not logically follow that Mission Linen gained
21  a benefit or was a legal successor in interest to Star's dry cleaning operation because Mission Linen
22  ceased the dry cleaning operation shortly after it acquired the commercial laundry and dry cleaning
23  operations.

24       Similarly inaccurate is the City's contention that Mission Linen benefited by discharging its
25  wastewater in a manner that allowed it to be released from the City's sewers into the subsurface.  The
26  City apparently contends that Mission Linen knew or intended that the City's sewers leak – but fails
27  to cite any testimony to support such contention. [Document 152 at 43, ¶ 390.] The City also apparently
28  argues that Mission Linen, and not the City, had the obligation to control and maintain the City's

1   sewers – it did not.  Rather, the facts in evidence give rise to an inference that Mission Linen had a

2   reasonable expectation that by discharging its separator water to the City's sewers, the waste was not

3   being allowed to accumulate and escape through structural defects in the City's sewers and into the

4   subsurface.

5          At bottom, Mission Linen does not dispute that it is a business, but the record does not reflect

6   that it has disproportionately benefited from the dry cleaning activities that it operated for a short

7   period at the Mission Linen Site. [Document 152 at 45, ¶ 407, et. seq.]  Over the last eight years,

8   Mission Linen has single-handedly borne the cost of investigating the Contamination Plume, which is

9   substantially off-site along the City's sewers. [Document 152 at 45, ¶ 411.]  Any arguable economic

10   benefit Mission Linen may have received as a company is far outweighed by the response actions it

11   has voluntarily taken to date, much of which should have been borne by the City for its failure to

12   maintain its sewers and prevent or minimize releases to the subsurface.

13          **4.   The City received an economic benefit from the contaminating activities and by not**

14              **investigating or addressing releases from its sewers.**

15          The only evidence in the record is that the City charges sewer-user fees, which are used to pay

16   for the maintenance and repairs of the sewers.  [Document 152 at 33, ¶¶ 287-289 citing to Exhibit

17   JT/61.]  However, any user fees paid for services near and servicing the Mission Linen Site were not

18   received. [Document 152 at 7, ¶ 44; see also 20, ¶¶ 166-168.]

19           The City does not regularly maintain or clean its sewers in the vicinity of the Mission Linen

20   Site.  [Document 152 at 12, ¶ 86; 26, ¶¶ 220-222; 34, ¶¶ 301-303.] In fact, the City does not know the

21   condition of the sewers in the vicinity of the Mission Linen Site.  [Document 152 at 7, ¶ 44.]  The

22   City's efforts are tantamount to turning a blind eye to problems.  In 2009, the City had concluded that

23   its sewers in the vicinity of the Mission Linen Site were broken and needed repair.  [Document 152 at

24   19, ¶ 161; 27, ¶ 229.]   The City did not schedule or make repairs following this investigation.

25   [Document 152 at 27, ¶ 230.] In fact, the City has never made repairs to the sewers in the vicinity of

26   the Mission Linen Site.  [Document 152 at 19, ¶ 164; 35-36, ¶¶ 314-316; 44, ¶ 403.] It logically follows

27   that the City's sewer-user fees benefited the City elsewhere.

28   ///

1    The City attempts to use the fact that it does not operate for profit as a basis to excuse any

2    obligation that it may have to safely operate and maintain its sewers, but it does not.  In addition to

3    citing to the Massachusetts State Constitution, the City raises several hypothetical or apparently factual

4    arguments that are not in evidence and should be disregarded. The City could have presented evidence

5    at trial relating to its budgets, sewer rates, and decisions.  The City could have presented evidence to

6    explain whether its lower sewer rates benefited the populace and whether such benefit outweighed the

7    need to protect the City's drinking water supply from contamination caused by releases from the City's

8    sewers.  The City chose not to do so.  There is no evidence in the trial record in this area, and apart

9    from hypotheticals that can be identified to raise doubt, it is nothing more than speculation to detract

10   from what has been admitted at trial.

11   The City also ignores the fact that in addition to not having maintained its sewers, the City has

12   received a financial savings by not participating in the DTSC investigation.  In 2010, after receiving

13   notice from the DTSC, Mission Linen promptly entered into a Voluntary Consent Order with the

14   DTSC and voluntarily undertook the investigations of the extent of the Contamination Plume, a

15   substantial portion of which arises from the City's sewers.   Mission Linen also undertook

16   investigations of the City's sewers, something the City should have been doing for several decades.

17   As discussed above, Mission Linen's expert testified that wastewater containing PCE was not

18   exclusively a result from the Mission Linen Site.  The City's sampling data collected in 2009 from its

19   trunk lines showed the presence of PCE in wastewater in various parts of the City.  [Trial Transcript

20   at 197:6-21; Exhibit JT/130-1.] The City has not demonstrated that Mission Linen and Star's discharge

21   of separator water is the only source of wastewater containing PCE in the City's sewers that has been

22   released.  Thus, the City's attempt to shift the burden to investigate and maintain its sewers to Mission

23   Linen fails.  What is known from the trial record is that there is a cause and effect relationship between

24   defects in the City's sewers and the contamination that exists adjacent to those defects.  The City has

25   received a cost savings for the investigations performed by Mission Linen to date and the Court should

26   consider the record in its allocation of responsibility of the City's repairs to its sewers and the resulting

27   contamination.

28   ///

**F.  Contracts between the parties and financial resources and economic status.**

There is no dispute these are no relevant considerations in this case and have no evidence in the record that will impact an allocation.

**IV.**

**RESPONSE TO THE CITY'S BRIEF REGARDING PROPOSED CONCLUSIONS**

**A.  Liability.**

Mission Linen accepts the City's position that the only issue for the Court to decide is allocation, as the City has now abandoned its third party defense and does not address it in its briefing or findings. [City's Brief – Document 150 at 17:19-20.]  Based on the City's acceptance of liability, the Court should disregard certain proposed conclusions of law offered by the City which contradict the City's admission. This is discussed in full below, but it is also noteworthy that many of these conclusions contradict the undisputed facts in this case.

The City also indicates that it anticipates that Mission Linen will focus its attention to address the City's liability regarding its third party defense.  For the first time, the City identifies in its brief that it has abandoned its third party defense.  The City's comments criticizing Mission Linen's efforts at trial, including the breadth of evidence and undertaking to rebut the City's third party defense, should similarly be disregarded.  Mission Linen, as the plaintiff, presented a complete case in anticipation of the City's defenses that it maintained, including an extensive list of witnesses it indicated would be testifying.  The City characterizes Mission Linen's straightforward presentation of the evidence as mudslinging, pejorative and argumentative.  However, the evidence about the City's conduct is essential to this case, particularly as Mission Linen's operations and response actions are stipulated facts. The City's comments are an apparent attempt to address evidence that it did not rebut at trial, and thus should be disregarded because they lack probative value to the Court's consideration of the trial record.

Separately, the record rebutting the anticipated third party defense is probative to the Court's consideration of allocation. The Court may, and should, consider the evidence established by Mission Linen at trial and set forth in its proposed findings of fact and conclusions or law regarding the level of care exercised by the City with respect to its sewers.

**B.   Allocation.**

In its brief, the City refers to the allocation factors as the *East Bay Park* Factors, which substantially employ the Gore Factors.  The City treats these factors as dispositive and asks that the Court narrowly apply them.  It is well established that not all factors may be applicable in every case, and are certainly not dispositive.  In fact, although the court in the *Easy Bay Park* case cited to the list that the City relies on in its brief, the court did not evaluate or rely on all of them.  Accordingly, the Court has broad discretion to consider all relevant evidence, including the City's maintenance program, the precautions taken by the parties against foreseeable releases and risk of contamination, and the exercise of due care with respect to both known and foreseeable risks.

**1.   *Waste Management of Alameda County v. East Bay Regional Park District.***

The City cites extensively to the *East Bay Park* case, and while Mission Linen does not dispute that the case is instructive, the City's interpretation and reliance are misplaced.

In *East Bay Park*, plaintiff – referred to as WMAC, and its predecessor OSC – operated a municipal solid waste facility for several decades, and the conditions were in part a result of the fact that the waste facility was at the end of its useful life and required that the plaintiff address those issues.

A very simplistic summary of the facts is that there was an ultimate decision to cap the landfill so that the site could be dedicated as a public park.  The defendant, the Park District, acquired the property – knowing that it was a prior contaminated waste facility, but after WMAC had capped the landfill in a manner to prevent the generation and release of leachate from the underlying waste facility – for purposes of developing a public park.

There was some dispute over the approach to cap the landfill, and the court noted WMAC disregarded the known risks that potential heavy rains could cause the failure of the cap and levee, which would result in releases of leachate.   Thereafter, these foreseeable heavy rains did in fact cause the forewarned consequences.   Despite the release being characterized as an emergency because it was contaminating the San Francisco Bay, the court found that "the emergency action was plainly preventable, and necessitated by years of inaction."  *Waste Mgmt. v. East Bay Park*, *supra,* 135 F. Supp. 2d at 1086.  The record indicated that the releases of leachate were the result of a "fundamental

1   failure of the cap and levee." *Id.* at 1096.  This conclusion was also supported by Mr. O'Brien's

2   analysis in the *East Bay Park* case that elevated data was "consistent with the conclusion that leachate

3   has been escaping through the levee." *Id.* at 1087.

4          WMAC and the Park District argued that the other was responsible for maintaining the

5   property in its post-capped condition and for responding to the foreseeable failure of the cap and levee

6   as a result of the heavy rainstorm.  The issue before the court was determining allocation of

7   responsibility between the operator of the waste facility and the current owner who did not operate as

8   a waste facility but knew of the conditions and risk.

9          The City attempts to liken Mission Linen to WMAC, but it is the City who is more similar to

10  WMAC because the City has owned, operated and controlled the leaking waste facilities in this case,

11  not Mission Linen.  The City cannot be likened to the Park District, who was never in the waste

12  business, because the City has at all relevant times controlled its sewers for purposes of carrying waste

13  through its collection system for treatment to prevent groundwater contamination, with a duty to safely

14  operate and maintain its sewers, and to take precautions against foreseeable risks – i.e. releases and

15  contamination.

16         Mission Linen does not dispute that it bears some responsibility – including for onsite releases,

17  but with respect to the contamination caused by releases from the City's sewers, the City's reliance on

18  *East Bay Park* is without reasoning.  If Mission Linen could be likened to anyone in *East Bay Park*

19  with respect to the releases from the City's sewers, it would be the absent generators of the waste that

20  was discharged to the waste facility with an expectation that it was being handled appropriately and

21  not being released and causing contamination.

22         The City is similar to WMAC for several reasons both in its duty and conduct under the

23  circumstances.  Both WMAC and the City operated a waste facility and had a duty to take precautions

24  to prevent the release of contaminants.  In *East Bay Park*, the manner of closing the landfill was

25  intended to provide a barrier between leachate and any water with which it might come into contact.

26  *Waste Mgmt. v. East Bay Park*, *supra,* 135 F. Supp. 2d at 1075-1076.  The City had a similar obligation

27  to maintain its collection system to protect the waste within its sewers from being released into the

28  subsurface and contaminating groundwater.  [See e.g. Exhibit JT/62.]  Although there are differences,

including that the City is continuing to operate its waste collection system, they both had knowledge of the existence of the hazardous waste, the risk of contamination, and the need to prevent such consequence.

Both WMAC's cap and the City's sewers were required to meet minimum criteria in design and construction, and their respective failures to meet those criteria lead to the failure of their infrastructure causing releases of waste that caused contamination. *Waste Mgmt. v. East Bay Park*, *supra,* 135 F. Supp. 2d at 1076-1077. [See e.g. Document 152 at 27-29, ¶¶ 234-252 – regarding the City's below industry standard design and construction of its sewers for cover and flow.] Under these similar circumstances, following the failures of their respective infrastructure, there is no indication that repairs were made to remedy the problem.

Poor maintenance was a principal issue in both cases. In *East Bay Park*, the court attributed the contamination to WMAC's poor maintenance of the containment system for which it was responsible. *Waste Mgmt. v. East Bay Park*, *supra,* 135 F. Supp. 2d at 1085-1086, see also fn. 10. The court held that "municipal landfills typically contain some leachate. The danger arises when leachate is allowed to accumulate or escape…" *Id.* at 1094. Similar to the unmaintained landfill in *East Bay Park*, the City failed to maintain or clean its sewers, and also failed to implement recommendations from its consultants about the accumulation of waste causing problems to its sewers. The record in this case is well established that the City's failure to maintain its sewers caused defects that were a direct source of releases. [See e.g. Document 152 at 27, ¶ 233, et. seq.]

The issue of maintenance was also a focus in other similar cases like *Adobe* and *Lincoln* in which the Court evaluated the issue specifically respective to sewer operators' level of maintenance of their sewers to prevent releases as well as to stop ongoing releases. The City's failure to implement appropriate maintenance in this case is a contributing cause to the Contamination Plume, and much like WMAC, the City should be responsible for the contamination it caused through releases from its sewers.

The City is also similar to WMAC because both operators took a "passive approach" and ignored data, information and growing signs of problems. *Waste Mgmt. v. East Bay Park*, *supra,* 135 F. Supp. 2d at 1085. As demonstrated above, the City was aware of ongoing discharges of wastewater

Case 1:15-cv-00672-AWI-EPG   Document 154   Filed 03/21/18   Page 40 of 52

containing PCE, as well as other hazardous wastes being discharged to its sewers, ignored recommendations from its consultants with respect to known problems and the need for maintenance, and disregarded notice from regulatory agencies of the risk of contamination that could be caused by releases of PCE from its sewers.  The City's passive approach to its sewers, including turning a blind eye to the growing signs of problems despite knowledge of the consequences, is a contributing source of the Contamination Plume, for which responsibility should be borne by the City.

WMAC's passive approach carried over to its cooperation with the public agency.  Under similar circumstances the agency eventually wrote to WMAC (or its predecessor) after being "prodded by the Park District" based on concerns of fluctuating leachate levels at the site.  *Waste Mgmt. v. East Bay Park*, *supra,* 135 F. Supp. 2d at 1082.  In this case, an inference can be drawn from the DTSC letter to the City regarding its leaking sewers and elevated detections of PCE as a result of Mission Linen's investigations.  Even under the City's interpretation of the DTSC's letter to be an effort by Mission Linen, it demonstrates the level of participation between the two parties and Mission Linen's efforts to get the City to address its sewers because it had not done so.  It is also an indication that the City, much like WMAC, merely provided information in response to regulatory requests, but that its cooperation stopped there because it took very little action to actually address the contamination and issues with their facilities to stop the continuing releases. *Waste Mgmt. v. East Bay Park*, *supra,* 135 F. Supp. 2d at 1097 – noting WMAC's pattern of conduct that is "marked more by foot-dragging than action."  Accordingly, the City's conduct is similarly aligned to that of WMAC in the *East Bay Park* case; both in its passive approach to maintenance of its waste facility that is the actual source of releases, and in its minimal cooperation and lack of action to address known issues identified by the overseeing regulatory agency.

The City concedes that the party who created and operated a waste facility should bear primary responsibility for the operations and consequences therefrom.  In this case, the party responsible for releases from the City's sewers is the City.  Mission Linen acknowledges that its discharge of separator water was a source of wastewater containing PCE in the sewers – a practice that was not prohibited by the City, but there is no evidence that Mission Linen knew or should have known that the City's sewers contained defects that would cause releases into the subsurface. [Document 152 at 23, ¶¶ 199-

- 35 -

PLAINTIFF'S BRIEF IN SUPPORT OF FINDINGS AND CONCLUSIONS     1:15-cv-00672-AWI-EPG

201; 42, ¶¶ 383-384; 43, ¶¶ 390-391.]  The City's sewers have exacerbated the magnitude of the Contamination Plume, and Mr. O'Brien demonstrated that a much smaller problem would exist if the City's sewers did not cause releases.  [Document 152 at 6, ¶ 33.]

**C. Star's Orphan Shares.**

        Ultimately, it is a decision for the Court how to allocate Star's orphan shares.  Orphan shares are distributed equitably among all parties to the action.  *Asarco LLC v. Shore Terminals LLC*, 2011 U.S. Dist. LEXIS 72859, 8-9 (N.D. Cal. July 7, 2011).  There are various methods the Court could employ to allocate these shares, such as to proportionately assign Star's allocation to the parties based on its determination of their respective allocation, or the Court could assign Star's shares evenly to the remaining responsible parties for each of the areas of the Contamination Plume, Mission Linen and the City.

        However, the City's argument does little to help the Court's evaluation because it is conclusory, one-sided and unsupported by the trial record.  If the Court considers the relationship between Mission Linen and Star, it must do so completely, and it must also consider the relationship between the City and Star.

        **1.  Mission Linen and Star.**

        The City argues that Mission Linen should be responsible for all of Star's orphan shares because it "did the same thing" as Star and their respective operations could not be distinguished.  This argument fails as it is substantially unsupported.  Again, the City raises its unsupported argument about successor liability, which fails for the reasons stated above.  Despite the fact that Mission Linen is the subsequent operator at the Mission Linen Site, Mission Linen has demonstrated that their contributions can be distinguished because they each discharged separator water to separate and distinct City sewers. [Document 152 at 37, ¶ 332, et. seq.]

        Mission Linen discontinued the dry cleaning operations after its purchase.  Mission Linen operated the dry cleaning equipment for five out of 40+ years – prevented the potential for ongoing discharge and releases of separator water containing PCE for the last 35 years.  [Exhibit JT/1 at ¶¶ 1(c), 1(g) and 1(j); Document 152 at 42, ¶ 379.]  Accordingly, if Mission Linen's acquisition of Star's

1  operations are considered against it, then its discontinuation of the operations 35 years ago must also
2  be considered.

3  **2.  The City and Star.**

4  The City disregards its own relationship with Star.  At all relevant times, the City has owned,
5  operated and controlled the sewers that Star discharged separator water containing PCE to, which are
6  not all the same sewers that Mission Linen discharged to.  The City permitted the connection to its
7  sewer as well as the known discharges by Star as a result of its dry cleaning operations. [Document
8  152 at 21, ¶¶ 179-181 citing to Exhibits JT/150, JT/1 and JT/125.]  The City's proper maintenance and
9  cleaning during the time Star operated would have prevented or limited the releases of separator water
10 containing PCE.  [Document 152 at 22, ¶ 184, et. seq.; 25, ¶ 218.]  However, the City's failure to
11 exercise routine care with respect to its sewers allowed the PCE in separator water to settle within the
12 City's sewers and be released through defects. [See e.g. Document 152 at 15, ¶ 121, et. seq.; 29, ¶ 253,
13 et. seq.]  The City's involvement in these releases extend beyond the period Star operated because
14 PCE was allowed to settle in its sewers. [Document 152 at 15, ¶ 125.]  Accordingly, although the
15 redistribution of Star's orphan shares is left to the discretion of the Court, it should consider the City's
16 involvement in the releases associated with Star's operations.

17 **V.**

18 **RESPONSE TO THE CITY'S PROPOSED FINDINGS AND CONCLUSIONS**

19 **A. Mission Linen's Response to the City's Proposed Findings of Fact in Its Supplemental**
20 **Proposed Findings of Fact and Conclusion of Law.  [Document 150 at 22.]**

21 **City's Proposed Finding Paragraph 10**:

22 "There is no evidence as to the amount of PCE that has remained in the City's sewers since
23 1983. *See Transcript,* Vol. 2 at 293:7-294:3, 305:14-305:21 (Dec. 13, 2017)."

24 **Mission Linen's Response to Paragraph 10**:

25 The proposed finding is not probative to the Court's analysis. As discussed above, there is
26 substantial data and evidence to demonstrate that the Contamination Plume, which requires abatement,
27 is coincident with releases from the City's sewers.  [Plaintiff's Exhibit 178; Document 152 at 16, ¶
28 128.]  The ability to trace releases from the City's sewers is not dependent on conducting samples

1   within the sewers, particularly where the contamination already exists and relates to historical releases.

2   [Plaintiff's Exhibit 178.]  Mr. Krasnoff testified that based on his years of experience, that "PCE is

3   still likely present in these sewers today and continues to leach to the subsurface." [Trial Transcript at

4   293:18-294:3.]  This testimony is unrebutted by the City, and the City has presented no evidence that

5   PCE has not been released from its sewers because the City witnesses testified that the City has not

6   investigated its sewers. [Document 152 at 7, ¶ 43; 10, ¶ 65.]

7   **City's Proposed Finding Paragraph 11**:

8        "There is no evidence showing that Plaintiff informed the City it was discharging separator

9   water into a drain on the Mission Linen Property which ultimately connected to the City's sewer main

10   beneath East Mineral King Avenue. *See Transcript,* Vol. 2 at 287:17-288:9 (Dec. 13, 2017)."

11   **Mission Linen's Response to Paragraph 11**:

12        Exhibit JT/125 is a City approved building and foundation plan for the dry cleaning plant to

13   be added at the Mission Linen Site during Star's operations. [Exhibit JT/125.]   Apart from this

14   document, there is no witness to testify about this issue for the City, Mission Linen or Star as to

15   whether or not Mission Linen or Star informed the City of their discharge of separator water to the

16   City's sewers.  Mr. Krasnoff testified that the dry cleaning operator is deceased and is the only witness

17   who would be the source of this information.  [See Document 152 at 3, ¶ 14.]  The City's only witness,

18   Mr. Ennis only has personal knowledge of the City's operations going back to 2012, decades after the

19   relevant time in question.  [Document 152 at 11, ¶ 77.]  Stated another way, there are no witnesses for

20   the City to testify as to a lack of communication that would give rise to this inference.  Instead, there

21   simply is no available information, except for the City's approval of the plan for installation of the dry

22   cleaning plant at the Mission Linen Site. [Exhibit JT/125.]

23        Moreover, even absent this information, the Court should consider whether the City's sewer

24   maintenance and management program was appropriate.  The *Adobe* court rejected that city's lack of

25   notice because its argument was circular, finding that "the disposal of PCE may very well have been

26   unforeseeable because of the City's failure to inspect or maintain the sewer." *Adobe Lumber, Inc. v.*

27   *Hellman*, 658 F.Supp.2d 1188, 1206-1207 (E.D. Cal. 2009).

28   ///

1   There is also no dispute that the City had actual knowledge of the presence of PCE in its sewers
2   through its own records as early as 1989. [Exhibit JT/99.]  Therefore, the Court may at least consider
3   the lack of due care exercised by the City with respect to PCE, the specific constituent of concern since
4   1989 – nearly thirty years.  The City's knowledge, industry standards and lack of due care with respect
5   to its sewers since 1989 is fully briefed in Mission Linen's findings of fact. [See e.g. Document 152
6   at 21, ¶ 175, et. seq.]

7   **City's Proposed Finding Paragraph 12**:

8   "Plaintiff has not assessed the condition of the sewer lateral known to convey wastewater from
9   the Mission Linen Property to the City's sewer main beneath East Mineral King Avenue. *See*
10  *Transcript,* Vol. 2 at 247:15-249:7 (Dec. 13, 2017)."

11  **Mission Linen's Response to Paragraph 12**:

12  The City's finding is ambiguous.  To the extent that it means Mission Linen did not assess its
13  sewer lateral during its operations, no such facts or testimony are in evidence to establish this fact or
14  even such an inference.

15  To the extent that the City means there is no testimony offered by Mission Linen's experts as
16  to the sewer lateral, this is erroneous.  Mr. Krasnoff testified and concluded that the sewer laterals
17  servicing the Mission Linen Site are not a source of PCE release because they have not been shown to
18  leak through the connection with the sanitary sewer main because the pipe protrudes inside the sewer
19  main. [Document 152 at 18, ¶¶146 and 149.]  The building drain and sewer lateral are not a source of
20  releases because it has a high velocity flow, as it moves from a relatively shallow building drain at
21  two feet below surface to the sewer mains at five to six feet below surface.  As a result, there are not
22  opportunities for the leakage that occurs in the flatter sloped, low velocity flow, sanitary sewer main.
23  [Document 152 at 18, ¶ 150.] Therefore, the City's statement that Mission Linen has not assessed the
24  condition of the sewer lateral is inaccurate, and Mission Linen has provided testimony and expert
25  analysis regarding whether they could be a source of releases.

26  ///
27  ///
28  ///

**City's Proposed Finding Paragraph 14**:

"Because no storm water data has been collected at or near the Mission Linen Property, there is no evidence showing PCE-impacted surface water runoff or storm water ever entered into the City's storm sewer. *See Transcript,* Vol. 2 at 256:17-265:4 (Dec. 13, 2017)."

**Mission Linen's Response to Paragraph 14**:

The City's inference regarding surface storm water data is flawed because it has not and cannot explain how samples taken in this decade would prove or disprove the existence of PCE in storm water that flowed into the storm sewers decades ago.  Mr. Krasnoff's testimony that the PCE on the surface was washed into the storm sewers during rain events would tend to show that PCE is no longer in the surface water because it has been washed into the sewers. [See e.g. Document 152 at 4, ¶ 18; 15, ¶¶ 119-120.]  As the dry cleaning operations ceased several decades ago these surface condition do not continue to exist today.

The City's finding is improper because it asks the Court to disregard all other evidence in the trial record that demonstrates that surface water containing PCE entered the City's storm sewer and was released through defects in the sewers.  Specifically, Mr. Krasnoff testified that he considered the type of dry cleaning equipment, the equipment manual, the standard practices of the dry cleaning industry during the relevant time, the defects in the City's sewers, and the data corroborating elevated concentrations of PCE in soil vapor and ground water coincident with the City's sewers.  [Document 152 at 3-4, ¶¶ 14-19.]  As discussed above, the City has accepted Mr. Kransoff's analysis based on this same evidence with respect to the discharges to the City's sanitary sewers, and the City has not explained why his analysis should be treated differently with respect to the storm sewers because it is based on the same evidence and analysis.  Mr. Krasnoff's testimony is also corroborated by the soil vapor data evidence set forth below.

**City's Proposed Finding Paragraph 15**:

"The available soil vapor data collected at and near the intersection of Tipton Street and East Mineral King Avenue do not support Plaintiff's theory that vapor emissions of PCE were sorbed onto airborne particulates, which were discharged through the City's storm drains during rain events, and

1   then released through the City's storm sewer. *See Transcript,* Vol. 4 at 532:23-534:25 (Dec. 15,
2   2017)."

3   **Mission Linen's Response to Paragraph 15**:

4        The City has no expert testimony regarding the condition or releases from the City's storm
5   sewers, or analysis of the data that demonstrates that the Contamination Plume in the areas where the
6   storm sewers are located – along Tipton and at Mineral King east of Tipton – can only be reasonably
7   explained by releases of storm water containing PCE from the City's storm sewers.

8        Mr. O'Brien establishes through unrebutted testimony that the contamination in this area could
9   not be caused by onsite releases because the Mission Linen Site is downgradient of the contamination
10  present along Tipton, coincident with the City's storm sewers. [Re: Groundwater – Trial Transcript at
11  348:1-349:8, Plaintiff's Exhibit 161; Re: Soil Vapor – Trial Transcript at 349:12-350:5, Plaintiff's
12  Exhibit 162; Re: groundwater volatized into soil pore spaces causing the soil vapor contamination –
13  Trial Transcript at 356:3-359:4, 360:9-361:10, Plaintiff's Exhibits 326A and 326B.] The data and
14  elevated concentrations of contamination along Tipton are consistent with storm sewer releases
15  because the storm sewers flow east along Mineral King toward Tipton, and then north along Tipton
16  flowing north several blocks beyond the Mission Linen Site. [Trial Transcript at 458:6-17; 462:16-
17  463:2.]

18       Based on the totality of the evidence, and lack of rebuttal expert testimony offered by the City,
19  Mission Linen has established the reasonable pathway to explain how PCE-impacted surface water
20  runoff entered the City's storm sewers.  This evidence is corroborated by the resulting Contamination
21  Plume coincident with the City's storm sewers that can only be reasonably explained by releases of
22  storm water containing PCE from the City's storm sewers flowing east along Mineral King and then
23  north along Tipton.  [Document 152 at 38, ¶¶ 343-344 citing to Plaintiff's Exhibits 165 and 178.]

24  **City's Proposed Finding Paragraph 18**:

25       "In other cities such as the City of Lodi, the City of Modesto, the City of Watsonville, and the
26  City of Eureka, PCE was detected in the subsurface in the vicinity of sewer lines that were suspected
27  to have leaks. *See Transcript,* Vol. 2 at 294:14-296:20 (Dec. 13, 2017)."

28  ///

1   **Mission Linen's Response to Paragraph 18**:

2          The City's finding is an incomplete statement of the evidence presented in the trial record, and

3   not all of the testimony relates to detections of PCE in the subsurface.  Mr. Krasnoff testified that "the

4   City of Lodi… went in and slip lined the sewers near one of the dry cleaners that had issues, and that

5   was part of their sewer system management plan." [Trial Transcript at 295:2-6.]  The identification

6   and repair of issues with the City of Lodi's sewers demonstrates that city's conduct with respect to

7   known defects and potential risks associated with such defects.  [Document 152 at 46, ¶ 417.]

8          The City of Modesto inspected its sewers and undertook a program to address the potential of

9   releases from its sewers.  It undertook the investigation and cleanup efforts when it was alerted by the

10  regulatory agency and then filed a lawsuit to recover those costs. [Trial Transcript at 190:8-15.]  The

11  City of Modesto also had a sewer system management plan in place as to how to address problems

12  with its sewers. [Trial Transcript at 295:6-9.]  Unlike the City of Modesto, the City has not performed

13  any investigation of its sewers since being contacted by the DTSC. [Document 152 at 36, ¶ 319, et.

14  seq.; 46, ¶ 414.]  In the City of Watsonville, the city had already taken steps to address its leaking

15  sewers. [Trial Transcript at 296:7-15.]   It also agreed to take over the cleanup of the entire

16  contamination associated with what leaked out of their sewers. [Trial Transcript at 190:5-7.] Unlike

17  the City of Watsonville, who had already addressed its sewers when the contamination was discovered,

18  the City has still done nothing to investigate its sewers despite actual knowledge of problems.

19  [Document 152 at 36, ¶¶ 319-322; 45-46, ¶¶ 411-414.]

20         Mr. Krasnoff's opinions are intended to demonstrate that under similar circumstances, other

21  similarly situated sewer operators exercised due care to address known problems with their sewers

22  upon learning of "suspected" defects and/or "suspected" contamination. The conduct of these cities is

23  in stark contrast to the City's conduct with respect to responding to known defects in its sewers.

24  **City's Proposed Finding Paragraph 20**:

25         "Plaintiff's expert, Peter Krasnoff, has been retained by Plaintiff's counsel, Jan Greben, in

26  more than 10 cases; and has been paid in excess of $2,000,000 to provide expert opinions in those

27  cases. *See Transcript,* Vol. 2 at 278:12-278:17 (Dec. 13, 2017)."

28  ///

1   **Mission Linen's Response to Paragraph 20**:

2      Not only is this a collateral matter not necessary for the resolution of the findings in this case,

3   it is a mischaracterization of Mr. Krasnoff's testimony.  Mr. Krasnoff testified that over the last twenty

4   years, a rough estimate of the fees generated from the work by West Environmental for Mr. Greben –

5   e.g. his clients – could be in the $2 million range.  The Court should not accept as true the sum that is

6   a "rough estimate" to be binding on Mission Linen or Mr. Krasnoff.

7      Mr. Krasnoff testified that the approximately ten litigation matters he worked on with Mr.

8   Greben were of varying magnitudes. [Trial Transcript at 277:15-278:11 – citing that at least one of the

9   litigations proceeded over seven years.]  The finding is also an improper attempt to ask the Court to

10  find that Mr. Krasnoff was paid for his opinions, but the only evidence shows that Mr. Krasnoff was

11  paid for his time to prepare his expert opinion, and the fact that he was well-prepared and provided a

12  complete expert analysis has taken time and resources.  [Trial Transcript at 257:16-258:1.]  There is

13  no purpose for the City's proposed finding other than to attempt to denigrate Mr. Krasnoff's expert

14  testimony, because it has not offered expert testimony to rebut the majority of his opinions in this case.

15  **City's Proposed Finding Paragraph 21**:

16     "There is no evidence that City was uncooperative or obstructionist in its dealings with

17  governmental agencies."

18  **Mission Linen's Response to Paragraph 21**:

19     In its brief, the City spends a significant amount of time addressing the evidence and testimony

20  that Mission Linen presented with respect to the City's level of cooperation with the DTSC. In fact,

21  the City filed a post-trial request for judicial notice asking the Court to consider new information with

22  respect to the City's conduct in rebuttal to the testimony of the City Manager Mr. Olmos offered by

23  Mission Linen. It logically follows that because the City concedes that Mission Linen has presented

24  evidence, its finding that "there is no evidence" is inaccurate and improper.

25     Moreover, the City's brief in support of these findings attempts to enter new factual findings

26  and other unsupported arguments.  These issues are discussed fully above, and on that basis, the Court

27  should disregard the City's finding.

28  ///

**B.  Mission Linen's Response to the City's Proposed Conclusions of Law in Its Supplemental Proposed Findings of Fact and Conclusions of Law. [Document 150 at 26.]**

<u>City's Proposed Conclusion Paragraph 5</u>:

"[Plaintiff has failed to establish a 'release' or 'threatened release' of PCE or any other 'hazardous substance' from the City's sewers, which means Plaintiff cannot establish a prima facie case in its CERCLA cost recovery action against the City. *See* 42 U.S.C. § 9601 (22); *see also Adobe Lumber,* 658 F.Supp.2d at 1192.]"

<u>Mission Linen's Response to Paragraph 5</u>:

The City concedes that it does not contest liability and the only issue for the Court to decide is allocation. [City's Brief – Document 150 at 17:19-20.]  The City also asks the Court to find that: "At all times relevant to this litigation, during which PCE was discharged into the sanitary sewer laterals from the Mission Linen site, there have been blockages and surcharge events that have caused sudden and accidental releases from the City's Subject Sewers. Vol. 1, at 11:16-19; Amended Pre-Trial Order, p. 3, ll. 22-23 [Doc. 68.]; Order on Joint Stipulation, p. 3, ll. 17-22 [Doc. 71] (entered June 16, 2017)." [City's Proposed Findings of Fact and Conclusions of Law – Document 150 at 26, ¶ 17.]

<u>City's Proposed Conclusion Paragraph 6</u>:

"[Plaintiff has failed to establish that its alleged response costs are necessary under CERCLA. 42 U.S.C. § 9607(a)(4)(B); *see also Waste Mgmt. of Alameda County, Inc. v. E. Bay Reg'l Park Dist.,* 135 F.Supp.2d 1071, 1099 (N.D. Cal. 2001) ('[a] response cost is viewed to be necessary under CERCLA if it is not duplicative of other costs, wasteful, or otherwise unnecessary to address the hazardous substances at issue').]"

<u>Mission Linen's Response to Paragraph 6</u>:

The City concedes that it does not contest liability and the only issue for the Court to decide is allocation. [City's Brief – Document 150 at 17:19-20.]  This conclusion of law is improper as it is contradicted by the undisputed, stipulated facts. [Exhibit JT/1 – Stipulation of Fact ¶ 4(a).]  The City has not addressed any facts that would support this conclusion in its brief or findings of fact, nor at trial.  Mission Linen has presented unrebutted evidence at trial that by entering into a voluntary consent

1   order with the DTSC, and taking necessary response actions, Mission Linen's response actions to date

2   are necessary under CERCLA. [Document 152 at 2, ¶¶ 3-4; 20, ¶¶ 170-174; 50-51, ¶¶ 18-20.]

3   **City's Proposed Conclusion Paragraph 7**:

4       "[Plaintiff has failed to establish that its alleged response costs have been or will be consistent

5   with the national contingency plan. 42 U.S.C. §9607(a)(4)(B); *see also* 40 C.F.R. § 300.700(c)(3)(i)

6   (setting forth national contingency plan requirements).]"

7   **Mission Linen's Response to Paragraph 7**:

8       The City concedes that it does not contest liability and the only issue for the Court to decide is

9   allocation. [City's Brief – Document 150 at 17:19-20.]  This conclusion of law is improper as it is

10  contradicted by the undisputed, stipulated facts. [Exhibit JT/1 – Stipulation of Fact ¶ 4(a).]  The City

11  has not addressed any facts that would support this conclusion in its brief or findings of fact, nor at

12  trial.  Mission Linen has presented unrebutted evidence at trial that it entered into a voluntary consent

13  order with the DTSC and took response actions that are consistent with the National Contingency Plan.

14  [See e.g. Document 152 at 2, ¶¶ 3-4; 20, ¶¶ 170-174; 50-51, ¶¶ 18-20.]

15  **City's Proposed Conclusion Paragraph 10**:

16      "From at least 1978 to 1983, Plaintiff released PCE from the Mission Linen Property into the

17  environment by disposing of separator water. 42 U.S.C. § 9601(22); *see also 3550 Stevens Creek*

18  *Assoc. v. Barclays Bank of Cal.,* 915 F.d 1355, 1362 (9th Cir. 1990) ('a disposal requires some

19  affirmative act of discarding a substance as waste and not its productive use')."

20  **Mission Linen's Response to Paragraph 10**:

21      The City's conclusion is not supported in fact or law.  The undisputed record shows that

22  Mission Linen discharged separator water to the City's sewers.  By its discharge of separator water,

23  Mission Linen did not dispose of or cause the release of wastewater containing PCE from the City's

24  sewers into the groundwater.  The terms "disposal" and "release" within the meaning of CERCLA

25  require a finding that there was an action that caused the hazardous substance to enter the environment,

26  which is notably missing from Mission Linen's discharge.  The undisputed testimony demonstrates

27  that Mission Linen and Star did not have knowledge that the separator water they were discharging to

28  the City's sewer was being released into the environment. [Document 152 at 43, ¶¶ 390-391.]

The City owned, operated, controlled and had a duty to take precautions to prevent releases from its sewers.   [Document 152 at 43-44, ¶¶ 392-403.]  The releases that occurred from the City's facility to the environment supersede Mission Linen's control over its separator water, and Mission Linen had a reasonable expectation that the City's sewers were carrying that wastewater to its treatment plant and not releasing into the subsurface.  Therefore, with respect to Mission Linen's discharge of separator water, there is no evidence that Mission Linen "released" or "disposed" of it into the environment but rather, that it discharged it to the City's sewers.

**City's Proposed Conclusion Paragraph 13, in pertinent part**:

"…In contrast, the City's ownership and operation of its sewers do not involve, and have never involved, the use of PCE. Thus Plaintiff (and Star Laundry before Plaintiff) received all or substantially all of the economic benefits from the use and disposal of PCE at the Mission Linen Property. There is no evidence as to the amount of PCE that has remained in the City's sewers since 1983. There is no evidence showing that Plaintiff informed the City it was discharging separator water into the City's sewers.  The City's sewers have apparently experienced issues comparable to other cities such as the City of Lodi, the City of Modesto, the City of Watsonville, and the City of Eureka, *i.e.,* where PCE was detected in the subsurface in the vicinity of sewer lines that were suspected to have leaks…"

**Mission Linen's Response to Paragraph 13**:

These are merely a restatement of the City's proposed findings of fact, which are addressed above.  For the same reasons they are improper findings, it follows they are an improper ground to support the City's proposed conclusion.

## VI.

## CONCLUSION

The City would have the Court believe that this case is about Mission Linen trying to disavow any responsibility merely because Mission Linen presented a complete case for the record during trial. Mission Linen has acknowledged its contribution, and immediately entered into a voluntary consent agreement with the DTSC.  Since 2010, Mission Linen has borne the sole burden and expense to respond to the DTSC to delineate the Contamination Plume at and around the Mission Linen Site and

1   the City's sewers.  Mission Linen has investigated the City's sewers and resulting contamination,

2   which included areas and sources that were not part of Mission Linen's operations.  In determining

3   contribution, Mission Linen's expert Keith O'Brien fairly assessed Mission Linen's contributions

4   relative to the other responsible parties.

5          With respect to the City, the unrebutted testimony at trial shows that there would be a much

6   smaller Contamination Plume had the City's sewers not leaked, and that the City's sewers require

7   repair in order for the Contamination Plume to be remediated.  The other essential components to the

8   City's contribution is that it has: (1) not exercised due care with respect to its operation of its sewers,

9   and (2) the cost savings the City has received by not maintaining its sewers over the past several

10  decades and by choosing not to participate in the efforts to date to address the Contamination Plume

11  and its sewers.  Notably missing from the City's briefing is the need to repair its sewers, and the City

12  should be held solely responsible for such repairs.

13         The other essential component is the determination of how to allocate Star's orphan share.  The

14  Court should disregard the City's argument regarding Mission and Star's purported relationship

15  because it is unsupported by any legal authority and without factual basis.  The Court has discretion

16  in reassigning Star's orphan share, and should consider the supported testimony of Mr. O'Brien

17  distinguishing the discharges to the City's sewers, as well as the City's involvement in the releases

18  that caused the contamination associated with Star's operations and discharge of separator water.  The

19  City's involvement in these releases extend beyond the period Star operated because it failed to

20  exercise due care in the regular maintenance of its sewers that led to the accumulation of PCE that was

21  allowed to continue to be released through defects in the City's sewers to the subsurface causing the

22  resulting Contamination Plume.

23                                         Respectfully submitted,

24  Dated:  March 21, 2018               GREBEN & ASSOCIATES

25

26                                          _/s/ Jan A. Greben_____
                                            Jan A. Greben
27                                          Christine M. Monroe
                                            Attorneys for Plaintiff MISSION LINEN SUPPLY
28