# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MISSION LINEN SUPPLY,** | **CASE NO. 1:15-CV-0672 AWI EPG** |
| **Plaintiff** | |
| **v.** | **FINDINGS OF FACT AND**<br>**CONCLUSIONS OF LAW** |
| **CITY OF VISALIA,** | |
| **Defendant** | |

This is a Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.) ("CERCLA") case that arises from the contamination of property surrounding a dry-cleaning business in Visalia, California by the chemical perchloroethylene ("PCE"). Plaintiff Mission Linen Supply ("Mission") has brought suit against the City of Visalia ("the City"). Mission seeks declaratory relief under CERCLA that sets the percentage of responsibility between it and the City for future response costs.

In December 2017, a bench trial was held. Following the bench trial, the parties attempted to settle the matter. The Court has received word that the attempts were unsuccessful. Because settlement attempts were unsuccessful, the Court now issues these findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1). In sum, the Court finds that Star Laundry, Mission, and the City are potentially responsible parties for the PCE contamination plume, and after dividing Star Laundry's orphan share of future response costs, Mission will be responsible for 50% of necessary future response costs while the City will be responsible for 50% of necessary future response costs.

**MOTIONS TO STRIKE**

Mission Linen has filed three motions to strike and the City has filed one motion to strike.

**1.    Mission's Motions (Doc. Nos. 153, 160, 162)**

**a.    The City's Arguments & Proposed Findings (Doc. Nos. 160 and 162)**

*Argument*

Two of Mission's motions seek to strike portions of the City's proposed findings of fact and conclusions of law, as well as portions of the City's response to Mission's proposed findings of fact and conclusions of law. In essence, Mission contends that the arguments and proposed facts are unsupported by the evidence and thus, improper.

*Discussion*

Mission's motions will be denied. The documents in question are simply proposed findings and a response. The documents do not constitute evidence or the closing arguments of counsel, they are simply filings like any other motion, opposition, or reply. The Court is not swayed or influenced by arguments that have insufficient factual support. The Court will review the parties' proposed findings and the record, but the Court will not adopt any side's findings verbatim or in a wholesale fashion. The Court will not issue any proposed finding if it determines that there is an insufficient factual basis for the finding.[1]

**b.    Strike Portions of Dr. Sweetland's Testimony (Doc. No. 153)**

*Argument*

Mission requests that the Court strike Dr. Nicole Sweetland's testimony at pages 533:10-534:25, 536:14-537:1, and 547:5-549:1 of the record. Mission argues that Dr. Sweetland expanded her previously disclosed testimony and offered new undisclosed opinions. In her rebuttal report, Dr. Sweetland offered the opinion that "Mr. Krasnoff's opinion regarding storm water runoff containing PCE at the Mission Cite is speculative." However, Mission contends that at trial, Dr. Sweetland testified as to the specific reasons why she disagrees with Mission's expert Peter Krasnoff. See Doc. No. 153-1 at 2:11-13.

---

[1] Making formal motions to strike proposed findings is not desirable. There is nothing so scandalous, inflammatory, or improper about the City's filings that a motion to strike is warranted. If a finding does not have a proper factual basis, then Mission should point that fault out as part of its response to the City's proposed findings.

1

*Synopsis of Relevant Testimony*

At pages 533:10 to 534:25 of the trial transcript, Dr. Sweetland testified that there is contamination to the east of Mission's property, she considered whether a storm sewer could cause that contamination and whether there was a pathway to that storm sewer from the property, that there are no laterals from the property to the storm sewer, that Peter Krasnoff opined that PCE entered the storm sewer once PCE vapor from the property sorbed onto particulate matter, but there is no site specific information that indicates that fumes came out of the facility and ended up in the storm sewers. Similarly, at pages 536:14-537:1, Dr. Sweetland stated that Krasnoff provided no site specific information to support his opinion that PCE vapor ended up in the storm sewer, Krasnoff provided no evidence in support of that theory, and Dr. Sweetland saw no evidence that would support that theory. Finally, at pages 547:5 to 549:1, Dr. Sweetland stated that the condition of the storm sewers were not important to her because Krasnoff's opinion regarding PCE air vapor was speculative, that the scientific process requires individuals to support their theories, Krasnoff's opinion was a "pathway opinion" and not a "sewer condition opinion," Dr. Sweetland still has not seen evidence that support's Krasnoff's theory, and she would have expected Krasnoff to cite evidence that supports his PCE air vapor theory.

*Discussion*

Despite Mission's motion and arguments to the contrary, the above described trial testimony appears to be consistent with Dr. Sweetland's opinion that Krasnoff's PCE air vapor and storm water runoff theory was speculative. The cited trial testimony expands on that disclosed opinion essentially by stating that Krasnoff did not cite evidence in support of his theory and Dr. Sweetland is aware of none. This is consistent with what a "speculative" opinion is. The Court finds no basis to strike Dr. Sweetland's testimony at pages 533:10-534:25, 536:14-537:1, and 547:5-549:1. Mission's motion to strike Dr. Sweetland's testimony is denied.[2]

---

[2] Even if Dr. Sweetland's testimony is an improper expansion of her previously disclosed opinions, there is no harm to Mission. The Court has considered Dr. Sweetland's criticisms of Krasnoff, but finds Krasnoff's "PCE air vapor to storm sewer pathway" opinion to be credible. Krasnoff's opinion is based on his experience and research, and the shape/location of the PCE contamination plume in this case. Moreover, given the fact that PCE was only used at the Mission property from 1971 to 1983, it is unknown whether any testing could be performed that would confirm Krasnoff's theory that PCE air vapor sorbed onto airborne particles, those particles settled near Mission's property, and then were washed into the storm sewer during rain events. While Dr. Sweetland was critical of the absence of

1    **2.    City's Motion (Doc. No. 151)**

2    *Arguments*

3    The City wishes to strike several aspects of Peter Krasnoff's testimony.  First, Krasnoff

4    testified that there were no other options for dry cleaners to dispose of PCE containing separator

5    water, other than dumping the water down the drain.  The City argues that this opinion is

6    unsupported by sufficient facts and data, rather it was drawn from vague impressions from past

7    inquiries and other cases.  He conducted no investigation in this case.  Second, Krasnoff testified

8    about the Fresno and Merced sewer maintenance programs.  However, the City argues that its

9    program was not introduced into evidence.  Further, none of Krasnoff's opinions were given in

10   relation to how the City exercised due care with respect to PCE.  Krasnoff's opinions are more

11   relevant to the issue of bare liability, but not allocation.  Third, Krasnoff's opinion that the City's

12   program is not adequate should be stricken because it was outside his area of expertise and not

13   supported by sufficient facts and data.  Krasnoff also opined that the City's program was

14   underfunded.  However, Krasnoff has no experience deciding what a public agency can do with its

15   budget and make choices.  Finally, Krasnoff testified as to repair costs for the sewers.  However,

16   repair costs are not relevant to allocation, and Krasnoff's answer should be stricken, just as

17   Mission's other expert's testimony (O'Brien) about costs were stricken.

18   *Discussion*

19   With respect to the first opinion regarding methods of PCE disposal, Krasnoff's opinion

20   was based on a review of documents published by the California Regional Water Quality Control

21   Board, deposition testimony of an executive of one of the major dry-cleaning equipment

22   manufacturers (from a unrelated lawsuit), investigations performed in other cases, and the

23   deposition testimony of a Mr. Greaver (as part of this lawsuit).  See TT 57:14-60:18.  The Court

24   has twice ruled that this foundation is sufficient for Krasnoff to offer an expert opinion about other

25   disposal options for PCE.  See TT 60:23-61:2, 522:25-523:22.  The Court remains satisfied that

26   Krasnoff has a sufficient basis to offer an expert opinion regarding disposal methods of PCE by

27   ──────────────

28   evidence, she offered no opinions that explained how relevant information could be obtained or that productive testing could be performed in light of the timeframe involved, i.e. about 30 years after PCE was no longer used and no longer escaping as vapor.

dry cleaners during the 1970's and 1980's.  The City's criticisms affect the weight of Krasnoff's opinions, they do not undermine the admissibility of the opinion.  See Bergen v. F/V St. Patrick, 816 F.2d 1345, 1352 n.5 (9th Cir. 1987).  The City's motion to strike Krasnoff's disposal methods opinion is again denied.

With respect to the second opinion, which compared the sewer maintenance programs of Merced and Fresno to the City's, the Court finds that how the City maintained or repaired its sewers is relevant to the issue of allocation.  Merced is a smaller city than Visalia,[3] but it is not so small that its practices serve no useful comparison to the City.  However, Fresno has a population of over 500,000[4] and is significantly larger than the City's population of about 133,000.  Given the larger size of Fresno, as well as the additional resources that are generally available to a larger town, the Court finds that Mission has not adequately shown that Fresno is a fair comparator to the City.  Therefore, under Federal Rule of Evidence 403, the Court will grant the City's motion and strike Krasnoff's testimony relating to Fresno's sewer programs/practices.[5]

With respect to the third opinion regarding the City's sewer practices, the Court finds that how the City maintained, cleaned, and repaired its sewers is relevant to the issue of allocation.  The existence and aspects of the City's formal maintenance program is in turn relevant to how the City maintains its sewers.  With respect to budgetary issues, the degree of maintenance funding could reflect on the nature of the sewer maintenance implemented.  It is true that Krasnoff has never been responsible for running a municipal sewer department, however, Krasnoff is an engineer who has about 30 of experience with sewer operation, maintenance, and maintenance

---

[3] In 2017, Merced had an estimated population of 83,081.  See https://www.census.gov/search-results.html?q=Merced+city%2C+CA&page=1&stateGeo=none&searchtype=web&cssp=Typeahead.  In 2017, Visalia had an estimated population of 133,010.  See https://www.census.gov/search-results.html?q=Visalia%2C+CA&page=1&stateGeo=none&searchtype=web&cssp=SERP&_charset_=UTF-8.  The Court takes judicial notice of the populations of Visalia and Merced as reflected by United States Census Bureau's website.  See Fed. R. Evid. 201; King v. County of Los Angeles, 885 F.3d 548, 555 (9th Cir. 2018).

[4] In 2017, Fresno had an estimated population of 527,438.  See https://www.census.gov/search-results.html?q=fresno+city%2C+ca&page=1&stateGeo=none&searchtype=web&cssp=SERP&_charset_=UTF-8.  The Court takes judicial notice of the estimated population of Fresno as reflected by United States Census Bureau's website.  See Fed. R. Evid. 201; King, 885 F.3d at 555.

[5] Even if the Court did not strike Krasnoff's testimony and considered evidence regarding the sewer maintenance programs of Fresno, that evidence would not change any of the Court's findings of fact or conclusions of law.

1  programs.  See Trial Transcript at 154:17-155:17.  The Court is satisfied that Krasnoff has

2  sufficient experience with sewer maintenance programs (including funding) to render an opinion.

3  See Trial Transcript 154:17-161:25.  The Court will not grant this aspect of the City's motion to

4  strike.[6]

5       Finally, there is no objection by Mission to striking Krasnoff's testimony regarding the

6  estimated cost to repair the relevant sewers.  In fact, Mission notes that the Court previously struck

7  this testimony.  For clarity, the Court does not find that the cost of repairing the sewers is relevant

8  to allocation or any other issue in this case, and, under Federal Rule of Evidence 402, Krasnoff's

9  testimony regarding the costs of sewer repair (page 222 lines 20 to 24 of the trial transcript) will

10  be stricken.

11

12                    **REQUESTS FOR JUDICIAL NOTICE**

13       The City has filed two requests for judicial notice.

14  **1.     Request 1 – Government Letter Referenced in Deposition Testimony (Doc. No. 150-1)**

15       *Arguments*

16       The City asks the Court to take judicial notice of a July 2014 letter from the California

17  Department of Toxic Substance Control ("DTSC").  See Doc. No. 150-1.  The request explains

18  that the letter is a governmental publication that was signed by a governmental official, and that

19  the letter was the subject of deposition testimony that was read into the record by Mission's

20  counsel.  See id.  The City states that it is not attempting to introduce the letter as evidence, but

21  simply to demonstrate that the deposition testimony read into the record was referring to the July

22  2014 letter.  See id. at 3:1-3.  Mission objects to taking judicial notice of the record.

23       *Discussion*

24       Official governmental letters can be judicially noticed.  See Smith v. L.A. Unified Sch.

25  Dist., 830 F.3d 843, 851 n.10 (9th Cir. 2016) (taking judicial notice of letters sent by L.A. Unified

26  School District); Cardenas v. Lynch, 669 F. App'x 354, 356 (9th Cir. 2016) (taking judicial notice

27

---

[6] The Court notes that it does not find Krasnoff's opinion regarding budgets and funding to be particularly compelling.
28  The Court makes no factual findings regarding the City's budget and does not base any of its findings or conclusions
on the City's sewer budgetary or funding practices.

of a governmental letter).  However, the City's request states expressly that it is not attempting to introduce the letter as evidence.  If the letter is not going to serve as evidence, then there is no point in taking judicial notice of it.  Because the letter would serve no evidentiary purpose, the Court denies the City's request.

**2.**  **Request 2 – Municipal Correspondences Regarding Peter Krasnoff (Doc. No. 139)**

*Arguments*

The City requests that the Court take judicial notice of responses by eight California cities (Mountain View, Eureka, Vallejo, Modesto, Auburn, Hollister, Crockett, and Lodi) to the City's Public Records Act requests.  The requests asked for information or records regarding contracts with Peter Krasnoff or his firm West Environmental Services, and reports or evaluations prepared by Krasnoff or West Environmental relating to sewers.  Vallejo responded that they do not provide sewer services and that they have no responsive records, and that further inquiry should be directed to the Vallejo Flood and Water District.  The City of Crockett responded that Krasnoff consulted with a sugar company and that Crockett shares a treatment plant with the company.  All other cities responded in essence that they had no responsive documents.

Mission objects *inter alia* that the documents are subject to dispute because the cities' responses are framed by the requests, and the requests do not acknowledge that Krasnoff worked for other firms besides West.  Moreover, the relevant document retention policies of the cities are not provided and Krasnoff has been working for over 25 years.  Additionally, the responses have no relevance to the underlying issues in this case, and there is significant prejudice because Mission could not conduct its own examination or redirect exam of Krasnoff.  With respect to Vallejo, that city directed inquires to another agency, and Krasnoff testified that he performed work with Vallejo in the mid-80's pursuant to an EPA grant; Vallejo's response is not inconsistent.  With respect to Eureka, Krasnoff stated that he worked with Eureka as part of a settlement where money was held in a trust account, he did not testify that he worked for Eureka.  With respect to Auburn, although the City did not ask, Krasnoff worked as a subcontractor and did not work on that city's sewers.  With respect to Crockett, that city's response confirms what Krasnoff testified to, he worked indirectly with Crockett through his client, S&H Sugar.  With

respect to Lodi, the City's request did not capture the context of Krasnoff's work with Lodi. With respect to Hollister, he was a sub-contractor to an engineer. With respect to Mountain View, Krasnoff worked on a specific flow monitoring project in the 90's. The City's request to Mountain View was not sufficiently tailored to the work that Krasnoff performed. With respect to Modesto, Krasnoff stated that he did not perform work for Modesto. If the Court grants the City's motion, Mission requests the opportunity to file its own rebutting requests for judicial notice, which would include counsel minutes and invoices.

*Discussion*

Initially, the Court finds that the written responses of the eight California municipalities are the type of government document that may be judicially noticed. See Fed. R. Evid. 201; Smith, 830 F.3d 843at n.10; Citizens for Responsible Open Space v. San Mateo Cty., 159 Cal.App.4th 717, 731 n.10 (2008) (taking judicial notice of response to Public Records Act request). Further, judicial notice may be granted at any time. See Fed. R. Civ. P. 12(d). However, the Court agrees with Mission that it would be improper to take judicial notice of the eight responses.

Mission has demonstrated that there are substantial Rule 403 related concerns. It is not clear that the documents are necessarily inconsistent with Krasnoff's testimony, e.g. Modesto's response and Crockett's response do not seem inconsistent, and Vallejo's response is incomplete because it references another agency that handles its sewers. There are further concerns regarding the scope of the requests and the absence of any record retention policies. Also, Krasnoff worked for other firms before West, did subcontracting, and arguably performed tasks that would not necessarily be captured by the requests submitted by the City. Thus, there is little probative value to the responses, but a substantial risk of confusion and misleading. Because of concerns under Rules 403, the Court declines to take judicial notice of the eight Public Records Act responses.[7]

---

[7] Even if the Court took judicial notice of the eight responses, they would not change any of the Court's findings of fact and conclusions of law. As explained above, the inconsistencies between Krasnoff's testimony and the eight responses are not necessarily clear. Further, the Court finds Krasnoff's testimony generally to be credible and persuasive. Krasnoff has been accepted as an expert witness in a number of CERCLA cases, including some involving PCE and sewers. E.g. Seattle Times Co. v. LeatherCare, Inc., 2018 U.S. Dist. LEXIS 138549, *2 n.1 (W.D. Wash. Aug. 15, 2018); KDF Enters. v. City of Eureka, 2013 U.S. Dist. LEXIS 76252, *7-8 (N.D. Cal. May 30, 2013) Voggenthaler v. Md. Square, LLC,, 2010 U.S. Dist. LEXIS 74217, *38-39 (D. Nev. July 22, 2010); Adobe Lumber,

8

# FINDINGS OF FACT[8]

*The Property*

The real property at issue is located at 520 E. Mineral King Ave., Visalia, California ("the Property"). JE 1 at ¶ 1(a).

The Property is composed of three parcels that total about 1.5 acres. JE 1 at ¶ 1(b).

The Property has five buildings and an unpaved employee parking lot. JE 1 at ¶¶'s 1(d), 1(e). Three buildings are storage buildings, one large building is a laundry facility ("Laundry Building"), and the last building is a storage warehouse ("Warehouse Building"). JE 1 at ¶ 1(d).

The Laundry Building has been used as a laundry since 1937. JE 1 at ¶ 1(e).

Visalia Laundry & Dry Cleaning operated in the Laundry Building from 1937 to 1971. JE 1 at ¶ 1(f).

From 1971 to 1978, Star Laundry & Dry Cleaning ("Star") owned the two portions/parcels of the Property on which buildings are located.[9] JE 1 at ¶ 1(g).

From 1971 to 1978, Star conducted dry cleaning operations in the Warehouse Building. JE 1 at ¶ 1(g).

In 1978, Mission acquired the two parcels/portions of the Property that have the five buildings; in 2003, Mission acquired the third parcel/portion of the Property that has the unpaved employee parking lot. JE 1 at ¶ 1(h).

Mission operates an industrial laundry business on the Property. See JE 1 at ¶ 1(c).

Dry cleaning operations were performed by Star and Mission on the northern half of the Warehouse Building. JE 1 at ¶ 1(i).

Star and Mission used PCE in their dry-cleaning operations between 1971 and 1983. TT 237:21-25.

---

Inc. v. Hellman, 2010 U.S. Dist. LEXIS 139766, *11 (E.D. Cal. Mar. 4, 2010); Vine St., LLC v. Keeling, 460 F. Supp. 2d 728, 737 (E.D. Tex. 2006); Ultramar Inc. v. Napa Sanitation Dist., 1996 U.S. Dist. LEXIS 18311, at *20 (N.D. Cal. Dec. 2, 1996). The eight responses would not so undermine Krasnoff's credibility that the Court would no longer credit his testimony.

[8] "JE" refers to Joint Exhibit and "PE" refers to Plaintiff's Exhibit. No defense exhibits were admitted into evidence. "TT" refers to the Trial Transcript.

[9] Star did not own the parcel/portion that consists of an employee parking lot. See JE 1(d), 1(e), 1(g).

Mission discontinued dry cleaning operations and the handling and storage of PCE at the Property in 1983.  JE 1 at ¶ 1(j).

PCE had only been used at the Property for dry cleaning operations.  JE 1 at ¶ 1(j).

From 1978 to 1983, Mission stored PCE in a 55-gallon drum and within the dry-cleaning machines, all of which were located at the northern end of the Warehouse Building.  JE 1 at ¶ 1(*l*).

Mission scrapped and removed the dry-cleaning machines from the Property in 1983.  JE 1 at ¶ 1(k).

Star and Mission utilized various pieces of equipment in the dry-cleaning process to recapture and reuse as much PCE as possible, including a state of the art piece of equipment known as a "sniffer" that reduced PCE-vapor.  See PE 184; TT 49:19-52:10, 302:14-303:8.

In the northeast corner of the Property, between two storage buildings, was a dry-cleaning equipment washing area.  PE's 162, 165; TT 537:4-22.

It is unknown what dry-cleaning equipment was washed in the "dry-cleaning equipment washing area."  See TT 545:12-14.

There are several pieces of equipment in the dry-cleaning process that would have been exposed to PCE.  See PE 184.

In the dry-cleaning process, there are five stages in which waste water is generated.  See PE 184; TT 258:23-259:20.

Star is no longer in existence and is not a part of the lawsuit.  TT 445:13-16.

There is no evidence that Visalia Laundry and Dry Cleaning used PCE at the Property.

Groundwater near the property flows in a southwesterly direction.  See TT 364:10-25, 388:16-21.

*The Sewer System Around 520 E. Mineral King Ave.*

The City is and has been the owner and operator of the sewers at and around the Property, including both storm and sanitary sewers, ("the Subject Sewers") at all relevant times.  JE 1 at ¶ 2(a).

Around the Property, the Subject Sewers consist of three sanitary sewer lines and two storm sewer lines.  See PE 150; TT 63:22-64:16.  One storm sewer is on S. Tipton St. (the street

that abuts the Property to the east), flows from south to north, is a 12-inch pipe, and was installed in 1939.[10] See PE. 150; TT 147:13-14, 246:21-247:2. One storm sewer is on E. Mineral King Ave., flows from west to east, and is an 8-inch pipe. See PE 150; TT 70:1-12. There are two sanitary sewers on E. Mineral King Ave., an 8-inch pipe and a 21-inch pipe, both of which flow east to west. See PE 150; TT 83:19-22, 243:18-244:12. The 8-inch pipe was installed in the 1920's and was used by the Property until 1978 (but is still used as a conduit for sewage today), and the 21-inch pipe was installed and used by the Property from 1978 to the present. See TT 141:5-9, 244:16-23. The 8-inch pipe transitions into a 10-inch pipe at the intersection with N. Santa Fe Ave., and then continues west on E. Mineral King Ave. See TT 243:18-244:5. Finally, there is a sanitary sewer that runs from south to north on N. Santa Fe St. (the street that abuts the Property to the west) and is an 18-inch pipe.[11] See PE 150; TT at 64:7-16, 150:12-13.

There is a lateral line at the Property that connects to the sanitary sewers on E. Mineral King. See TT 247:15-248:9. From at least 1971 to 1978, the lateral connected to the 8-inch sanitary sewer line, but from 1978 to the present, the lateral connected to the 21-inch sewer line. See id.

It is unlikely that the lateral line from the Property to the sanitary sewers leaked or released PCE, because that lateral protrudes inside the sewer mains and, because of a high slope, delivers wastewater quickly to the sewer main. See TT 98:15-99:10.

The Subject Sewers were installed below general industry standards in that: (1) the slope of all the pipes was too flat, and thus was not adequate to maintain proper velocities so as to keep materials from accumulating within, and plugging up, the sewer's pipes; and (2) the storm sewer on E. Mineral King Ave. and the storm sewer on S. Tipton St. are buried too shallow, meaning that they would not have adequate supporting strength. TT 62:17-63:3, 65:1-66:22, 79:9-17, 93:3-10.

---

[10] There also is a 6-inch sanitary sewer on S. Tipton St. See TT 246:9-13. Because there is no evidence that the S. Tipton St. sanitary sewer released PCE or contains PCE, the Court does not consider it.

[11] The 21-inch sanitary sewer on E. Mineral King and the 18-inch sanitary sewer on N. Santa Fe Ave. are actually one line. The line merely transitions from a 21-inch pipe to an 18-inch pipe at the intersection of E. Mineral King Ave. and N. Santa Fe Ave., and then runs north on N. Santa Fe Ave. See TT 244:6-11, 244:24-245:12. For purposes of this order, the Court will refer to this line as two separate sewers, one on N. Santa Fe and one on E. Mineral King.

The Subject Sewers each have numerous "defects," besides inadequate slope, including: holes/broken pipes, exposed soil, cracks, sags, offset/separated joints, missing portions of pipe, root intrusion, debris, and deposits of material that indicate blockages and surcharge conditions. See JE. 115; PEx.'s 125, 178, 179; TT 140:2-152:20, 214:25-215:6.

Most of the Subject Sewers' structural defects would have occurred shortly after installation of the pipes. See TT 142:16-24, 250:20-21, 291:19-292:22.

Laterals that used to connect homes to the 8-inch sanitary sewer on the south side of E. Mineral King Ave. were not properly sealed when the homes were removed as part of a highway project. TT 99:11-20.

These "non-sealed laterals" are open to the soil. See TT 99:16-18.

In the event of a backup or other type of blockage, it is possible that materials from the 8-inch sanitary sewer could be released into the soil/environment through the "non-sealed laterals." See TT 99:18-20.

At various times, there have been blockages and surcharge events that have caused sudden and accidental releases from the Subject Sewers. JE 1 at ¶ 2(b).

*Conditions & Operations Concerning the Subject Sewers*

There is no evidence that the Subject Sewers have ever been cleaned by the City.

There is no indication that at any relevant time the City has restricted or placed limits on the disposal or dumping of PCE into any of its sewers, including the Subject Sewers. See TT 208:15-209:5, 212:10-213:24; Knight Depo. 58:3-59:2.

At least since 1989, the City has known that PCE that exceeded drinking water limitations was found within its sewer system in general. See JE 99; TT 193:15-196:2.

In 1989, PCE was detected in the City's sewers at 59 micrograms per liter, and the regulatory levels for PCE in drinking water is 5 micrograms per liter. See JE 99; TT 193:15-196:2.

Monitoring levels through the 1990's and 2000's show variations in PCE concentrations in the City's sewers, ranging from levels below 5 micrograms per liter to levels that exceed 59 micrograms per liter. See JE.'s 99, 130-1; TT 195:23-197:21.

There is no evidence that either Star or Mission informed the City that they were dumping PCE into any of the Subject Sewers.  See TT 287:17-288:9.

No evidence presented indicates that the City has done anything to address PCE within its sewers.  See TT 196:3-6.

It appears that PCE in and of itself poses no risk of harm to the sewers or the City's wastewater treatment processes or facilities.  See TT 208:8-209:5; JE 100.

The PCE-containing separator water that was poured/dumped/disposed of into the sanitary sewers on E. Mineral King Ave. would have been transported to the City's wastewater treatment facility, but for the "defects."  See TT 92:4-17, 243:18-244:5.

The City could have taken steps to ensure that the Subject Sewers did not leak, but did not do so.  See TT 199:24-201:2.

There is no evidence that any of the Subject Sewers' "defects" (as depicted in the exhibits admitted and testimony taken) have been addressed or corrected in any way by the City.  See TT 229:19-230:3, 512:5-21; see also Loeb Depo. 16:4-9.

In 2009, the City was aware of structural failures in the storm drain on E. Mineral King Ave., but no repairs were ever scheduled.  See JE 115 at COV 942; TT 69:24-71:2-3, 111:5-112:4.

No evidence has been presented that the City has conducted or conducts any regularly scheduled maintenance/repair, cleaning, or inspection of the Subject Sewers.  See TT 108:23-112:4, 150:18-151:9; Ennis Depo. 173:5-174:8, 183:19-187:9, 211:18-213:12.

A regular maintenance program for the Subject Sewers by the City would have reduced, if not fully prevented, the release of PCE into the environment through the "defects" of the Subject Sewers.  See TT 152:10-153:10.

The City's sewer management plan is not as comprehensive as other comparable cities within the Central Valley of California, e.g. Merced, Modesto, and Lodi, including providing for regular maintenance of the sewers.  See TT 108:23-112:4, 135:16-136:17, 137:15:23.

The City has not maintained the Subject Sewers in accordance with general industry practice.  See TT 100:7-13.

There is no evidence that the City charged Star or Mission any extra sewer fees due to

13

those entities' disposal of PCE within the Subject Sewers, nor is there evidence that indicates Star or Mission paid any sewer fees that were higher than any other commercial property in the City.

There is no evidence that the City utilized the PCE dumped/poured/disposed of into the Subject Sewers by Star and Mission for any purpose.

Since at least the 1980's, it was generally understood that storm water contained pollutants. See TT 215:21-24.

In 1991, the City was informed by the California Regional Water Quality Control Board that PCE contamination from sewers and dry-cleaning activities was a concern based on an incident in the City of Lodi. See PE 59; TT 192:10-193:14.

As part of the City's 2005 Master Plan and Management Program relating to storm water, the City's consultants recommended that the City take various measures to control the flow of storm water pollutants and protect surface waters. JE 105, TT 216:19-218:10.

The City did not implement any of the recommendations identified in the 2005 Master Plan and Management Program in relation to the storm sewers near the Property, including cleaning the storm sewers. See TT 218:11-23.

### PCE Plume & PCE Releases

PCE is a solvent that has been used in dry cleaning operations. JE 1 at ¶ 3(a).

PCE is used to remove stains and other materials from fabrics that cannot be washed with water. TT 360:9-13.

PCE is a volatile organic compound that prefers to be in a gaseous state. See TT 360:9-22.

PCE is denser than water. See TT 35:25-36:5.

PCE is considered a hazardous substance for purposes of CERCLA. See 42 U.S.C. § 9601(14)(C); 40 C.F.R. § 261.31.

PCE has been detected in the indoor air, soil, soil gas, and groundwater at and around the Property and the Subject Sewers. JE 1 at ¶ 3(b).

The PCE plume around the Property, i.e. the PCE detected in the indoor air, soil, soil gas, and groundwater, ("the PCE Plume") poses an imminent and substantial endangerment, as determined by the California Department of Toxic Substance Control ("DTSC"). JE 1 at ¶ 3(d).

Surface water runoff containing PCE has flowed into the storm sewers near the Property. See TT 47:1-5, 48:19-25, 62:2-17, 214:14-24; see also TT 36:16-37:17, 307:6-12.

PCE was released from the Property when PCE-vapor sorbed onto airborne particles, the particles settled to the ground, and some of the particles got washed into the storm sewers during rain events. See TT 47:1-5, 48:19-25, 62:7-16, 254:19-255:8, 263:23-264:2; see also TT 36:16-37:17, 307:6-12.

From 1971 and 1978, separator wastewater generated from dry cleaning was discharged into the building drain, which discharged into the 8-inch sanitary sewer main beneath E. Mineral King Ave. JE 1 at ¶ 1(m).

From 1978 to 1983, separator wastewater generated from dry cleaning was discharged into the building drain, which discharged into the 21-inch sanitary sewer beneath E. Mineral King Ave. JE 1 at ¶ 1(m).

From 1971 to 1983, the separator wastewater discharged from the Property into the 8-inch and 21-inch sanitary sewers beneath E. Mineral King contained PCE. See TT 47:6-21, 49:23-52:17, 255:13-20, 256:12-16.

The amount of PCE discharged from the Property, either through PCE-vapor or through the separator wastewater, is unknown.

From 1971 to 1983, the only option or manner of disposing of the separator wastewater that contained PCE was to discharge the wastewater into the sewers. See TT 52:11-17, 239:6-17.

PCE leaked or was otherwise discharged or released into the environment from the Subject Sewers through the various breaks, cracks, offsets, and other defects, and surcharge events. See TT 34:9-17, 36:17-37:13, 47:1-21, 48:19-25, 62:2-17, 92:1-93:10, 145:19-146:2, 230:4-231:6, 254:19-255:3, 383:18-21, 435:19-24, 539:2-540:14; PE's 178, 179.

The inadequate slope of the Subject Sewers contributed to the release of PCE into the environment. See TT 92:1-17.

The PCE Plume at/around the Property correlates with the various defects in the Subject Sewers. See PE's 125, 178, 179; TT 151:21-152:9, 394:1-398:3, 401:15-22.

The high concentration (greater than 10,000 micrograms per cubic meter) portion of the

15

PCE Plume that is located in the northeastern portion of the Property appears to correlate to the dry-cleaning equipment washing area.  <u>See</u> PE 162; TT 537:5-18.

It is unknown whether PCE remains in the Subject Sewers, but it is possible that PCE from the Property may still be within the Subject Sewers.  <u>See</u> TT 293:18-294:9.

The PCE Plume is abatable.  JE 1 at ¶ 3(c).

Soil vapor extraction (for PCE located above the groundwater table) and air sparging (for PCE located below the groundwater table) appear to be viable methods of remediating the PCE Plume.  <u>See</u> TT 418:10-423:9, 433:1-8.

Leakage from the defects in the Subject Sewers is an impediment to the soil vapor extraction method of remediating the PCE located above the groundwater table.  <u>See</u> TT 424:20-425:7.

It is possible to repair the Subject Sewers in order to prevent leakage without actual excavation in the streets.  <u>See</u> TT 425:8-19.

The Subject Sewers should be repaired before a soil vapor extraction method is attempted/implemented.  <u>See</u> TT 425:20-426:1.

If the Subject Sewers are not properly repaired, the existing defects will permit hazardous substances to continue to leak or otherwise be released into the environment.  <u>See</u> TT 229:19-230:3, 234:13-17.

*Regulatory Actions Regarding the PCE Plume*

On September 8, 2006, DTSC issued an Imminent and Substantial Endangerment Order for various properties located within the central portion of the City.  <u>See</u> JE 1 at ¶ 5(a).

On February 3, 2010, DTSC issued an Imminent and Substantial Endangerment Order for the Property (hereinafter "the Mission ISEO").  JE 1 at ¶ 5(b).

In response to the Mission ISEO, Mission entered into a voluntary consent order with DTSC.  JE 1 at ¶ 5(c).

Mission has funded DTSC oversight costs, conducted investigative activities at or near the Property, and submitted workplans to the DTSC.  <u>See</u> JE 1 at ¶ 5(c).

In April 2010, Mission, through its consultant Source Group Inc. ("SGI"), submitted a work

plan for site characterization activities, including: video surveys of drains and sewer mains, drilling, advancing membrane interface probes, installing groundwater monitoring wells, and collecting samples of indoor air, sub-slab soil vapor, soil, soil vapor, and groundwater.  See JE 1 at ¶ 5(c).

The results of the 2010 characterization work were reported to DTSC by SGI in a November 2010 report entitled Onsite Remedial Investigation Report.  See JE 1 at ¶ 5(c).

On February 2, 2011, DTSC requested further characterization work for the subsurface conditions at and around the Property.  JE 1 at ¶ 5(d).

In April 2011, SGI submitted a work plan to DTSC for further characterization of the subsurface at and around the Property.  See JE 1 at ¶ 5(d).

The April 2011 work plan included performing an area well survey, additional video inspections of sewer mains, advancing an offsite upgradient boring for collection of soil and water samples, installing three additional downgradient monitoring wells, and collecting and analyzing indoor air, soil vapor, and groundwater samples.  See JE 1 at ¶ 5(d).

In May 2012, SGI reported the results of the further requested site characterization to DTSC.  See JE 1 at ¶ 5(d).

In June 2013, and in compliance with the Mission ISEO, SGI submitted to DTSC a draft Source Remedial Action Plan, which addressed primarily PCE in sewer line bedding material, soil, and soil vapor, but not in groundwater.  See JE 1 at ¶ 5(e).

In response to a December 2013 letter from DTSC and the Mission ISEO, SGI submitted to DTSC in February 2014 and June 2014, work plans to further characterize the soil vapor conditions at and around the Property.  See JE 1 at ¶ 5(f).

In September 2014, SGI submitted to DTSC the results of the further characterization efforts in a report entitled Data Gap Soil Vapor Investigation Report.  See JE 1 at ¶ 5(f).

In March 2016 and as required by the Mission ISEO, SGI prepared a Groundwater Feasibility Study which presented an evaluation of the effectiveness and feasibility and cost of various technologies as a means to eliminate an ongoing release of hazardous substances from the Property.  JE 1 at ¶ 5(g).

In accordance with the Mission ISEO, SGI prepared in July 2016 an Additional Site

Investigative Work Plan to further characterize deep soil vapor conditions and the lateral and vertical extent of groundwater contamination.  JE 5(h).

The results of the July 2016 work plan were prepared by SGI and presented to DTSC in an October 2016 reported entitled Groundwater and Soil Vapor Characterization Report.  JE 1 at ¶ 5(h).

As required by the Mission ISEO, periodic monitoring of soil vapor and/or groundwater was conducted through the first quarter of 2011 through the fourth quarter of 2016.  JE 1 at ¶ 5(i).

A draft cleanup plan for the PCE Plume has not been approved by any regulatory agency, and no drafts of comprehensive cleanup plans have been made.  <u>See</u> TT 411:14-412:23.

Once a cleanup plan is approved by the DTSC, public comment/public participation on the cleanup will occur.  <u>See</u> TT 411:9-412:8.

Mission has incurred at least some necessary response costs to meet the minimal threshold required for establishing its CERLA claims against the City.  JE 1 at ¶ 4(a).

DTSC wrote to the City to request information regarding the condition of the City's sewers near the Property.  <u>See</u> TT 187:21-24.

The City responded to DTSC's request for information by providing approximately 80 gigabytes of files that were not organized in any particular fashion and that did not respond to the specific requests by the DTSC, to wit the condition of the sewers, how the sewers were maintained, and related information.  <u>See</u> TT 188:1-6.

DTSC sent the City more than one letter requiring the City to provide responsive information in a more usable format.  <u>See</u> TT 187:24-188:1.

There is no evidence that the information that the City ultimately provided to DTSC was unacceptable.

In 2010, DTSC wrote a letter to the City that the City's new permitting process was delaying DTSC's investigation of the PCE Plume, and that DTSC did not understand why the permitting process had been changed.  <u>See</u> TT 187:12-20.

DTSC explained that if it was unable to obtain the appropriate permits, then the groundwater contamination at the Property would be further exacerbated.  <u>See</u> Olmos Depo. 45:5-19.

There is no indication that the City took any response to the DTSC's letter regarding permits.  See Olmos Depo. 45:5-19.

The City did issue appropriate permits as part of the site characterization process of the Property/PCE Plume.  See TT 406:20-408:20.

There is no evidence that DTSC was unable to obtain necessary permits from the City, nor is there evidence that discusses the impact of any delays involved during the permitting process.

In April 2013, DTSC wrote the City and invited the City to participate in a meeting with Mission in order to work towards addressing the groundwater contamination issues and the conditions of the sewers that had been identified by the investigative efforts of Mission.  See PE 86; TT 188:7-11.

The City responded to DTSC's request for a meeting by stating that it was unclear whether the questions identified as agenda items were prepared by DTSC or Mission's counsel, but in any event did not believe that it was in the City's best interest to participate in such a meeting at that time.  See PE 86; TT 188:11-14.

There is no evidence that DTSC made any further requests to meet with the City regarding the Property or the PCE Plume.

*Expert O'Brien's Allocation Method*

Mission's expert Keith O'Brien proposed an allocation method based largely on the location of the PCE.  See TT 433:9-446:20, 454:7-13; PE 165.

O'Brien's proposal is generally reflected in PE 165, which shows the PCE soil vapor contamination at and around the Property.  See TT 433:9-434:21, 454:7-13; PE 165.  PE 165 has different colored circles that are imposed over the soil vapor contamination.  See id.  The circles cover five distinct areas were soil vapor requires cleanup.  See id.  The circles can be used as a form of units in measurement irrespective of any particular cleanup remedy, because they are indicative of the underlying contamination plume and illustrate the scope of each area.  See id.

One area contains eight green circles and covers the contamination on E. Mineral King Ave. between S. Tipton St. and N. Santa Fe. Ave.  See PE 165.  Another area contains nine purple circles and covers the contamination on E. Mineral King Ave. that is west of N. Santa Fe Ave.

See id. Another area contains nine yellow circles and covers the contamination on N. Santa Fe Ave. (some of the yellow circles are either partly or entirely within the Property boundaries). See id. Another area contains three pink circles and covers contamination that is entirely within the Property. See id. The final area contains seventeen blue circles and covers the contamination on E. Mineral King that runs east of S. Tipton St., as well as the contamination on S. Tipton St. (some of the blue circles are either partly or entirely within the Property boundaries). See id. There are 46 total circles on PE 165. See id.; TT 441:9.

O'Brien found that only Mission and Star were responsible for the pink circles because their dry-cleaning operations led to PCE being located on the Property and no City sewers were located on the Property. See TT 437:21-438:11.

O'Brien found that Mission and the City were responsible for the yellow circles because the 21-inch sanitary sewer line that runs along E. Mineral King Ave. and then up N. Santa Fe Ave. was used only by Mission, not by Star. See TT 438:12-439:9.

O'Brien found that Star and the City were responsible for the purple circles because the 8-inch sewer line that ran from E. Mineral King Ave. past N. Santa Fe Ave. was used only by Star, not by Mission. See TT 440:3-23.

O'Brien found that Mission, Star, and the City were responsible for the green and blue circles because both Star and Mission used PCE that could have found its way into the relevant sewer, and the defect in the City's Subject Sewers caused a release of PCE. See TT 437:12-20, 439:10-404:2.

For each group of circles, the number of circles in the group was divided by the number of responsible parties identified to determine a party's responsibility for the particular area (e.g. 8 green circles divided by 3 responsible parties equals Star, Mission, and City being held responsible for approximately 2.7 circles). See TT 443:2-445:9.

Because Star is no longer in existence, O'Brien divided Star's "orphan share" based on the relationship of the total number of circles assigned to the City and the total number of circles assigned to Mission, and then divided Star's circles between the City and Mission based on that ratio. See TT 445:10-446:1.

O'Brien concluded that the City would be responsible for approximately 24 circles and Mission would be responsible for 22 circles. See TT 446:2-10. In terms of percentages, 24 and 22 circles equate to 52% and 48%.

**CERCLA FRAMEWORK**

"Through a complex statutory framework, CERCLA provides for the 'liability, compensation, cleanup, and emergency response for hazardous substances released into the environment and the cleanup of inactive hazardous waste disposal sites.'" Chubb Custom Ins. Co. v. Space Sys./Loral, Inc., 710 F.3d 946, 956 (9th Cir. 2013) (quoting Carson Harbor Vill., Ltd. v. County of L.A., 433 F.3d 1260, 1265 (9th Cir. 2006)). CERCLA 42 U.S.C. § 9607(a) "allows private parties who incur cleanup costs to recover those costs from 'various types of persons who contributed to the dumping of hazardous waste at a site.'" Carson Harbor Vill., 433 F.3d at 1265 (quoting Ascon Properties, Inc. v. Mobil Oil Co., 866 F.2d 1149, 1152 (9th Cir. 1989)). A § 9607(a) plaintiff must prove: "(1) the site on which the hazardous substances are contained is a 'facility' under CERCLA's definition of that term [CERCLA § 9601(9)]; (2) a 'release' or 'threatened release' of any 'hazardous substance' from the facility has occurred . . . ; (3) such 'release' or 'threatened release' has caused the plaintiff to incur response costs that were 'necessary' and 'consistent with the national contingency plan' ("NCP") . . . ; and (4) the defendant is within one of four classes of persons subject to the liability provisions of [§ 9607(a)]." City of Colton v. American Promotional Events, Inc.-West, 614 F.3d 998, 1002-03 (9th Cir. 2010); Carson Harbor Vill., 433 F.3d at 1265. The "four classes of persons" named in the fourth element are known as "potential responsible parties" or "PRP's." TDY Holdings, LLC v. United States, 884 F.3d 1142, 1147 (9th Cir. 2018); Chubb, 710 F.3d at 956-57.

As relevant to this case, a "facility" under CERCLA includes any building, pipe, pipeline, site or area where hazardous substance has been deposited, sored, disposed of, or placed, or otherwise came to be located. 42 U.S.C. § 9601(9).

A "release" means "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . . ." 42 U.S.C. § 9601(22).

"Response costs are considered necessary when an actual and real threat to human health or the environment exists," and are considered consistent with the NCP "if the action, when evaluated as a whole, is in substantial compliance [with the NCP]." City of Colton, 614 F.3d at 1003. Response costs include costs of preliminary investigation, monitoring, and assessing. See 42 U.S.C. § 9601(23); Village of Milford v. K-H Holding Corp., 390 F.3d 926, 933 (6th Cir. 2004); Wickland Oil Terminals v. Asarco, Inc., 792 F.2d 887, 892 (9th Cir. 1986). Most courts hold that consistency with the NCP not need not be established with respect to initial investigation and monitoring costs. See Village of Milford, 390 F.3d at 933; Pakootas v. Teck Cominco Metals, Ltd., 2016 U.S. Dist. LEXIS 107089, *46 (E.D. Wash. Aug. 12, 2016); Spectrum Int'l Holdings, Inc. v. Universal Coops., Inc., 2006 U.S. Dist. LEXIS 49716, *15 (D. Minn. July 17, 2006); Palmisano v. Olin Corp., 2005 U.S. Dist. LEXIS 48006, at *66-67 (N.D. Cal. June 24, 2005); VME Ams. v. Hein-Werner Corp., 946 F.Supp. 683, 693 (E.D. Wis. 1996); A.S.I., Inc. v. Sanders, 1996 U.S. Dist. LEXIS 2484, *15 (D. Kan. Feb. 9, 1996) (and cases cited therein); Marriott Corp. v. Simkins Indus., 825 F.Supp. 1575, 1583 (S.D. Fla. 1993); Amland Properties Corp. v. Aluminum Co. of Am., 711 F.Supp. 784, 795 (D. N.J. 1989); but see Board of Cty. Comm'rs v. Brown Grp. Retail, Inc., 768 F.Supp.2d 1092, 1115 (D. Col. 2011).

As relevant to this case, PRP's include present owners or operators of a "facility," as well as those who owned or operated a facility at a time when hazardous substances were disposed of at the facility, i.e. past owners or operators of a "facility." 42 U.S.C. § 9607(a)(1), (2); TDY, 885 F.3d at 1147. CERCLA imposes strict liability on PRP's. TDY, 885 F.3d at 1147; Chubb, 710 F.3d at 956.

Once a plaintiff has established liability under § 9607(a), the plaintiff can obtain "a declaration that the responsible party will have continuing liability for the cost of finishing the job." City of Colton, 614 F.3d at 1008 (quoting In re Dant & Russell, 951 F.2d 246, 249-50 (9th Cir. 1991)); see also Boeing Co. v. Cascade Corp., 207 F.3d 1177, 1191-92 (9th Cir. 2000) (in a 42 U.S.C. § 9613(f) case, affirming declaratory relief under § 9613(g)(2) for future costs where "the essential facts establishing the right to declaratory relief have already occurred."). 42 U.S.C. § 9613(g)(2) provides that, in a § 9607(a) action, "the court shall enter a declaratory judgment on

liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." Thus, "CERCLA expressly provides for declaratory actions for determining liability as to future responses costs." Dant & Russell, 951 F.2d at 249.

"[C]ourts may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." Burlington N. & Santa Fe R.R. v. United States, 556 U.S. 599, 615 n.9 (2009). Courts have "broad discretion in allocating costs among PRP's." TDY, 885 F.3d at 1149; Boeing, 207 F.3d at 1187. Courts have considered numerous equitable factors, including: (1) the parties' relative fault or culpability, (2) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished, (3) the amount of hazardous waste involved, (4) the degree of toxicity, (5) the degree of involvement of the parties in the generation, transportation, treatment, storage or disposal of the hazardous waste, (6) the degree of care exercised by the parties with respect to the hazardous waste, (7) the degree of cooperation by the parties with government agencies to prevent harm to the public health or the environment, (8) financial resources or economic status, (9) economic benefits received by the parties from contaminating activities or remediation, (10) knowledge and/or acquiescence of the parties in the contaminating activities, and (11) contracts between the parties. Waste Mgmt. of Alameda County, Inc. v. East Bay Regional Park Dist., 135 F. Supp. 2d 1071, 1090 (N.D. Cal. 2001); see also Exxon Mobil Corp. v. United States, 108 F. Supp. 3d 486, 534-35 (S.D. Tex. 2015). Apportionment/divisibility may also be established by volumetric, chronological, and other types of evidence, including appropriate geographic considerations. See Burlington N., 556 U.S. at 616-18; see also Boeing, 207 F.3d at 1188 (allocation by volume). The cost of "orphan shares," i.e. shares attributable to a PRP who is either insolvent or cannot be identified, are "distributed equitably among all PRP's, just as cleanup costs are." Pinal Creek Grp. v. Newmont Mining Corp., 118 F.3d 1298, 1303 (9th Cir. 1997).

*CERCLA § 9607(a)*

PCE is a "hazardous substance." 42 U.S.C. § 9601(14); 40 C.F.R. § 261.31.

The Property is a "facility." 42 U.S.C. § 9601(9).

The Subject Sewers are a "facility." 42 U.S.C. § 9601(9); Westfarm Assocs. Ltd. Pshp. V.

Washington Suburban Sanitary Comm'n, 66 F.3d 669, 678-80 (4th Cir. 1995); Adobe Lumber, Inc. v. Hellman, 658 F.Supp.2d 1188, 1194-1202 (E.D. Cal. 2009); JE 1 at ¶ 2(c) ("The City's sewer mains and trunks, only (without admission of any other portion of the sewer system) are a facility within the meaning of CERCLA.").

Mission is a PRP because it is the current owner or operator of the Property. 42 U.S.C. § 9607(a)(1).

The City is a PRP because it is the current owner or operator of the Subject Sewers. 42 U.S.C. § 9607(a)(1); JE 1 at ¶ 2(d).

PCE was "released" from the Property when PCE evaporated into the atmosphere, sorbed onto particles in the air, the PCE-laden particles landed on the ground, and then were washed into the Subject Sewers (specifically the storm sewers) between 1971 and 1983.

Based on the location of the former dry-cleaning equipment washing area, as well as the corresponding elevated levels of PCE detected at and near the location of the former dry-cleaning equipment washing area, it is more likely than not that some PCE was "released" from the Property, either in the form of PCE-containing wastewater or PCE-vapor, at the "dry cleaning equipment washing area" as part of the washing process.[12]

Star is a PRP because it was the past owner of the Property at a time when PCE was "released" from the Property. 42 U.S.C. § 9607(a)(2).

PCE was "released" from the Subject Sewers when PCE leaked, escaped, or leached out of the Subject Sewers' defects, or when surcharge events forced PCE out of the Subject Sewers' defects.

---

[12] The Court notes that Mission has argued in a motion to strike and in its proposed findings of fact and conclusions of law that there was no investigation by the City's expert of the equipment washing area, there is no evidence about what equipment was washed or how it was washed, or what entity performed the washing, rather there is simply a notation on a chart. These are valid points. However, in terms of location, a significant quantity and concentration of the PCE Plume appears to correlate with the location of the dry-cleaning equipment washing area. Moreover, the notation is on several of Mission's own exhibits. The exhibits were admitted without limitation and for all purposes, which means that the Court is entitled to draw any reasonable conclusions that are possible from the exhibits. Further, SGI prepared the exhibits that have the notation at issue. SGI was acting on behalf of Mission in an area in which it clearly had expertise, since it also submitted reports to the DTSC on behalf of Mission regarding the PCE Plume. SGI's work is Mission's work, and SGI's representations on the exhibits are Mission's representations. The Court is not satisfied that the notation, made by SGI on Mission's behalf, should be ignored or easily discounted.

Until repaired, the Subject Sewers are a source of "threatened releases" of PCE or other hazardous substances.

Mission has incurred at least some necessary response costs to meet the minimal threshold required for establishing its CERCLA claims against the City. JE 1 at ¶ 4(a).

Some of the necessary response costs were caused by the "release" of PCE through the "defects" in the Subject Sewers. See Carson Harbor Vill., Ltd. v. Unocal Corp., 287 F.Supp.2d 1118, 1185-87 (C.D. Cal. 2003) (describing the § 9607(a) causation requirement).

To the extent that consistency with the NCP is necessary, Mission's cooperation with DTSC, including entering into a voluntary consent decree, as well as its monitoring and investigation of the PCE Plume as directed by the DTSC, demonstrate that its actions have been at least substantially consistent with the NCP.[13] See TT 405:14-413:1; JE 1 at ¶¶ 5(c)-5(i).

Mission's actions also reflect a commitment to respond appropriately to the DTSC and to meet the requirements of the NCP.

Because Mission has satisfied its burden under § 9607(a), it may obtain declaratory relief that establishes all PRP's liability for future CERCLA expenses.[14] See 42 U.S.C. § 9613(g)(2); see also Boeing, 207 F.3d at 1191-92 (affirming declaratory relief under § 9613(g)(2) that allocated the costs of future expenses where "the essential facts establishing the right to

---

[13] Some form of public participation is generally necessary to show consistency with the NCP. See Santa Clara Valley Water Dist. v. Olin Corp., 655 F.Supp.2d 1066, 1075 (N.D. Cal. 2009). When monitoring and investigative costs and activities are at issue, at least one court within the Ninth Circuit has held that the public participation requirement is inapplicable. See United Alloys, Inc. v. Baker, 797 F. Supp. 2d 974, 997 (C.D. Cal. 2011). To the extent that Mission was required to demonstrate public participation regarding its monitoring and investigative activities of the PCE Plume, the Court concludes that Mission's close involvement and cooperation with the DTSC substantially complies with the public participation requirement. See Bedford Affiliates v. Sills, 156 F.3d 416, 428 (2d Cir. 1998); see also NutraSweet Co. v. X-L Engineering Co., 227 F.3d 776, 791 (7th Cir. 2000).

[14] In the Amended Pre-Trial Order, the City raised what appears to be a reference to the "third party defense" of 42 U.S.C. § 9607(b)(3). See Doc. No. 68 at 22:17-21. Mission's proposed findings of fact and conclusions of law address the CERCLA third party defense, but the City's proposed findings do not. To the extent that the City has not abandoned the CERCLA third party defense, the defense fails. One element of the third party defense is that another party was the "sole cause" of the release or threatened release of the hazardous substance. See 42 U.S.C. § 9607(b)(3); Carter-Jones Lumber Co. v. Dixie Distrib. Co., 166 F.3d 840, 845 (6th Cir. 1999); Westfarm Assocs. Ltd. Pshp. V. Washington Suburban Sanitary Comm'n, 66 F.3d 669, 682 (4th Cir. 1995); Coppola v. Smith, 2015 U.S. Dist. LEXIS 5127, *26 (E.D. Cal. Jan. 15, 2015). Here, because the evidence (including evidence from the City's own expert) establishes that the Subject Sewers leaked, the City cannot establish that a third party only, to the exclusion of the City itself, is solely responsible for a release or threatened release of PCE.

declaratory relief have already occurred.").[15]

### *CERCLA § 9613(g)(2) – Allocation Considerations*

1. Parties' Relative Fault or Culpability

Star and Mission are directly at fault for PCE being "released" from the Property through the disposal of separator water and through PCE-vapor. Either Star or Mission is at fault for the likely release of PCE in the process of washing the dry-cleaning equipment. However, there is no evidence concerning the procedures used to wash the equipment, and Star and Mission had state of the art equipment to attempt to capture, reuse, and minimize the loss of PCE as part of their dry-cleaning processes. Further, disposing of the PCE-containing separator water into the sewer system was a standard practice, and no alternatives to sewer disposal have been identified. The City has never prohibited the disposal of PCE into its sewers.[16] Star and Mission did not violate any ordinances when they dumped/poured/disposed of PCE wastewater into the Subject Sewers.

The City bears a significant amount of fault and culpability for the PCE Plume spreading beyond the boundaries of the Property. It is clear and undisputed that PCE traveled in the Subject Sewers. If the Subject Sewers did not leak, then the PCE would not have been able to escape and travel outside of the sewer pipes, and the contamination of the nearby soil gas and groundwater would not have occurred, at least in terms of the PCE Plume's current size. The defects in the Subject Sewers in part relate to the installation of the sewer pipes, which, with the exception of the 21-inch sanitary sewer line on E. Mineral King Ave., pre-dates the activities of Star and Mission. Further, there is no indication that the City engaged in regular maintenance or repair of the Subject Sewers, or attempted to repair even major defects in the Subject Sewers once the City had actual

[15] The Court notes that Mission seeks declaratory relief under 42 U.S.C. § 9613(g)(2) and 28 U.S.C. § 2201, the Declaratory Judgment Act. The City has not addressed Mission's request under § 2201, nor has it provided proposed findings of fact and conclusions of law that address § 2201. It is unclear what purpose would be served by awarding declaratory relief under both § 9613(g)(2) and § 2201. Moreover, in *City of Colton*, the Ninth Circuit indicated that the specificity of § 9613(g)(2) controlled over § 2201. See City of Colton, 614 F.3d at 1007 ("Although Colton's complaint referred to the Declaratory Judgment Act rather than [§ 9613(g)(2)], the latter provision clearly governs this initial cost-recovery action."). Based on these considerations, the Court declines to address § 2201 at this time and will limits its declaratory relief to § 9613(g)(2). If Mission has valid arguments for the propriety of a § 2201 declaration in this case, it may move the Court for reconsideration.

[16] It appears that PCE in and of itself poses no risk of harm to the sewers or the City's wastewater treatment facility. See TT 208:8-209:5.

26

knowledge that such defects existed. The evidence is unrebutted that regular cleaning and maintenance would have alleviated, if not actually prevented, the release of PCE from the Subject Sewers.

2.     Ability to Distinguish Individual Contributions to the Release of PCE

In certain areas of the PCE Plume, it is possible to eliminate Star, Mission, or the City as a contributor.

First, a portion of the PCE Plume begins at the intersection of N. Santa Fe Ave. and E. Mineral King Ave., then extends west on E. Mineral King Ave., and follows an 8-inch sanitary sewer. Only Star emptied its PCE-containing separator water into this 8-inch sanitary sewer. Therefore, this portion of the PCE Plume was not caused by Mission. See TT 440:3-23.

Second, some portions of the PCE Plume are located directly on the Property, and not near the Subject Sewers, and thus, were not caused by the City. Cf. TT 437:1-438:11.

Third, a portion of the PCE Plume begins at the intersection of N. Santa Fe Ave. and E. Mineral King Ave., then extends north on N. Santa Fe Ave., and follows an 18-inch sanitary sewer. Mission emptied its PCE-containing separator water into this 21-inch sanitary sewer line on E. Mineral King Ave., and that 21-inch sewer line transitions into the 18-inch sanitary sewer line on N. Santa Fe Ave. Therefore, this portion of the PCE Plume was not caused by Star. See TT 438:15-439:9.

3.     Amount of Hazardous Waste Involved

The exact amount of PCE involved is unknown, as are the quantities of PCE that may still exist in the Subject Sewers. Also, the quantities of PCE generated by Star and the quantities of PCE generated by Mission are unknown.

4.     Degree of Toxicity

PCE is a hazardous substance, and some portions of the PCE Plume contain concentrations of PCE that greatly exceed the regulatory limits set for drinking water. Further, DTSC has determined that the PCE Plume poses an imminent and substantial endangerment.

5.     Involvement in The Generation, Transportation, Treatment, Storage or Disposal of PCE

The City did not use or generate the PCE that constitutes the PCE Plume. However, the

City did act as a passive transporter of PCE. Star and Mission poured/dumped/disposed of their PCE-containing separator water into the sanitary sewers of the Subject Sewers. Further, PCE-vapor sorbed onto airborne particles and were washed into the Subject Sewers' storm sewers. Once in the Subject Sewers, the PCE either was transported to the City's wastewater treatment facility or "released" through the various defects found throughout the Subject Sewers. While the City did not directly know that its pipes were moving and releasing PCE, the City's sewers were the mechanism for transporting PCE and expanding the size of the PCE Plume. Thus, the City's involvement in the transport of PCE and expansion of the PCE Plume is very high.

Star and Mission both used the PCE in question and disposed of PCE-containing wastewater into the Subject Sewers. But for the conduct of Star and Mission, the PCE "deposited" by Star and Mission would not have made its way into the Subject Sewers. Therefore, Star and Mission's involvement in the generation and disposal of PCE is very high.[17]

6.      Degree of Care Exercised Regarding the PCE

Star and Mission utilized state of the art dry cleaning equipment, including the "sniffer," that were designed to contain, recapture, and reuse as much PCE as possible. Further, there were no other options of disposing of PCE-containing separator water/wastewater, other than pouring that wastewater into the sewer system. There is no evidence that Star or Mission acted without an appropriate degree of care towards PCE.

The City passively handled the PCE, and there is no evidence that the City knew that Star or Mission were disposing of PCE into the Subject Sewers. No degree of care was exercised by the City. However, it has not been established that the City should have acted in a particular fashion with respect to the PCE (as opposed to sewer maintenance) at or around the time the PCE was released from the Property or deposited in the sewers between 1971 and 1983.

7.      Degree of Cooperation by the Parties with Government Agencies to Prevent Harm to the
        Public Health or the Environment

Mission engaged in a high level of cooperation with the DTSC by signing a consent

---

[17] The Court notes that the quantity of PCE-containing separator water that was generated and discarded by either Star or Mission is unknown.

decree, providing DTSC with requested information, and engaging in monitoring and investigative work as DTSC requested. The evidence does not reveal any way in which Mission could have been more cooperative.

The City's cooperation with the DTSC appears to have been adequate, but not proactive. The City adequately responded to requests for information. Although more than one request was made by DTSC, there is no evidence that DTSC did not obtain the information that it needed in a sufficiently acceptable timeframe or format. The City also issued permits related to the investigation of the PCE Plume. Although DTSC was concerned about the new permitting process, there is no evidence that DTSC did not obtain the permits or that any delays caused by the permitting process materially or adversely affected the investigation or public health. Finally, the City rejected an attempted meeting between Mission, DTSC, and the City. The City's response to DTSC indicates a concern over who was setting the agenda, DTSC or Mission's counsel. There is no evidence that DTSC requested any additional meetings with the City, or that the failure to attend the proposed meeting materially or adversely affected the investigation or public health.

8.      Financial Resources or Economic Status

No evidence was submitted regarding the financial or economic status of Mission or the City. Star is no longer in existence and thus, has no ability to pay any amount towards any removal or remediation of PCE/the PCE Plume.

9.      Economic Benefits Received by the Parties from Contaminating Activities or Remediation

The City received no material economic benefit from unknowingly and passively transporting the PCE-tainted storm water and wastewater.

Star and Mission actively used PCE as part of their dry-cleaning operations and thus, both received significant economic benefits from using PCE.

10.     Knowledge or Acquiescence in the Contaminating Activities

Although there is no indication that Star or Mission engaged in unlawful conduct, they knowingly and intentionally used PCE in their dry-cleaning operations and knowingly and intentionally disposed of PCE-containing separator wastewater in the Subject Sewers from 1971 to 1983.

Although there is no evidence that the City knew either that the Subject Sewers leaked or that PCE from the Property was making its way into the Subject Sewers, the City knew that hazardous substances can enter its sewers and at least since 1989, was aware that PCE was in its sewers (but not necessarily the Subject Sewers specifically).

There is no evidence that any PRP knew that its activities (either running a dry-cleaning business or operating/owning a sewer system) were causing the PCE Plume.

11.    Contracts Between the Parties

There is no evidence that Star or Mission had or has contracts with the City. Presumably, Star and Mission entered into a contract for sale when Mission purchased two parcels of the Property from Star, including the dry-cleaning operations.

12.    Geographic Considerations

Geographic considerations are generally accounted for in the proposed allocation by O'Brien. Mission had no involvement with the portion of the PCE Plume that extends west of N. Santa Fe Ave. on E. Mineral King Ave. The City had no involvement with some of the PCE Plume that is located within the Property's boundaries. Star had no involvement with the portion of the PCE Plume that extends north on N. Santa Fe Ave.

Additionally, in conjunction with the Court's "fault" analysis under the first consideration above, as a general matter, the Court finds that Star and Mission are more responsible for PCE contamination that exists within the geographic boundaries/property lines of the Property based on their use of PCE at the Property. Also as a general matter, the Court finds that the City is more responsible for the spread of PCE beyond the geographic boundaries/property lines of the Property based on the transportation of PCE through the pipes of the Subject Sewers.

*CERCLA Allocation Conclusion*

The City contends that Mission should be responsible for the lion's share of future cleanup efforts based on the facts that Mission and Star used PCE for profit, Mission essentially continued the dry-cleaning practices of Star, Star and Mission poured PCE in the Subject Sewers, and the PCE that was poured into the Subject Sewers would not have entered the Subject Sewers but for

Mission and Star's conduct.[18]  Further, a significant portion of the PCE Plume is located within the boundaries of the Property.  These facts demonstrate a strong connection between Star and Mission and the PCE Plume in general.  These facts clearly warrant allocation of a substantial portion of any future costs to Mission.

However, there are other considerations that point to the City bearing a significant percentage of future costs.  First, there is no indication that Star or Mission knew that their activities, and in particular their activities of dumping/pouring/disposing of PCE, were causing the creation of a substantial contamination plume.  Second, no evidence indicates that either Star or Mission were violating any law by disposing of PCE-containing wastewater into the Subject Sewers (the sanitary sewers on E. Mineral King Ave.).  There is no evidence the City has ever prohibited the disposal of PCE into its sewers, placed any limits on the quantity of PCE that could be disposed of, or required permits before PCE could be disposed of.  It appears that PCE can be adequately treated through the City's wastewater treatment facilities.  The Court can only conclude that the City does not view PCE as a problem for its sewers and wastewater treatment process.  Third, the PCE would not have migrated to the extent that it has, but for the defects within the Subject Sewers.  The evidence is undisputed that the Subject Sewers are rife with defects, and through these defects, PCE was released into the environment.  The Court has no doubt that PCE would still be found in the soil vapor and ground water at the Property, irrespective of the condition of the Subject Sewers, based on the dry-cleaning activities of Star and Mission.  But the Subject Sewers provided the mechanism for the PCE to travel beyond the boundaries of the Property, and the shape of the PCE Plume correlates significantly with the Subject Sewers.  The PCE Plume is larger and more extensive than it otherwise would be because of the defects in the Subject Sewers.  Fourth, the evidence indicates that the PCE would not have been released from the Subject Sewers, but instead would have been properly treated by the City's wastewater treatment facilities, if the City regularly cleaned and maintained the Subject Sewers.

---

[18] Additionally, although the City does not agree that PCE-vapor from the Property ultimately migrated into the Subject Sewers, the Court has accepted this pathway.  Thus, but for the dry-cleaning activities of Star and Mission, some portion of PCE (through PCE-vapor) would not have entered the Subject Sewer (or landed on other portions of the Property).

1   The City's philosophy appears to be reactive to problems with its sewers, only addressing a

2   problem once it becomes aware of the problem.  While the City is free to adopt whatever practice

3   it sees fit, such a practice poses a danger that materialized here:  undetected/unknown defects

4   caused the release of a hazardous substance into the environment.  Therefore, the defects within

5   the Subject Sewers in particular, as well as the cleaning, maintenance, and regulatory practices of

6   the City over its sewer system as a whole, directly led to the expansion of the PCE Plume.

7       After considering all of the above factors, the Court concludes that the geographic features

8   of the PCE Plume generally provide an equitable basis for allocating responsibility for future

9   necessary response costs.  In general, Star and Mission should be responsible for the remediation

10  costs of the PCE within the Property and the City should be responsible for the remediation costs

11  of the PCE outside of the Property.  In order to express allocation in percentages, the Court relies

12  largely on the methodology of Keith O'Brien.[19]  However, the Court finds that a modification to

13  O'Brien's method is appropriate.  Under either of two modifications, the Court concludes that, for

14  all necessary future response costs incurred by Mission, Mission is responsible for 50% of the

15  costs and the City is responsible for 50% of the costs.

16      First, O'Brien allocated responsibility for the three pink circles on PE 165 to Star and

17  Mission because of their dry-cleaning activities and the fact that no sewers were located on the

18  Property.  See TT 437:21-438:11.  Two yellow circles touch two of the pink circles and are

19  located fully within the Property.  See PE 165.  Further, four blue circles in the northeast corner

20  are fully within the Property, correspond to the dry-cleaning equipment washing area, appear to be

21  a significant distance away from the sewers, and involves a section of the PCE Plume that is

22  greater than 10,000 micrograms per cubic meter.  See PE 165.  Given the rationale for assigning

23  the pink circles to Star and Mission, as well as the location of the two yellow circles and four blue

24  circles in question, the Court finds that treating these two yellow and four blue circles as pink

25

26  [19] The Court realizes that O'Brien's testimony is based largely on air sparging and soil vapor extraction, which is a
    plan that has not been proposed to the DTSC or approved by the DTSC.  However, O'Brien's testimony sufficiently

27  covers the PCE Plume and provides a rational basis for reaching allocation percentages, even if air sparging and soil
    vapor extraction is never used to remediate the PCE Plume.

28

circles, i.e. assigning responsibility to Mission and Star only, is appropriate.[20]  Therefore, the Court will apply O'Brien's methodology with nine pink circles, seven yellow circles, and thirteen blue circles.  With this modification, and otherwise applying O'Brien's methodology including allocating Star's orphan shares, the Court concludes that Mission is responsible for 23 total circles and the City is responsible for 23 total circles, which means a 50/50 allocation for all necessary future response costs incurred by Mission.

Alternatively, the Court will assign responsibility for the various circles on PE 165 based on their location either within or outside of the Property boundary.  See PE 165.  If a circle's center (represented by a black dot) falls within the Property boundary or on the boundary, the Court will assign responsibility for that circle to Star and Mission because Mission and Star both actively used PCE on the Property for profit and as part of their dry-cleaning activities.  See id. Further, because Mission purchased two-thirds of the Property from Star and essentially continued dry cleaning activities in Star's former facilities, the Court will assign all of Star's "orphan share" to Mission.  If a circle's center falls outside of the Property boundary, the Court will assign full responsibility to the City because the City's defective/leaking sewer pipes transported and spread the PCE beyond the property boundaries.  See id. With these modifications, the Court finds that the City is responsible for 23 circles (nine purple circles, five blue circles, four green circles, and five yellow circles) and Star/Mission is responsible for 23 circles (four yellow circles, three pink circles, four green circles, and twelve blue circles).  Therefore, the Court concludes that, for all necessary future response costs incurred by Mission, Mission is responsible for 50% of the costs and the City is responsible for 50% of the costs.

---

[20] The Court notes that there are six blue circles in the northeast corner of the PCE Plume that are completely within the Property.  The City's expert pointed out that the location of the dry-cleaning equipment washing area corresponded to the "dark red" PCE oval in the northeast corner of the PCE Plume.  The "dark red" PCE oval is covered by the four blue circles.  See PE 165.  Aside from the City's expert, given the location of the high PCE concentration, it is reasonable to conclude that PCE was "released" at the dry-cleaning equipment washing area.  However, no expert opined that all of the PCE covered by the six circles in question were the result of the practices at the dry-cleaning equipment washing area.  Mission's experts opine that all of the PCE covered by the six circles are the result of the leaking storm sewer on S. Tipton St.  In the absence of any testimony/evidence that affirmatively links all circles to the dry-cleaning equipment washing area, the Court will only view four of the blue circles that cover the "dark red" PCE oval as pink circles.

With respect to any repairs that may be necessary to the Subject Sewers, the City is responsible for 100% of the costs of such repairs.[21] There is no basis apparent, nor any basis identified by the City, for anything less than a 100% allocation figure for repairing the Subject Sewers.

## ORDER

Accordingly, IT IS HEREBY ORDERED that:

1. Mission's motions to strike (Doc. Nos. 153, 160, and 162) are DENIED;

2. The City's motion to strike (Doc. No. 151) is GRANTED in part and the testimony of Peter Krasnoff's with respect to cost of repairing the City's sewers and with respect to the City of Fresno's sewer maintenance program is STRICKEN;

3. The City's requests to take judicial notice (Doc. Nos. 139 and 150-1) are DENIED;

3. Pursuant to 42 U.S.C. § 9613(g)(2), the Court declares as follows:

    a. For all necessary future response costs incurred by Mission regarding the PCE Plume, Mission is responsible for 50% of those future costs and the City is responsible for 50% of those future costs; and

    b. The City is responsible for 100% of any repairs to the Subject Sewers that may be necessary.

IT IS SO ORDERED.

Dated:  February 5, 2019

_____

SENIOR  DISTRICT  JUDGE

---

[21] The Court notes that the Pre-Trial Order indicated that there was a dispute over who was responsible for what portions of the sewers. The City admitted that the Subject Sewers were a CERCLA facility, but only admitted that the mains and trunks were facilities. See JE 1 at ¶ 2(c). The City did not admit that side sewers, laterals, and wyes were CERCLA facilities. In the absence of any other evidence regarding ownership or responsibility of the sewers, the Court limits this allocation to the mains and trunks of the Subject Sewers. See id.