1
2
3
4
5                    **UNITED STATES DISTRICT COURT**
6                    **EASTERN DISTRICT OF CALIFORNIA**
7

8   **MISSION LINEN SUPPLY,**              | **CASE NO. 1:15-CV-0672 AWI EPG**
9                    **Plaintiff**
10            **v.**                        | **FURTHER ORDER ON PLAINTIFF'S**
                                            | **MOTION TO ENFORCE JUDGMENT**
11  **CITY OF VISALIA,**
12                   **Defendant**          | (Doc. No. 184)
13
14

15        This is a Comprehensive Environmental Response, Compensation, and Liability Act (42

16  U.S.C. § 9601 et seq.) ("CERCLA") case that arises from the contamination of property at and

17  surrounding a dry-cleaning business in Visalia, California from the chemical perchloroethylene

18  ("PCE").  On February 5, 2019, following a bench trial, this Court issued a Findings of Fact and

19  Conclusions of Law ("February Order") pursuant to Rule 52(a)(1).  See Doc. No. 176.  The

20  February Order determined liability between Plaintiff Mission Linen Supply ("Mission") and

21  Defendant the City of Visalia ("the City") for future necessary response costs.  See id.  On May

22  12, 2020, the Court issued an order that partially addressed the merits of Mission's motion to

23  enforce judgment and required the parties to submit additional briefing.  See Doc. No. 190.  The

24  additional briefing has now been received.  This order resolves the remainder of Mission's motion

25  to enforce judgment.

26

27                    **RELEVANT BACKGROUND**

28        Mission owns property that was contaminated by PCE through dry-cleaning activities.  See

1    Doc. No. 176.  Mission is obligated under a consent order by the DTSC to cooperate and to

2    remediate the PCE plume at and surrounding Mission's property.  See id.  PCE contamination was

3    the result of dry-cleaning activities by Mission and its predecessor, Star Laundry.  See id.

4    Although PCE has not been used on the subject property since 1986, PCE spread beyond the

5    property's borders.  See id.  The PCE plume coincides with the City's sewer systems, which

6    contain a number of defects that permitted the PCE to "escape" into the environment.  See id.  Star

7    Laundry (who is insolvent and not a party), Mission, and the City were potentially responsible

8    parties under CERCLA for the PCE plume.  See id.  After dividing the orphan share of Star

9    Laundry, the Court held that Mission and the City are each 50% liable for future necessary

10   response costs.  See id.  Because Mission is obligated by the DTSC to clean up the property and is

11   the plaintiff, the Court declared, "For all necessary future response costs incurred by Mission

12   regarding the PCE plume, Mission is responsible for 50% of those future costs and the City is

13   responsible for 50% of those future costs."  Id.  The Court also declared that the City was

14   responsible for 100% of any necessary repair costs to the subject sewers.  See id.  In late June

15   2020, the Ninth Circuit affirmed the February Order.  See Doc. No. 193.

16          Prior to the Ninth Circuit's affirmance, the Court issued an order on May 12, 2020, that

17   partially addressed Mission's motion to enforce judgment.  See Doc. No. 190.  In relevant part, the

18   May 2020 order did four things.  First, the order recognized that the Court has the authority to

19   issue supplementary monetary awards that effectively enforce the February Order's declarations.

20   See id.  Second, the Court ordered the City to pay half of a DTSC invoice (the City had agreed to

21   pay half).  See id.  Third, the Court ordered the parties to meet and confer regarding further

22   communication procedures regarding "sewer repair progress."  See id.  Finally, the Court ordered

23   that parties to file supplemental briefing regarding the possible application of the California Public

24   Contracts Code and the City Charter to the February Order/CERCLA and the other costs sought

25   by Mission.  See id.  That supplemental briefing has now been received and the matter is fully

26   briefed.

27          Additionally, on December 30, 2019, Mission removed a state court action filed by the

28   City.  See City of Visalia v. Mission Linen Supply, Inc., Case No. 1:19-cv-1809 AWI EPG

2

(hereinafter "Dec. Case") at Doc. No. 1.[1]  In the Dec. Case, the City contended that the cleanup is a "public works project" that affects a watercourse (groundwater beneath the streets and Mission's property) and that is subject to the competitive bidding procedures of the Public Contracts Code and the City Charter.  See id.  Because Mission contends that the Public Contracts Code does not apply to the cleanup, the City alleged that a declaration of rights regarding whether the cleanup work which is to be paid in part by the City is subject to the competitive bidding procedures of the Public Contracts Code.  See id.  The City also noted that contracts that Mission had entered into regarding the cleanup did not comply with Public Contracts Code § 20164.  See id.

The Court remanded the Dec. Case in May 2020.  See id. at Doc. No. 20.  To the Court's knowledge, the Dec. Case remains pending in the Tulare County Superior Court.

## PLAINTIFF'S MOTION

### *Plaintiff's Arguments*

Mission argues that it has incurred DTSC required costs and expenses related to monitoring and remedial planning efforts.  Mission argues that the Court should order the City to pay 50% of a $32,812.57 feasibility study which the DTSC found acceptable and which the DTSC used as the basis for ordering Mission to perform a pilot study.  The City has indicated that the cost is invalid because the contract did not conform to state law and the City's bidding procedures for public projects.

In supplemental briefing, Mission argues that CERCLA is not dependent on state law.  Application of the Public Contracts Code to CERCLA would require a twisted interpretation that creates requirements that are otherwise not supported by the text of CERCLA.  If the Court were to extend the Public Contracts Code to this CERCLA case, it would impact every private plaintiff's ability to recover costs against public agencies, would cause delays, and be contrary to CERCLA's goals of promoting timely cleanup of hazardous waste sites by those responsible for the contamination.  Being forced to terminate existing contracts and start over with new

---

[1] The Court takes judicial notice of this case and any filings in that case that are referred to in this order.  See Fed. R. Evid. 201; United States v. Raygoza-Garcia, 902 F.3d 994, 1001 (9th Cir. 2018).

environmental consultants that were chosen in compliance with the Public Contracts Code would interfere with existing cleanup efforts and make subsequent enforcement of the February Order more restrictive.  Although a public entity seeking costs under CERCLA must separately comply with the Public Contracts Code to the extent that those costs arise from a contract for a public project, the same cannot be said of a private entity.

Mission also argues that the City has not established why the Public Contracts Code applies.  Mission is not a "city" or a "public entity," so it is unclear how the Public Contracts Code could apply to it.  Similarly, the City has not demonstrated that there is a "public works contract" at issue or a "public project" at issue within the meaning of the Public Contracts Code.  The City has not awarded any contracts that would implicate the Public Contracts Code.  The only contracts at issue were made by Mission, and Mission is not a "public entity" or a "city."

Finally, Mission argues that the February Order is an adjudication of liability.  It creates liability as between the City and Mission, it does not create a contractual relationship.  Nothing in either the language of the Public Contracts Code or its legislative history indicates that the Public Contracts Code was intended to apply to situations that arise from CERCLA orders like the February Order.

*Defendant's Opposition*

The City argues that it is not refusing to pay its share of the $32,812.57, but instead is seeking a declaration from the California Superior Court regarding whether the public moneys to be used for this apparent public works project should be subject to the public bidding rules of the California Public Contracts Code and the City Charter.  That state action arises from Mission's stated intention to move forward with a pilot project using public funds, as well as Mission's intention to force the City to pay 50% of the costs in consultant's work from the time of trial through June 2019.

In supplemental briefing, the City emphasizes that it is not disputing that it will be responsible for 50% of cleanup costs.  The concern is whether the Public Contracts Code applies to the contract for the feasibility study and other expenses that fall under the February Order.  The City explains that it wants to make sure that the public expenditures to contractors is valid and not

4

subject to challenge.  Contracts that fail to follow the requirements of the Public Contracts Code are void and public funds expended pursuant to such contracts are subject to recovery suits by taxpayers against the contractors.  The City contends that there is no need for the Court to address the issue further because the issue is currently pending in the Dec. Case.

In its supplemental reply, the City argues that it is not arguing that CERCLA requires application of the Public Contracts Code or that CERCLA is dependent on the Public Contracts Code.  However, if the City were obligated to clean up the PCE contamination, it would have to publicly bid for work in compliance with the Public Contracts Code.  Mission does not identify a single provision of CERCLA that purports to exclude responsible parties from satisfying lawful fiscal appropriation obligations when paying their share of a CERCLA cleanup.  Mission makes no showing of any provision of CERCLA or the February Order that cannot be satisfied in accordance with the Public Contracts Code.  Instead, Mission is objecting to the Public Contracts Code interfering with its ability to use its chosen contractors in the cleanup of the PCE plume.  Such favoritism without a public bidding process and when public money is involved is one of the practices that the Public Contracts Code sought to eliminate.

The City also argues that it knows that Mission is not a public entity or anything that would ordinarily subject it to the Public Contracts Code.  However, Mission is trying to put a public entity on the hook for potentially millions of dollars.  The question is whether Mission has authority to commit the City to what might be an unlawful expenditure under the Public Contracts Code.  The cleanup of the area around Mission is a "public works contract" under § 1101 of the Public Contracts Code because if involves the repair of a public improvement.

The City also argues that it is not a judgment debtor.  The February Order is not an ordinary judgment for money damages.  The City and Mission are on the hook for half the cleanup costs.  There is nothing before the Court that the DTSC would care how the cleanup was paid for or whose name appears on a contract to do so.  The City's expenditure for a cleanup is government money and its appropriation is subject to governmental control.  Mission does not explain how respect for the Public Contracts Code's safeguards would undermine CERCLA or the February Order.

1    In sum, the City contends that Mission is ignoring the kind of work to be done in the

2    cleanup, ignores the stated objectives of the Public Contracts Code, and ignores the fact that

3    Mission has essentially been made an actor who stands in the City's shoes when selecting

4    contractors to be paid with public money for public works projects.

5         *Discussion*

6         Initially, the Court cannot agree that it is appropriate to avoid discussing the application of

7    the Public Contracts Code in favor of the pending Dec. Case.  This case was a CERCLA action

8    that has been resolved in this Court and affirmed by the Ninth Circuit.  Pursuant to that resolution,

9    and in accordance with the DTSC consent decree, Mission is incurring further response costs and

10   seeking reimbursement from the City.  The parties clearly disagree about the applicability of the

11   Public Contracts Code to not only the contract for the feasibility study, but also to any other

12   contract that Mission may make in furtherance of remediating the PCE plume.  The positions of

13   the parties implicate practically every other necessary response cost that Mission may incur.  If the

14   Court were to not address the issue now, the issue would not necessarily be finally decided for

15   years.  Even if the Dec. Case is decided by the Superior Court tomorrow, there are still appeals

16   that may be taken.  While the California Courts proceed to resolve the issue, Mission would be

17   unable to recover for most if not all further necessary response costs.  The February Order could

18   have little force for years.  This would likely stall and hinder a timely cleanup of the PCE plume.

19   One of CERCLA's central purposes is to facilitate expeditious and efficient cleanup of hazardous

20   waste sites.  United States v. W.R. Grace & Co., 429 F.3d 1224, 1240 (9th Cir. 2005).  That

21   CERCLA purpose would not be served by waiting for the California Courts to fully resolve the

22   question presented.  The fact of the matter is that there is a necessary response cost at issue,

23   Mission is attempting to enforce the February Order with respect to that cost, and the parties have

24   briefed their positions regarding the Public Contracts Code.  The matter is ripe for decision in this

25   Court.  In order to further a central goal of CERCLA, and to avoid rendering the February Order

26   largely a nullity for an unknown period of time, the Court will resolve Mission's motion.

27        The Court understands that the City is attempting to determine whether the Public

28   Contracts Code would apply to the feasibility study contract and other contracts made by Mission

1 as part of the cleanup/remediation process ordered by the DTSC and implicating the February

2 Order.  The City contends that the failure to follow the Public Contracts Code bidding provisions

3 make the feasibility study infirm and make any money paid by the City subject to a taxpayer

4 recovery action against a contractor.  The parties admit that there is no law that discusses

5 application of the Public Contracts Code in a CERCLA matter like this one, nor are there

6 analogous cases in the CERCLA context.  Therefore, this motion represents uncharted territory for

7 CERCLA cases.

8          The Court does not find the fact that the Public Contracts Code is state law to be

9 determinative.  The Ninth Circuit has recognized that non-CERCLA related state laws can impact

10 and have application to a CERCLA cleanup.  See McLellan Ecological Seepage Situation v. Perry,

11 47 F.3d 325, 329 (9th Cir. 1995) (explaining in the context of CERCLA § 113(h) that a lawsuit

12 brought to enforce minimum wage requirements would insufficiently related to the goals of a

13 CERCLA cleanup to qualify as a "challenge" to a CERCLA clean up); see also Fort Ord Toxics

14 Project, Inc. v. California EPA, 189 F.3d 828, 831 (9th Cir. 1999) (discussing *McLellan* and the

15 minimum wage example in the context of CERCLA § 113(h)).  Therefore, the question is how and

16 why the City contends and has concerns that the Public Contracts Code has application to this case

17 or would render any payment by the City for the feasibility study improper.

18          The City's supplemental briefing relies heavily on the statutory definition of a "public

19 works contract" and the stated purpose of the Public Contracts Code.  This is consistent with the

20 allegations in the Dec. Case, which also contended that the cleanup is a "public works project."

21 Although not cited in the supplemental briefing, based on the allegations in the Dec. Case, the

22 Court understands the City to contend that § 20164 of the Public Contracts Code is a bidding

23 process that would apply to Mission during the cleanup effort.  Section 20164 is part of Article IV

24 of the Public Contracts Code.  Therefore, the Court takes the City to contend that Article IV of the

25 Public Contracts Code applies to contracts made by Mission as part of the cleanup effort.  After

26 reviewing the relevant portions of the Public Contracts Code, the Court cannot conclude that those

27 provisions have any application to the feasibility study contract made by Mission pursuant to the

28 DTSC order.

First, as indicated above, Article IV of the Public Contracts Code is directed to "Cities." Section 20164, as correctly described by the City, sets a process for notices that invite bids for public projects. See Cal. Pub. Cont. Code § 20164.  However, § 20160 is entitled "application of article."  See Cal. Pub. Cont. Code § 20160.  That sections reads:  "The provisions of this article shall apply to contracts awarded by cities subject to Title 4 (commencing with Section 34000) of the Government Code."  Id.  In this case, the contract at issue is one that was awarded solely by Mission.  The feasibility study contract was not awarded by the City, and the Court is aware of no contracts relevant to this motion that were created, awarded, or entered into by the City.  Because the feasibility study contract was not awarded by the City, the plain language § 20160 shows that none of the Public Contracts Code Article IV provisions have any application.[2]  Cf. Satele v. Superior Ct., 7 Cal.5t h 852, 858-59 (2019) ("[T]he proper goal of statutory construction is to ascertain and effectuate legislative intent, giving the words of the statute their ordinary meaning. When the statutory language is clear, we need go no further.  We consider the language in the context of the entire statute and the statutory scheme of which it is a part, harmonizing provisions relating to the same subject matter, to the extent possible." (citations and quotations omitted)).

Second, the Public Contracts Code defines the term "public works contract" as "an agreement for the erection, construction, alteration, repair, or improvement of any public structure, building, road, or other public improvement of any kind."  Cal. Pub. Cont. Code § 1101.  This language is broad and could possibly apply to any number of cleanup expenses relating to the PCE plume.  However, the expense at issue was for a feasibility study to evaluate possible remedial actions.  A feasibility study is not an erection, construction, alteration, repair or improvement of anything, let alone any public structure, road, or other public improvement.  The City does not explain how exactly this particular expense represents a "public works contract" under the Public Contracts Code.  Assuming that the feasibility study fits within the various categories of a "public works contract" under § 1101, the preceding section of the Public Contracts Code is relevant.

---

[2] The Court notes that Article IV also contains a definition of "public project" and that definition could arguably include some of the cleanup work that Mission might contract to be done.  See Cal. Pub. Cont. Code § 20161.  Again, because the feasibility study contract was not awarded by the City, Article IV's definition of "public project" has no application to or effect on the feasibility study contract.

1    Section 1100.7 in part states:  "This code is the basis of contracts between most public entities in

2    this state and their contractors and subcontractors."  Although it does not actually define any

3    specific terms, § 1100.7 is in the first "definitional" section of the Public Contracts Code.  Given

4    its explanatory language and its placement in the first definitional section of the Public Contracts

5    Code, it is reasonable to read § 1100.7 as defining the general applicability of the Public Contracts

6    Code.  Because it establishes the general applicability of the Public Contracts code, it is through

7    the lens of § 1100.7 that the other definitions in the first definitional section, including § 1101,

8    should be viewed.  Cf. Satele, 7 Cal.5th at 858-59 (discussing statutory interpretation).  With the

9    context of § 1100.7, § 1101 should not be read as referring to "any agreement," rather, it should be

10   read as referring to "any agreement" between "most public entities in this state and their

11   contractors and subcontractors."[3]  So reading these sections together, the feasibility study contract

12   is not a "public works contract" under the Public Contracts Code because it is not an agreement

13   between a public entity and a contractor.

14          Third, and relatedly, the lynchpin of the City's argument appears to be that Mission stands

15   in the shoes of the City when Mission makes contracts in furtherance of remediating the PCE

16   plume.  The basis for this contention is unclear because the City cites no statutory or case

17   authority that directly supports placing Mission in the City's place.  It is true, as all parties

18   acknowledge, that through the February Order's application of CERCLA, the City is liable for

19   50% of all necessary cleanup costs to be incurred by Mission.  Since the only entities that were

20   found to be viable potentially responsible parties under CERCLA were Mission and the City, the

21   net effect of the February Order is that all reasonable and necessary cleanup costs will be evenly

22   split between Mission and the City (excluding the City's repairs of its sewers).  However, the

23   cleanup of the PCE plume is being driven by and occurring as a result of the actions of the DTSC.

24   DTSC conducted an investigation (the contours and extent of which are unclear) and determined

25   that Mission should cleanup the PCE plume.  To that end, DTSC and Mission entered into a

26   consent decree, and Mission has expended funds in compliance with the DTSC's directives and

27

28   _____
     [3] The Court is unaware of any authority that is inconsistent with this reading of § 1101 and § 1100.7, and the parties'
     briefing contains no contrary authority.

1   the consent order.  Mission will continue to expend funds until the PCE plume is sufficiently

2   remediated to the DTSC's satisfaction.  The funds expended by Mission are its own private funds,

3   not the City's funds.

4       CERCLA provides a mechanism for Mission to recover at least a portion of its

5   expenditures for necessary response costs.  Mission has fulfilled the first step in the process

6   because it obtained a declaration that the City is liable for 50% of the future necessary response

7   costs incurred by Mission in the cleanup effort.  See In re Dant & Russell, 951 F.2d 246, 249-50

8   (9th Cir. 1991).  The second step in the recovery process is to actually incur a necessary response

9   cost.  See id.  The third step is to produce that response cost to the City and demand payment of

10  50%.  If payment is challenged or rejected, the fourth step is to file an enforcement action against

11  the City to obtain 50% of the necessary response cost.  See 42 U.S.C. § 9613(g)(2).  Under either

12  the third or fourth step, Mission will recover 50% of the necessary responses costs (whatever

13  number that may be depending on the result of any challenges) that it expended.

14      This is not, as the City correctly points out, a typical judgment debtor relationship.  If no

15  additional costs are ever incurred, the City will pay Mission nothing.  Further, generally speaking,

16  a judgment debtor will owe a sum certain once a judgment is entered.  That is not the case in a

17  CERCLA matter like this.  The debt owed is not determined until the expense is actually incurred,

18  and even then, the expense itself is subject to limited challenges.  See New York v. Green, 420

19  F.3d 99, 111 (2d. Cir. 2005); United States v. USX Corp., 68 F.3d 811, 819 n.17 (3d Cir. 1995);

20  Bedford Affiliates v. Manheimer, 1997 U.S. Dist. LEXIS 23903, *67 (E.D. N.Y. Aug. 6, 1997).

21  In this context, it is perhaps more accurate to say that the City is not a judgment debtor so much as

22  a liable party.  The City is liable for 50% of every future necessary response cost incurred by

23  Mission.  It is possible that public monies will be spent to satisfy liability to Mission for costs

24  relating to projects that affect public improvements.  But the City is not paying for a contractor to

25  perform a public works project, indeed it is not paying a contractor at all (except of course for

26  sewer repairs), it is paying Mission.  Nor is the City paying Mission to clean up the PCE plume.

27  The City is paying its liability to Mission, as determined in a CERCLA proceeding, for a

28  necessary response cost incurred by Mission.  Therefore, given the obligations of Mission to

remediate the PCE plume, the CERCLA framework for recovering future necessary response costs, and the purpose of the funds that would be expended by the City to Mission, i.e. to satisfy its liability to Mission, and in the absence of citation to any contrary authority by the City, the Court cannot conclude that Mission stood in the City's shoes when it awarded the feasibility study contract. The City and Mission remain separate entities.

Finally, it is true that the Public Contracts Code, and in particular the public bidding process, "is intended to assure a healthy degree of competition, to guard against discrimination, favoritism, or extravagance, and to assure the best social, environmental, and economic result for the public." Michealis, Montanari & Johnson v. Superior Court, 38 Cal.4th 1065, 1073 (2006) (citing Pub. Cont. Code § 100); see also Amelco Elect. v. City of Thousand Oaks, 27 Cal.4th 228, 240 (2002). However, as explained above, the feasibility study contract was made by Mission, it was not a contract awarded by the City. The City is in essence a liable party to Mission, it is not a co-signee (de facto or otherwise) of any agreements made by Mission in furtherance of the cleanup effort/DTSC consent order. Because the Public Contracts Code does not apply, that code's goals and objectives are not implicated.[4]

The City has expressed concern that Mission may be unfairly favoring a particular environmental consulting service.[5] That is perhaps a concern, but it is in Mission's best interest to find a reputable environmental consulting service that can efficiently and cost-effectively cleanup the PCE plum. While the City will be expending funds, so too will Mission.[6]

---

[4] The Court notes that there is no dispute that any agreements that the City itself has to make as part of any cleanup effort are subject to the Public Contracts Code. Cf. Fort Ord, 189 F.3d at 831. Therefore, for the actual agreements made by the City, presumably the relevant provisions of the Public Contracts Code will be followed and the objectives of efficiency, promoting healthy competition, and avoiding favoritism with respect to contracts between public entities and their contractors will be met.

[5] This is just the Court's shorthand. The City expressly states that it is not alleging that Mission or its consultants have done anything improper or unethical.

[6] The Court notes that the City's concern that a contractor could be subject to a recovery action by a taxpayer does not seem likely. In addition to the analysis above, presumably a contractor will have been paid by Mission by the time Mission seeks to recover from the City. In that situation, the contractor received no public funds, rather, it received only Mission's private money. Thus, the contractor will have received no public money that a taxpayer could seek to recoup.

The City has also expressed concerns that a finding that the Public Contracts Code does not apply could somehow provide a safe harbor for unscrupulous public officials and entities to avoid the requirements of the Public Contracts Code.  The Court does not find that this is a realistic concern.  This case is not one in which the City engaged in a collusive or conspiratorial plan with Mission to get around the Public Contracts Code and favor its preferred contractors. Instead, this is a case in which Mission is under a binding DTSC consent order to clean up the PCE plume.  Full and strenuous litigation has determined that the City is a liable potentially responsible party under CERCLA, and, through CERCLA, the City is liable for 50% of the future necessary response costs incurred by Mission to cleanup of the PCE plume.  The Court cannot envision a scenario in which a public entity either loses a lawsuit or suffers a determination of liability through a court proceeding (particularly a CERCLA case), all in furtherance of a plot to favor a crony contractor and bypass the Public Contracts Code.  The posture of this case prevents it from aiding corrupt public entities or public officials to avoid the Public Contracts Code.

In sum, given the arguments presented, the Court concludes that the Public Contracts Code has no application to the contract for the feasibility study.[7]  Because the City makes no further challenges to the feasibility study, the Court concludes that the City is liable for 50% of the cost of the feasibility study.  The Court will grant Mission's motion and order the City to pay 50% of the costs.[8]

### ORDER

Accordingly, IT IS HEREBY ORDERED that:

1.    Mission's remainder of Mission's motion to enforce judgment (Doc. No. 184) is
      GRANTED;

---

[7] The parties did not address the City Charter or any bidding procedures mandated by the City Charter in a meaningful way.  It appears to the Court that the parties intend for their arguments regarding the Public Contracts Code to also apply (perhaps with slight variation) to the City Charter.  In the absence of separate and sufficiently developed arguments regarding the City Charter, the Court's basic analysis concerning the Public Contracts Code will apply to the City Charter.  Because the City did not award, create, or enter into the feasibility study contract, the City Charter has no application to or effect on the feasibility study contract.

[8] The only contract before the Court is the one awarded by Mission for the feasibility study.  For any further disputes regarding necessary response costs or motions to enforce, the Court would consult and follow the analysis of this order to the extent that the analysis would be relevant.

1    2.    The City shall pay Mission 50% of the $32,812.57 feasibility study fee; and

2    3.    The City shall pay Mission as soon as possible but no later than 30 days from service of

3          this order.

4

5    IT IS SO ORDERED.

6    Dated:   October 2, 2020

          _____
                    SENIOR   DISTRICT   JUDGE